**FILED**

NOV 2 4 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Ahmad B. Nurriddin,
740 Sixth Street, SW
Washington, DC 20024
202-488-0739

Civil Action No.

CASE NUMBER  1:04CV02052

v.

JUDGE: John D. Bates

Sean O'Keefe, Administrator,
National Aeronautics and Space Administration,
300 E Street, SW
Washington, DC 20546

DECK TYPE: Employment Discrimination

DATE STAMP: 11/24/2004



JURY ACTION

## COMPLAINT AND JURY DEMAND

COMES NOW, the Plaintiff, Ahmad B. Nurriddin, ("Plaintiff Nurriddin" or "Plaintiff")
for his Complaint, seeking equitable relief and damages on account of acts of discrimination and
reprisal taken by defendant for and alleges as follows[1]:

### Jurisdiction and Venue

1.  This action is an action for damages and equitable relief. This action is brought under Title
    VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a and 2000e-16, *et seq.*
    (hereafter "Title VII") and the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794a, *et
    seq.*, as amended (hereafter "Rehabilitation Act"). This Court has jurisdiction over the
    subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a), and 42 U.S.C §
    2000e.

2.  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), 29 U.S.C. §§ 791 and
    794a and 42 U.S.C § 2000e-5(f)(3), as the unlawful discriminatory actions complained of
    were committed within this judicial district and this is the district where the official
    capacity Defendant can be found.

---

[1] Plaintiff's motion seeking leave to amend his existing complaint in a related case (CA No. 99-
3401) was denied on November 18, 2004. Should the Order denying the amendment be
reversed, Plaintiff intends to withdraw this complaint, which has been filed to preserve his rights
as regards any applicable statue of limitations.

## Parties and Participants

3.   Plaintiff is a Muslim African-American male, (by religion, race, and sex) former
     employee[2] of the National Aeronautics and Space Administration ("NASA" or "the
     Agency"), and is a citizen of the District of Columbia.

4.   During the time relevant to this complaint, NASA Headquarters employed more than 500
     persons.

5.   Defendant Sean O'Keefe is the Administrator of NASA, an independent Federal agency,
     with its Headquarters located at 300 E Street, SW, Washington, DC 20546. Mr. O'Keefe
     is named in his official capacity, as Administrator of NASA.

6.   At all times relevant to this action, Plaintiff was employed either as (a) Education Outreach
     Specialist, Grade GS-12, Position Classification Series 301; or (b) Education Programs
     Specialist, Grade GS-13, Position Classification Series 301.

7.   All of Plaintiff Nurriddin's positions were with the NASA Educational Affairs Division
     (renamed Education Division), at the Agency's Headquarters location in Washington DC;
     however Plaintiff Nurriddin was detailed to the National Science Foundation (NSF) from
     February 1999 to February 2000 and assigned to the Headquarters Human Resources
     Division between February 2000 and March 2000.

8.   Malcom Phelps was, at relevant times, a first-level supervisor of Plaintiff Nurriddin and
     Assistant Director of the Education Division. Dr. Phelps is a white male. He was
     personally involved in actions and omissions directed towards Plaintiff Nurriddin.

9.   Sherri McGee was, at relevant times, an alternate first-level supervisor of Plaintiff
     Nurriddin and Assistant Director of the Education Division. Ms McGee is a white female.
     She was personally involved in actions and omissions directed towards Plaintiff Nurriddin.

10.  Franklin Owens was, at all relevant times, the second-level supervisor of Plaintiff
     Nurriddin and the Deputy Director of the Educational Affairs Division and or Director of
     the Education Division. Mr. Owens is a white male. Mr. Owens was personally involved
     in actions and omissions directed towards Plaintiff Nurriddin.

---

[2] Plaintiff was terminated on February 6, 2004. The defendant's unlawful termination is
the subject of a pending administrative complaint. The termination [for medical inability to
perform duties] was particularly devastating because the Plaintiff's disability claim was certified
by doctors at the Department of Labor's Office of Workers' Compensation Programs (OWCP) as
being a consequence of the harassment and discrimination in my NASA work environment.
NASA managers caused Plaintiff's disability; then terminated him because he was disabled.

11.   Alfred Castillo was, at relevant times, the Headquarters Human Resources Director, briefly he supervised Plaintiff Nurriddin. Mr. Castillo is a Hispanic male. Mr. Castillo was personally involved in actions and omissions directed towards Plaintiff Nurriddin.

12.   Vicki Novak was, at relevant times, the Associate Administrator for Human Resources and Education. Ms. Novak is a white female. Ms. Novak was personally involved in actions and omissions directed towards Plaintiff Nurriddin.

13.   Adina Kanefield was, at relevant times, the Attorney Advisor. Ms. Kanefield is a white female. Ms. Kanefield was personally involved in actions and omissions directed towards Plaintiff Nurriddin.

14.   Andrew Falcon was, at relevant times, the Attorney Advisor. Mr. Falcon is a white male. Mr. Falcon was personally involved in actions and omissions directed towards Plaintiff Nurriddin.

15.   Daniel Goldin was, at relevant times Administrator of NASA. Mr. Goldin is a white male. Mr. Goldin was personally involved in the omissions directed towards Plaintiff Nurriddin.

## **Exhaustion of Administrative Remedies**

16.   Plaintiff Nurriddin contacted a NASA EEO Counselor on or about September 16, 1997, and alleged *inter alia,* that because his race, sex, religion, and in reprisal for prior protected activity, he was subjected to a pattern and practice of continuing harassment and a hostile work environment when; (a) he received a "Fully Successful" performance rating on July 31, 1997; (b) he was denied 26.5 hours of compensatory time; and (c) on or around October 23, 1997, he experienced confrontations with Dr. Phelps. Plaintiff Nurriddin filed a formal complaint on or about December 11, 1997, (NCN-98-HQs-A011). RMOs identified in this complaint are Mr. Owens, Ms. McGee, and Dr. Phelps.

17.   Plaintiff Nurriddin contacted a NASA EEO Counselor on or about January 6, 1998, and alleged *inter alia,* that because his race, sex, religion, and in reprisal for prior protected activity, he was subjected to a pattern and practice of continuous harassment and a hostile work environment when; (a) he was not placed in classification series 1701 following his November promotion although others had been reclassified into that series; (b) he was denied an available work cubicle, which was given to a white female; and (c) he was informed that because he attended too many minority conferences his performance

3

evaluation would be lowered. Plaintiff Nurriddin filed a formal complaint on or about April 18, 1998, (NCN-98-HQs-A034). RMOs identified in this complaint are Mr. Owens, Ms. McGee, Dr. Phelps, Dr. Julius Dasch, and Ms. Laura Giza.

18. Plaintiff Nurriddin contacted a NASA EEO Counselor on or about May 21, 1998, and alleged *inter alia,* that because his race, sex, religion, and in reprisal for prior protected activity, he was subjected to a pattern and practice of continuous harassment and a hostile work environment when; (a) the Office of General Counsel interfered with the job series change process after he rejected an EEO complaint settlement offer; (b) his duties as manager of the National Physical Sciences Consortium (NPSC) were terminated; (d) Frank Owens confronted him in an aggressive and hostile manner after being notified of his EEO complaint; (e) he was removed from an agency presentation panel to be conducted at the Annual NAACP Convention; (f) his responsibility as primary liaison for several African American, Hispanic, and Native American conferences was shifted to others, even though those responsibilities were included in his performance plan; (g) Frank Owens sent an email message to co-workers, soliciting their co-operation in reporting on his activities at the NAACP Convention; and (h) he was accused of missing a performance evaluation meeting while on leave. Plaintiff Nurriddin filed a formal complaint on or about September 9, 1997, (NCN-98-HQs-A055). RMOs identified in this complaint are Mr. Owens, Ms. McGee, and Dr. Phelps.

19. Plaintiff Nurriddin contacted a NASA EEO Counselor on or about September 9, 1998, and alleged *inter alia,* that because his race, sex, religion, and in reprisal for prior protected activity, he was subjected to a pattern and practice of continuous harassment and a hostile work environment when; (a) he was not promoted to a non-competitive GS-14 position, even though he managed three programs [two of which were previously managed by GS-14 employees] and the promoted employee managed only one program; (b) he was stalked by Dr. Phelps and cornered in a manner that was intimidating; (c) Dr. Phelps issued him a letter of reprimand for allegedly failing to follow non-existent conference procedures; (d) Frank Owens implied that he would have to drop his EEO complaints before being considered for a detail to the National Science Foundation; (e) Dr. Phelps issued work conditions and terms that were not applied to any others; (f) Dr. Phelps restricted his leave usage; (g) Dr. Phelps issued him a letter of reprimand for allegedly for failing to adhere to the leave restrictions; (h) 15 hours of administrative leave that was requested for

4

preparation of EEO responses was denied and he was charged annual leave; (i) Dr. Phelps
berated his work performance and termed his EEO complaints "a crock of shit"; (j) he was
denied work-related travel to two minority-audience conferences. Plaintiff Nurriddin filed
a formal complaint on or about January 14, 1999, (NCN-99-HQs-A014). RMOs identified
in this complaint are Mr. Owens, Ms. McGee, and Dr. Phelps.

20.   Plaintiff Nurriddin contacted a NASA EEO Counselor on or about May 9, 1999, and
alleged *inter alia,* that because his race, sex, religion, disability (major depression and
anxiety) and in reprisal for prior protected activity he was subjected to a pattern and
practice of continuous harassment and a hostile work environment, that was being
coordinated and or condoned by upper management officials, when: (a) he was denied
travel opportunities and awards; (b) the Office of General Counsel caused a delay in the
processing of his office transfer/detail communications, accommodations requests (despite
excessive demands for medical documentation), discrimination complaint investigations;
(c) the University Affairs Officer position was created by the removal of Complainant's
official duties to upgrade the new position, which was structured in a manner that denied
fair consideration. Plaintiff Nurriddin filed a formal complaint on or about August 27,
1999, (NCN-99-HQs-A34). RMOs identified in this complaint are Mr. Owens, Ms.
McGee, Ms. Adina Kanefield, and Ms. Vicki Novak. The defendant was sanctioned
because he failed to investigate this complaint.

21.   Plaintiff Nurriddin contacted a NASA EEO Counselor on or about August 18, 2000, and
alleged *inter alia,* that because his race, sex, religion, disability (major depression and
anxiety) and in reprisal for prior protected activity he was subjected to a pattern and
practice of continuous harassment and intimidation - a hostile work environment, which
was being coordinated and or condoned by upper management officials, when: (a) his
reasonable accommodation request was continually mishandled; (b) his request for
reasonable accommodation was denied on October 23, 2000; (c) he was placed on absent
without leave (AWOL) status in June 2000; (d) his request for advanced sick leave was
denied on September 26, 2000; (e) his request for leave status verification to the Thrift
Savings Plan (TSP) was not provided; (f) he was denied administrative leave to meet with
the EEO Counselor; (g) he was denied administrative leave to respond to EEO matters; and
(h) his doctor was sent an excessive and demeaning request for medical documentation on
September 8, 2000. Plaintiff Nurriddin filed a formal complaint on or about December 22,

5

2000, (NCN-01-HQs-A20). RMOs identified in this complaint are Dr. Phelps, Ms. Novak, Mr. Alfred Castillo, Mr. Andrew Falcon, Mr. Michael Christensen, Ms. Roberta Gross, and Mr. Daniel Goldin. The defendant was sanctioned because he failed to investigate this complaint.

22.  The matters identified as NCN-98-HQs-A011; NCN-98-HQs-A034; NCN-98-HQs-A055; NCN-99-HQs-A014; NCN-99-HQs-A34; and NCN-01-HQs-A20 were the subject of a Final Agency Decision, dated April 15, 2002 and an EEOC Appeal Decision dated September 30, 2004.

## Background

23.  Plaintiff Nurriddin experienced a continuous pattern of discriminatory and retaliatory actions and practices in his employment tenure at NASA.

24.  Plaintiff Nurriddin was hired, via Contractor Conversion, on May 5, 1991, into the position of Publications Specialist, within the Educational Publications and Special Services Branch of NASA's Educational Affairs Division. Plaintiff Nurriddin was hired by the agency at the Grade GS-12/05 level with the Position Classification Series 301. Plaintiff Nurriddin was compensated at the rate of $42,266, upon his conversion to the civil services. His salary was increased by only $42, drastically less than white staff members who were also converted into the federal service. Plaintiff Nurriddin complained about discrimination, but he maintained high work performance standards.

25.  Prior to the time of his hire, Plaintiff Nurriddin had earned a Bachelors of Science Degree in Economics and a Masters of Public Administration degree. Prior to his career in the federal government, Plaintiff Nurriddin had worked, successfully, as in student program administrator at the Virginia Commonwealth University. Mr. Howard Golden, white male, was the Chief of the Educational Publications and Services Branch and served as Plaintiff Nurriddin's first-level supervisor.

26.  Ms. Pamela Bacon, a white female, was a contractor with the Teacher in Space Program component of the Oklahoma State University (OSU) contract prior to her hire. Ms. Bacon enjoyed a very close personal relationship with Mr. Owens. Mr. Owens became the Technical Monitor for the Teacher In Space Program on or around January 10, 1990. At that time Mr. Owens was the Deputy Director of the Educational Affairs Division.

27.  In October 1991, Plaintiff Nurriddin made an oral complaint to Mr. Owens about the discriminatory hiring of Ms. Bacon. Ms. Bacon was hired two grade levels higher than Plaintiff Nurriddin and was paid $10,140 more, although she had less education and less experience as a NASA contractor.

28.  Plaintiff Nurriddin's verbal complaint [to Mr. Owens], of unlawful discrimination based upon race, was a protected statement pursuant to Title VII of the Civil Rights Act of 1964, as amended.

29.  In response to the complaint, identified in ¶ 27, Mr. Owens transferred Plaintiff Nurriddin to the Elementary and Secondary Education Branch of the Educational Affairs Division, in October 1991.

30.  Around the same approximate time, Mr. Owens, Mr. Golden and unnamed others in the personnel office decided to abolish the Plaintiff's Publications Specialist position. The defendant failed to properly document the abolishment of the Publications Specialist position or the lateral transfer of Plaintiff Nurriddin.

31.  During the process of discussing Plaintiff Nurriddin's complaint, Mr. Owens indicated that Plaintiff Nurriddin was gaining a reputation as a "minority interest only advocate" and cautioned that the label was "career limiting".

32.  Mr. Owens told the EEO Investigator that Plaintiff Nurriddin had complained about different treatment of individual employees, but indicated that he did not remember him [Plaintiff Nurriddin] using the term discriminatory.

33.  The defendant maintained separate education programs; one mainly for white participants (the Education Division) and one mainly for "minority" participants (in the Equal Opportunity Programs Office). The programs were "kept separate by design". General Spence Armstrong acknowledged that the defendant knowingly and intentionally maintained and operated dual education programs "because the constituents were very different".

34.  Dr. Edward Anderson, an African American male, became Plaintiff Nurriddin's first-level supervisor when he was transferred from the Education Publications and Special Services Branch to the Elementary and Secondary Education Branch. Plaintiff Nurriddin was assigned the duties of an Education Program Manager; however he remained officially titled a Publications Specialist until February 1995. The improper classification of Plaintiff Nurriddin was in violation of standard federal classification procedures.

35.   The range of grades for the defendant's employees with duties similar or equivalent to those being performed by Plaintiff Nurriddin was grades GS/GM-13 through GS/GM-14, but he was retained as a GS-12 until November 1997.

36.   On March 3, 1994, Plaintiff Nurriddin complained to General Spence Armstrong, Associate Administrator for Human Resources and Education about the unlawful discrimination in his initial hiring at grade GS-12 and that he was subject to continuing unlawful discrimination in the failure of the Agency to subsequently promote him. General Armstrong confirmed that he met with Plaintiff Nurriddin on at least two occasions and that Plaintiff Nurriddin discussed, "his non-promotion".

37.   According to Dr. Anderson, he and Mr. Owens were aware of Plaintiff Nurriddin's protected activity disclosures to General Armstrong. Dr. Anderson's affidavit to the EEO Investigator stated, "I am aware that Mr. Nurriddin raised the issue of disparate treatment with General Armstrong. I believe sometime in 1994. The reason Frank Owens was upset was that Mr. Nurriddin had an issue that he did not attempt to discuss with his supervisors within the Division first before going to see Gen. Armstrong".

38.   Dr. Anderson's admission is a direct evidence indicator of the discriminatory and retaliatory intent and motivation of the defendant.

39.   On or about February 19, 1995, NASA changed the position description and title in Nurriddin's official personnel records from Publications Specialist to a new title of Education Outreach Program Specialist, therein formally documenting the substantial alteration and increase of his job duties and responsibilities; however he remained classified as a GS-12 in the 301 series.

40.   In February 1995, Plaintiff Nurriddin reported an Agency-purchased laptop computer with ethnic and racially offensive material to his first-level supervisor Dr. Anderson. The computer desktop contained document icons entitled, "Racist jokes and stories" and "WAMERICAN HERITAGE". The Agency-purchased laptop computer had been on long-term loan to Dr. Malcom Phelps, a white male.

41.   Prior to the 1995 reorganization of the Education Division, Mr. Owens told Plaintiff Nurriddin that he would be "directed reassigned" to the Goddard Space Flight Center, if he [Plaintiff Nurriddin] wanted to continue managing the same programs. Mr. Owens indicated that Plaintiff Nurriddin would have to make a "fresh start" and manage several university level programs if he wanted to remain at NASA Headquarters. The "fresh start"

was a reference to Plaintiff Nurriddin's EEO complaint and was clarified by Mr. Owens' remarks about the termination of Ms. Anne Ayres after she filed an EEO complaint.

42.   No other employee in the Education Division was given an ultimatum to either accept a completely different set of programs or be "directed reassigned". Ms. Ayres was the only other Education Division employee to file an EEO complaint and she was terminated.

43.   Mr. Owens implemented a lateral transfer and Plaintiff Nurriddin was assigned to manage the Graduate Student Researchers Program (GSRP) and the National Physical Sciences Consortium (NPSC) training grant. Ms. Elizabeth Massey, non-Muslim, white female, Grade GS-14, had previously managed the GSRP. Ms. McGee, non-Muslim, white female, GS-14 had previously managed the NPSC training grant. Plaintiff Nurriddin was also assigned tasks with the Space Grant program.

44.   The GSRP was an agency-wide fellowship with a $22,000 annual stipend. Approximately 400 students participated in the GSRP program in 1995. There were five African American, four Hispanic, and one Native American student awardees participating in the GSRP in 1995. Ms. McGee admitted that, when Plaintiff Nurriddin became the national program manager for the GSRP level of "participation for underrepresented groups was pretty poor."

45.   Because of the Education Division's poor record of participation by African American, Hispanic, and Native American students in the GSRP, the Agency had initiated a "dual program", the Underrepresented Minority Focus GSRP program, which was being managed in 1995, by the Minority University Division of the Office of Equal Opportunity Programs. The Underrepresented Minority Focus GSRP and the GSRP were two graduate student programs, which were operated by different NASA offices. Both offices planned and implemented education programs that were primarily segregated by the race of the participants.

46.   In late July and again in early August 1996, Plaintiff Nurriddin requested funding to attend the Advancing Minorities in Engineering Conference (AIME) in Nashville, TN. AIME is an association of Engineering Deans at Historically Black Colleges and Universities. Plaintiff Nurriddin had been invited by AIME to make a presentation during the Conference.

47.   Dr. Julius Dasch, non-Muslim, white male, was permitted travel to China. Dr. Dash's travel to China was allegedly to accept a "prestigious" award. According to Dr. Dasch, his

travel began on September 30, 1996, and he spent six days on personal leave, in Japan, prior to traveling to China.   After completing his official travel, Dr. Dasch remained in China on personal leave, for an additional seven days.

48.   The time that Dr. Dasch spent in Japan was not "official time", however the Agency authorized funding for his early departure, in a manner that permitted his personal travel, while denying Plaintiff Nurriddin's travel to make a work-related presentation to the AIME Conference, allegedly because of a lack of funds.  Dr. Dasch stated that the agency spent six thousand dollars on the "trip".

49.   Ms. McGee told the EEO Counselor, that, "the funding that became available was taken from the next fiscal year as the trip crossed over into the next fiscal year.   That was a highly unusual circumstance.  In the 10 plus years that I have been in the division, that is the only time I have seen that happen." The agency contends that it estimates that only three thousand dollars was spent on Dr. Dasch's trip.

50.   During the same approximate period that the Agency denied Plaintiff Nurriddin's travel to the AIME Conference, Dr. Dasch traveled to Japan and China and four other non-Muslim employees Pam Bacon [white female], Rick Smith [white male], Laurel Kayse, [white female] and B. J. Bluth [white female] were authorized and funded to travel to Hampton, VA.

51.   Although the agency was obligated to retain the travel records after the complaint was filed, the agency destroyed the travel records.

52.   Plaintiff Nurriddin's duties as Education Program Manager during the performance period July 1, 1996, through June 30, 1997, included a Job Element entitled, "Serves as the Program Manager for other Education Division training grants inclusive of the National Physical Sciences Consortium (NPSC)".

53.   Ms. McGee had previously managed the NPSC training grant.  Prior to Plaintiff Nurriddin becoming the NPSC program manager, there were fiscal problems with the NPSC grant; including but not limited to charging the agency for students who did not participate in the program; claiming $1,000 in travel costs for students who were traveling less than 15 miles to the NASA Center; and billing the agency $10,550 for a student when the actual costs were $3,814.  Ms. McGee became the Assistant Director and interfered with Plaintiff Nurriddin's management of the NPSC training grant during the time that Plaintiff Nurriddin had raised substantial questions regarding the accuracy of NPSC's reports to the

agency. Ms. McGee's involvement with NPSC officials served to create a liability for the
agency and undermine Plaintiff Nurriddin's performance of his duties.

54.   Plaintiff Nurriddin contacted the EEO Office on or around November 5, 1996, to file his
      second complaint with respect to his complaints regarding unlawful discrimination based
      upon his religion, race, sex, and unlawful retaliation for protected activities regarding the
      above mentioned, (a) denied travel; (b) denied non-competitive promotion; (c) interference
      in his job performance; and (d) instances of harassment and intimidation by Mr. Owens
      and Dr. Phelps.

55.   July 1997, Plaintiff Nurriddin was issued a lowered performance evaluation [Fully
      Successful], by Dr. Phelps. Plaintiff Nurriddin's mid-term evaluation was highly
      successful. The lowered evaluation was based upon input from Ms. McGee, Mr. Owens,
      and Dr. Dasch.

56.   The lowered rating was issued ten days after a "verbal altercation" between Dr. Phelps and
      Plaintiff Nurriddin. The incident was instigated by Dr. Phelps because of Plaintiff
      Nurriddin's proposal to include Ms. Valerie Ambrose, in conjunction with his presentation
      at the NAACP Youth Convention. Ms. Ambrose, a young African American student,
      named the Mars Rover in a nation-wide competition. The Mars Rover, Sojourner, landed
      on Mars in July 1997. Plaintiff Nurriddin was commended by Mr. Kwesi Mfume,
      President and CEO of the NAACP for his contributions to the Youth Convention.

57.   Dr. Phelps stated that one of the reasons that he became frustrated working with and
      supervising Mr. Nurriddin was "because of the number of unfounded claims that he made
      about me." Plaintiff Nurriddin had reported the racially insensitive icon on Dr. Phelps'
      laptop computer. Dr. Phelps was specifically named in each of the seven discrimination
      and retaliation complaints that Plaintiff Nurriddin filed between 1996 and 2001.

58.   Dr. Dasch was consulted in the determination Plaintiff Nurriddin's 1997 evaluation.
      Afterwards, Dr. Dasch told an EEO Investigator that he served as Plaintiff Nurriddin's
      "informal supervisor".

59.   In or around November 1997, Dr. Dasch told Plaintiff Nurriddin that Dr. Phelps had stated
      that Plaintiff Nurriddin's performance evaluation would be lowered because he [Plaintiff
      Nurriddin] attended "too many minority conferences". Conflicting statements were
      provided by Dr. Phelps and Dr. Dasch regarding their conversations. Dr. Dasch stated that
      he recalled a conversation with Dr. Phelps during which it was discussed that Plaintiff

Nurriddin was attending a lot of minority conferences.  Dr. Phelps told the EEO Counselor that he did not think that he and Dr. Dasch had discussed Mr. Nurriddin's attendance at minority conferences or the number of conferences he attended and said he never told anyone that Mr. Nurriddin attended too many minority conferences and that no one ever told him that they felt that Mr. Nurriddin attended too many minority conferences.

60.    In 1997, Plaintiff Nurriddin received numerous commendations for his work on behalf of the agency, including: (a) August 22 – "GSRP Success" from Dr. Gerald Soffen, Director of University Program at the NASA Goddard Space Flight Center; (b) August 5, - "Thank you for contribution to the Youth and College Division convention program" from Mr. Kwesi Mfume, President and CEO of the NAACP; (c) December 16, - "Thank you for time and effort involved in speaking at the National Conference" from Ms. Natalie Bollinger, Director of Conference Planning at the American Indian Science and Engineering Society.

61.    On several occasions an issue evolved regarding Plaintiff Nurriddin and minority conferences, one such incident was when Mr. Owens arranged the transfer of primary liaison responsibility for several national African American, Hispanic, and Native American organizations to another office.  In completing his work plan, Plaintiff Nurriddin, had been the primary agency contact for many of the organizations.

62.    NASA employees in the position classification series 1701 received greater award amounts than Plaintiff Nurriddin.  Since 1994, it was known that Plaintiff Nurriddin was seeking to be reclassified to the 1701 series.  Plaintiff Nurriddin provided Mr. Cliff Woods, a personnel specialist in the Human Resources Office, with documentation to justify his being reclassified in the 1701 series.  Mr. Woods told the EEO Counselor that he stopped working on the 1701 reclassification because the General Counsel's Office told him to stop.  Mr. Woods never completed the evaluation of the documentation provided by Plaintiff Nurriddin.  On another occasion, Mr. Woods told the EEO Counselor that Plaintiff Nurriddin lacked the "required education" to be placed in the 1701 series, because he did not have 24 hours in education coursework.

63.    The "required education" justification was merit less because Ms. Marra was placed in the 1701 series without the "required education".  According to Ms. Marra the Personnel Office and Mr. Owens "reclassified many of us to the new Education Specialist code" in December 1996.

64.  On July 11, 1997, Ms. McGee sent an email message announcing an available space, indicating that "straws would be drawn" if more than one person expresses an interest. When Plaintiff Nurriddin expressed interest in another work cubicle that became available Ms. McGee told him that the work cubicle would be assigned by lottery. Plaintiff Nurriddin reminded Ms. McGee that he was still interested in being assigned the work cubicle the defendant chose to allocate the cubicle grade level/seniority to grant the cubicle. The cubicle that the defendant denied to Plaintiff Nurriddin was given to a white female.

65.  When questioned, Ms. McGee denied telling Plaintiff Nurriddin that the space would be awarded by lottery; however Mr. Owens told the EEO Counselor that he advised Ms. McGee not to use the lottery method. The method chosen to allocate the cubicle virtually eliminated Plaintiff Nurriddin's chances to receive the space.

66.  On April 30, 1998, a segment of Plaintiff Nurriddin's work responsibilities [NPSC] was removed by Mr. Owens. The removal was for retaliatory and discriminatory reasons. Four months earlier, Plaintiff Nurriddin had recommended that the NPSC grant be terminated because of fiscal discrepancies. Plaintiff Nurriddin's recommendation was endorsed by an attorney on the General Counsel staff and the NASA Grants Officer, but it was vetoed by Mr. Owens and Ms. McGee. Two years earlier, Ms. McGee had interfered with Plaintiff Nurriddin's management of the NPSC grant, which was a claim in a prior EEO complaint.

67.  According a communication from the NASA Inspector General, NASA ended the NPSC grant in May 1998. The termination of Plaintiff Nurriddin as the manager of the NPSC training grant, on April 30th, was clearly discriminatory and retaliatory.

68.  The removal of Plaintiff Nurriddin's work duties was done to undermine his requests for promotion and to diminish/eliminate his potential for awards that were comparable to his co-workers.

69.  The defendant sabotaged Plaintiff Nurriddin's GSRP work effort through drastically reducing the funding for the program. The GSRP original allocation in 1995 [the year Plaintiff Nurriddin was laterally transferred to manage the GSRP] was $7,348,288. The allocation in 1996 was $6,245,000; the allocation in 1997 was $5,423,229; and the allocation in 1998 was $4,974,814.

70. The cuts prompted Dr. Henry Britton, Director of the Research Program Management Division to "seriously question the continued participation" in the program by his office. Dr. Britton cautioned that the proposed reduction in program funding would "produce disastrous results." He added, "This proposed reduction occurs at a particularly ironic time, at which NASA is publicly touting the importance of education, yet privately undercutting one of the most successful programs promoting it."

71. The defendant failed to provide Plaintiff Nurriddin with adequate staff support after the GSRP assistant, Ms. Barbara Toyer left the agency.   The defendant's delay in providing staff support and information that was missing from the Space Science awardee files caused a backlog in GSRP grant processing. After admonishing Plaintiff Nurriddin (June 1997), the defendant dedicated a contractor [Marie Mercy] to grants processing (December 1997). Ms. Mercy had been hired on contract to the Education Division prior to June 1997. The delayed provision of grant processing assistance was an intentional effort to undermine Plaintiff Nurriddin's work.

72. On or about June 12, 1998, via an email message, Mr. Owens solicited Pam Bacon and Kevin Durham to "report on" Plaintiff Nurriddin during the NAACP Convention.

73. In July 1998, the Associate Administrator for Human Resources and Education, Ms. Vicki Novak told the EEO Counselor that management was looking in to the possibility of reassigning Plaintiff Nurriddin.

74. According to the EEO Counselor, Mr. Owens proposed a one-year IPA, which would not be a permanent transfer and therefore could not be used as the foundation for settling the EEO complaints.

75. Mr. Owens told the EEO Counselor that the transfer would respond to the Complainant's [Plaintiff Nurriddin] growing health concerns and would provide time to find a permanent placement for him outside Code FE.

76. In August 1998, Dr. John Echeverry, Clinical Psychologist, wrote to Ms. Novak and recommended that Plaintiff Nurriddin take two-weeks of sick leave because of the stressful work environment. Dr. Phelps responded to Dr. Echeverry's recommendation and approved the leave.

77. In August 1998, Plaintiff Nurriddin wrote a letter to Ms. Novak, therein detailing the long-standing concerns that originated with the disparate conversion and continued though the failure to promote and subsequent discriminatory, retaliatory and harassing actions that

14

were constant features of his work environment. Dr. Phelps answered the letter on Ms. Novak's behalf.

78.   Plaintiff Nurriddin filed a report with the United States Protective Police because he was stalked and intimidated by Dr. Phelps after returning from sick leave.

79.   In August 1998, a non-competitive promotion was granted to a lesser qualified co-worker, Mr. Gary Gans.  Mr. Gans is not a member of Plaintiff Nurriddin's protected classes but he provided testimony, favorable to management, during one of the complaints filed by Plaintiff Nurriddin.  There was close timing between Mr. Gans' testimony and his promotion.

80.   In August 1998, Plaintiff Nurriddin was issued a letter of reprimand, in part, for failure to follow procedures regarding conference attendance as they related to attending the Blacks in Government Conference.  The charge was baseless, because there were not any procedures for attending conferences established.

81.   In September 1998, Mr. Owens told Plaintiff Nurriddin that Legal Counsel advised that Plaintiff Nurriddin's request for a detail or office transfer needed to be put in writing to the EEO Office.  The Legal Counsel conditions were the direct opposite of Mr. Owens' earlier statements to the EEO Counselor (¶¶ 74 & 75).

82.   Plaintiff met with Ms. Ocella Hall, Deputy EEO Director on or about September 13, 1998.  Ms. Hall stated that the requirement, specified by Mr. Owens, amounted to requiring Plaintiff Nurriddin to withdraw his EEO complaints before he would be granted a detail.  In November 1998, the EEO Director, Mr. George Reese, indicated that Mr. James Gorman, the Deputy Associate Administrator for Human Resources and Education, reiterated the demand that Plaintiff Nurriddin drop his EEO complaints in order for his NSF detail request to be considered.

83.   After returning from the August sick leave, Plaintiff Nurriddin was: (a) placed on strict leave restrictions in September 1998; (b) had his work was closely scrutinized; (c) issued two letters of reprimand; (d) denied travel opportunities to two minority conferences; and (e) had his request for administrative leave for EEO related business partially denied.

84.   In September 1998, when Plaintiff Nurriddin was placed on leave restrictions he had more than 50 hours of use-or-lose leave in his leave account and he had complied with the office procedures for using his leave.

85. In October 1998, Dr. Phelps berated his EEO activities, terming them "bull shit", during Plaintiff Nurriddin's performance review. Dr. Phelps stated that he apologized when Plaintiff Nurriddin questioned him about his profanity. Dr. Phelps told Plaintiff Nurriddin to "go file another complaint." During the entire meeting Dr. Phelps was agitated, stating that he had to produce a report for the Deputy Administrator regarding my complaints, he did not apologize.

86. In October 1998, NASA Administrator Daniel Goldin, met with Plaintiff Nurriddin regarding his discrimination and harassment complaints. Mr. Goldin expressed his perception of the visual effects of the harassment on Plaintiff Nurriddin when he commented that earlier in the day, Plaintiff Nurriddin, "looked like crap".

87. After being directly advised of the adverse impact of Plaintiff Nurriddin's work environment, Mr. Goldin failed to take any corrective action after visualizing the adverse effects to Plaintiff Nurriddin's physical appearance and being personally informed of the discrimination, harassment, and retaliation that Plaintiff Nurriddin was experiencing.

88. A partial report of Plaintiff Nurriddin's EEO status was provided to Mr. Goldin's office by Ms. Novak. Ms. Novak also provided a written response on behalf of Mr. Goldin.

89. In November 1998, Mr. Reese advised Plaintiff Nurriddin that with: (a) the letters of reprimand issued in August and October; (b) the strict work conditions and leave restrictions issued in September; and (c) Ms. Novak's unwillingness to consider his request to accept the detail being offered by the National Science Foundation (NSF) without dismissing the EEO complaints, he was being slated for progressive disciplinary action - including termination.

90. On December 2, 1998, Dr. Luther Williams, Assistant Director for Education and Human Resources at the NSF wrote Ms. Novak to formally request that Plaintiff Nurriddin be permitted to participate in a one-year detail.

91. The defendant utilized various tactics, including offering a 60-day detail to the NASA Career Center, while maneuvering to delay the NSF detail and or to terminate Plaintiff Nurriddin's career.

92. Plaintiff Nurriddin began his one-year detail to NSF after a series of inquiries from Congresswoman Eleanor Holmes Norton.

93.  Plaintiff Nurriddin's request to Mr. David Weston, Director, Headquarters Equal Opportunity and Diversity Management, for the assistance of his office in expediting the requested reasonable accommodation, was not addressed.

94.  When asked about agency procedures and policies for reasonable accommodation, supervisory personnel specialist, Paulette Quinn Britt, stated in 2001, that "headquarters does not have specific policies".

95.  When Plaintiff Nurriddin completed his NSF detail he was assigned to Mr. Castillo until March 2000.  Mr. Castillo acknowledged that he was (a) aware of Plaintiff Nurriddin's accommodation request; (b) that the agency took "a long time to review" the request; and (c) the Office of General Counsel took over the response to the [reasonable accommodation] request.

96.  In response to medical documentation from Plaintiff Nurriddin's physicians, Ms. McGee drafted a letter to Plaintiff Nurriddin indicating that "the letters from his doctors 'provide the documentation required for sick leave' for the period 4/20/00 to 5/12/00".  On May 12, 2000, Mr. Andrew Falcon, sent an email message addressed to Ms. McGee and others, "I am not sure that we should be conceding that his [Plaintiff Nurriddin's] documentation is adequate, because we don't really think that it is, and accepting it here means that we may have to accept any similar documentation in the future."

97.  On May 15, 2000, Mr. Castillo sent an email message to Dr. Phelps, Ms. McGee, Mr. Falcon, Mr. Hillard Harrison, and Ms. Quinn indicating, "It seems that Ahmad intends to resist working in FE in any way he can, witness today's visit to the IG, and now this leave request, and tomorrow, who knows what else."

98.  In May 2000, Plaintiff Nurriddin was transported, via ambulance, to the George Washington University Hospital Emergency Room, with a suspected cardiac arrest.

99.  In response to four requests for documentation, Plaintiff Nurriddin's doctors, (Drs. Scott Schroth and John Echeverry) provided medical extensive documentation to the defendant regarding his health conditions and status.  On June 2, 2000, Dr. Stephen Conway, NASA Senior Medical Director, advised "Medical information has been supplied to NASA Human Resources, by John Echeverry, PhD and by W. Scott Schroth, M.D., M.P.H., Associate Professor of Medicine, George Washington University, both practitioners in the care of Mr. Nurriddin.  It is their opinion that Mr. Nurriddin has a medical condition, which impacts his ability to perform his work.  It is also their opinion that working

17

conditions at NASA aggravates this disorder. Accordingly, they recommend a transfer to a less stressful work site for Mr. Nurriddin and continued treatment for his illness. On the basis of their reports, I accept this opinion by these qualified Practitioners."

100. Three days later (June 5, 2000), Mr. Castillo sent an e-mail message to several agency officials, wherein he urged that Dr. Conway's opinion be ignored.  Dr. Conway's review was termed a "professional cop-out" and Mr. Castillo suggested that the defendant consider requesting a second opinion of the agency's own doctor.

101. Mr. Castillo did not have adequate medical expertise to question the medical reports; however he and other NASA managers continued to demand additional medical documentation.

102. On June 6, 2000, Doris Wojnarowski sent an email message to Dr. Phelps and Mr. Falcon advising, "he [Plaintiff Nurriddin] should be coded as AWOL and if he provides appropriate documentation it can be later changed to sick leave.  (Once you approve sick leave it is very difficult to then change to AWOL.)  We should also start disciplinary action for his failure to follow leave request procedures."

103. On June 16, 2000, Dr. Phelps sent a message to Mr. Castillo, Mr. Falcon, and Mr. Harrison, "Angela hand-delivered a letter from Dr. Echeverry re: Ahmad.  It's undated but was faxed on Wed. [June 14] at 11:45 am...Per discussion with you all, I had planned to count Mr. Nurriddin as AWOL as of last Mon." "Please advise if I should proceed & count him AWOL or charge him sick leave for the entire two-week period. Need you're advice ASAP so I can turn in the time sheet.

104. In accordance with the Wojnarowski email, Dr. Phelps wrongfully and willfully placed Plaintiff on AWOL, despite receiving appropriate documentation, prior to submitting the time and attendance records.

105. Plaintiff Nurriddin was intentionally and wrongfully placed on AWOL June 13 - 16, 2000.

106. Plaintiff Nurriddin applied for and was accepted in the NASA Voluntary Leave Transfer Program.  On June 19, 2000, Mr. Harrison sent an email message stating, "I think we have a problem since Mr. N (Plaintiff Nurriddin) has been accepted in the leave transfer program." Mr. Castillo's email response was "Yegads!  Will we ever finish with this guy? I was aware of and did sign the leave transfer authorization, but that's because I'm working on many different actions during the day and just didn't think through this one when I was signing it... For the time being, I'm going to let the AWOL stand as charged."

107. Ms. Bernadette Keane, NASA HQ Payroll Manager told the EEO Counselor that she questioned the AWOL classification, but the managers were insistent.

108. Agency managers monitored the financial status of Plaintiff Nurriddin, as indicated, in part, by Dr. Phelps' June 29, 2000, email message to Mr. Falcon, Ms. Quinn, Mr. Castillo, and Mr. Harrison, "He's nearly out of leave. As of the beginning of the current pay period he only had 39 hours of AL that had been donated. Unless more has been donated he won't get a full paycheck."

109. On July 6, 2000, Mr. Falcon's email message urged, "put him on AWOL; prepare charges for failure to follow the leave restriction and AWOL; as I understand it, he doesn't have much of a disciplinary record, so unless someone has a better idea, short term suspension (5-10 days ?) is probably the best place to start … even considering the litigation…" Plaintiff and the defendant were in Mediation for the instant case.

110. On August 8, 2000, Mr. Harrison's email message indicated, "…I guess this week might be key to know if there will be a settlement [from the mediation], but if it doesn't happen, we may want to take another look at how to proceed." The mediation was unsuccessful.

111. On August 10, 2000, Mr. Castillo's email message read, "Absent compelling reason for further accommodations, medical or otherwise, it's time to take corrective action for the continuing absence without acceptable reasons. I will have my staff get up to speed and get the action started again."

112. On August 30, 2000, Plaintiff Nurriddin requested 150 hours of advanced sick leave. Still under the care of his doctors, Plaintiff Nurriddin returned to work on September 5, 2000, but was provoked into a confrontation with Dr. Phelps when he sought to attend a meeting that was scheduled with the EEO Counselor.

113. Plaintiff Nurriddin was placed on AWOL on from September 12, 2000, through December 1, 2000. His advanced sick leave request was denied on September 26, 2000, although agency guidelines regulating advanced sick leave do not provide limitations on the granting of advanced sick leave.

114. Under contract to the United States Department of Labor Office of Workers' Compensation Programs (OWCP), Dr. Theodore Postolache, a psychiatrist at the National Center for the Treatment of Phobias, Anxiety and Depression, diagnosed Plaintiff Nurriddin with Major Depression on November 11, 2000. Dr. Postolache concluded that there was a casual

relationship between Plaintiff Nurriddin's depression and an employment related incident. Plaintiff Nurriddin's OWCP claim was accepted.

115. On September 14, 2001, Ms. Novak's email message, entitled 'Favorite Subject' to Ms. McGee, Mr. Castillo, Mr. Owens, and Dr. Phelps read, "AN, I really do not want to offer him another job in F. He's not qualified and he'll just create major problems if he should accept. A while back, Bob Stephens suggested that we (FE) take him back, give him work (they have a job for him) and document it if he can't handle it... I think it is better to work this at other than our level [Novak & Stephens were Associate Administrator for Human Resources and Education and Deputy General Counsel], if we can."

116. Mr. Castillo's September 18, 2001, email response read, "legal counsel, below Bob's level, asked if CP could find him a job and make an offer to close off the OWCP claim (expecting that he won't take it and therefore lose his case at OWCP). That claim, backed by his doc and supported by OWCP docs, is that he CANNOT work in FE because that's the source of his 'medical' problem. The offer is a tactical ploy to chip away at all his complaints..."

117. Mr. Castillo and Ms. Novak signed affidavits for the EEO Investigator on September 18, and 19, 2001, respectively. Ms. Novak's September 20, 2001, email to Mr. Mark Batkin, Mr. Harrison, Mr. Owens, Mr. Castillo, Mr. Stephens, Ms. McGee, and Dr. Phelps read, "Ladies and gents, I am asking Denise Gross of my staff, to set up a meeting with all of us, to discuss the AN 'case' in terms of where we are going on this. It has become clear to me in the last few days that everyone is NOT on the same wavelength in terms of strategy. I think a meeting of this nature will be constructive and helpful. From there, we will take whatever action is necessary."

118. On October 9, 2001, Pamela Covington, sent an email message, "if a detail assignment is an acceptable offer [for Plaintiff Nurriddin], then there is a strong possibility at GSFC." Ms. Novak responded, "I would say that a detail is NOT appropriate at this point, wouldn't you? Therefore, looks like we are heading toward the FE option." Mr. Harrison added, "A detail does nothing positive for us except delay whatever will happen. So moving ahead with FE appears to be the best way to proceed at this point."

119. Ms. Novak's October 10, 2001, email message to Mr. Harrison, Mr. Batkin, Mr. Owens, and Mr. Castillo stated, "Frank stopped by earlier this a.m. and he is good to go with the 'FE approach' we discussed." Mr. Harrison replied, "I've already talked with Frank [he

stopped by after meeting with you]. I also spoke with Paulette and left a message for Mark Batkin. The next step is to develop a latter to AN and workman's comp and see what happens."

120. Plaintiff Nurriddin's OWCP benefits were terminated. The OWCP officials restored the benefits after reviewing the case following a conference call with staff in Congresswoman Eleanor Holmes Norton's Office.

## COUNT I

[Unlawful Discrimination in Disciplinary Actions]

121. Paragraphs 1 through 120 are herein incorporated by reference.

122. Through its actions, in issuing Plaintiff Nurriddin Letters of Reprimand on or about: (a) August 26, 1998; and (b) October 30, 1998, which such Letters of Reprimand misrepresented material facts regarding the job performance and conduct of Plaintiff Nurriddin, the Agency engaged in unlawful discrimination against Plaintiff Nurriddin based upon his of his race, religion, and his sex, African-American male.

123. The issuance of such Letter of Reprimand resulted in, *inter alia*, reduced chances by Plaintiff Nurriddin of being appropriately promoted in a timely manner and receipts of other favorable personnel actions, with accompanying loss of wages and associated benefits.

124. Through its placement of Plaintiff Nurriddin on absence with out leave (AWOL) on June 13- 16, 2000 and September 12 to December 1, 2000; such placement was wrongful and despite receiving information and inquiry that should have caused non-placement in the AWOL status.

125. The agency knowingly and intentionally engaged in discriminatory acts against Plaintiff Nurriddin.

126. As a direct and proximate result of the Agency's unlawful and discriminatory actions, Plaintiff Nurriddin has suffered and will continue to suffer considerable stress, embarrassment, loss of enjoyment of life, and loss of salary and other material benefits, including prospective retirement benefits.

## COUNT II

[Unlawful Discrimination in Promotions]

127. Paragraphs 1 through 126 are herein incorporated by reference.

128. In October 1991, Mr. Owens laterally transferred Plaintiff Nurriddin from the Education Publications and Special Services Branch into the Elementary and Secondary Education Branch with the alleged purpose of allowing Plaintiff Nurriddin to be promoted, after his protected disclosures.

129. Through its actions, in delayed promotion to the GS-13 and in continuously refusing and failing to promote Plaintiff Nurriddin to at least Grade GS-14 and/or Grade GS-15, while Plaintiff Nurriddin was serving productively, successfully, and beneficially on behalf of the defendant. Such unlawful discrimination was based on race and sex (in the non-competitive promotions of Galloway and McGee); sex and religion (in the non-competitive promotion of Glasco); and race and religion (in the non-competitive promotion of Gans) was not practiced by the Agency against similarly situated others, who did receive promotions in a timely manner.

130. The agency knowingly and intentionally engaged in discriminatory acts against Plaintiff Nurriddin.

131. As a direct and proximate result of the Agency's unlawful and discriminatory actions, Plaintiff Nurriddin has suffered and will continue to suffer considerable stress, embarrassment, loss of enjoyment of life, and loss of salary and other material benefits, including prospective retirement benefits.

## COUNT III

[Unlawful Retaliation in Disciplinary Action]

132. Paragraphs 1 through 131 are herein incorporated by reference.

133. Through its actions, in issuing Plaintiff Nurriddin Letters of Reprimand on or about: (a) August 26, 1998; and (b) October 30, 1998, which such Letters of Reprimand misrepresented material facts regarding the job performance and conduct of Plaintiff Nurriddin, the Agency engaged in unlawful discrimination against Plaintiff Nurriddin based upon his of his race, religion and his sex, African-American male.

134. The issuance of such Letters of Reprimand resulted in, *inter alia*, reduced chances by Plaintiff Nurriddin of being appropriately promoted in a timely manner and receipt of other favorable personnel actions, with accompanying loss of wages and associated benefits.

135. Through its placement of Plaintiff Nurriddin on absence with out leave (AWOL) on June 13- 16, 2000 and September 12 to December 1, 2000; such placement was wrongful and despite receiving information and inquiry that should have caused non-placement in AWOL status.

136. The agency knowingly and intentionally engaged in retaliatory acts against Plaintiff Nurriddin.

137. As a direct and proximate result of the Agency's unlawful and retaliatory actions, Plaintiff Nurriddin has suffered and will continue to suffer considerable stress, embarrassment, loss of enjoyment of life, and loss of salary and other material benefits, including prospective retirement benefits.

## COUNT IV

[Unlawful Retaliation in Promotion]

138. Paragraphs 1 through 137 are herein incorporated by reference.

139. Through its actions, in delayed promotion to the GS-13 and in continuously refusing and failing to promote Plaintiff Nurriddin to at least Grade GS-14 and/or Grade GS-15, while Plaintiff Nurriddin was serving productively, successfully, and beneficially on behalf of the defendant. Such unlawful discrimination was based on race and religion (in the non-competitive promotion of Gans) was not practiced by the Agency against similarly situated others, who did receive promotions in a timely manner.

140. The agency knowingly and intentionally engaged in retaliatory acts against Plaintiff Nurriddin.

141. As a direct and proximate result of the Agency's unlawful and discriminatory actions, Plaintiff Nurriddin has suffered and will continue to suffer considerable stress, embarrassment, loss of enjoyment of life, and loss of salary and other material benefits, including prospective retirement benefits.

## COUNT V

[Unlawful Discrimination in Personnel Actions]

142. Paragraphs 1 through 141 are herein incorporated by reference.

143. Through the agency's actions by the Agency promoting a co-worker to a Grade GM-14 after she had taken over management of many of the programs that Plaintiff Nurriddin managed as a Grade GS-12, the Agency engaged in unlawful discrimination against Plaintiff Nurriddin based upon his religion and his race – African-American Muslim.

144. Plaintiff Nurriddin was issued an ultimatum with regard to being "directed reassigned" or take new duties. The Graduate Student Researchers Program duties that were assigned to Plaintiff Nurriddin had been previously the responsibility of Ms. Massey, at Grade GS-14. Plaintiff Nurriddin was a Grade GS-12. The NPSC duties had been the responsibility of Ms. Sherri McGee, at Grade GS-14.

145. Through the agency's actions in issuing a lowered performance evaluation; denying travel to work-related "minority" conferences; stripping job duties; utilizing false reasoning in disparate job series classification; denying an available work cubicle; denying staffing assistance; delaying consideration of NSF detail request; denying advanced sick leave; issuing of work conditions; reducing and denying awards; placement on leave restrictions; issuing a job offer as a 'tactical ploy'; and demanding excessive amounts of medical documentation.

146. The administration by the Agency of such discriminatory treatment against Plaintiff Nurriddin resulted in, *inter alia,* reduced chances by Plaintiff Nurriddin of being promoted in a timely manner and receipt of other favorable personnel actions, with accompanying loss of wages and associated benefits.

147. The agency knowingly and intentionally engaged in discriminatory acts against Plaintiff Nurriddin.

148. As a direct and proximate result of the Agency's unlawful and discriminatory actions, Plaintiff Nurriddin has suffered and will continue to suffer considerable stress, embarrassment, loss of enjoyment of life, and loss of salary and other material benefits, including prospective retirement benefits.

## COUNT VI

[Unlawful Retaliation in Personnel Actions]

149. Paragraphs 1 through 148 are herein incorporated by reference.

150. Through the Agency's actions in issuing a lowered performance evaluation; denying travel to work-related "minority" conferences; stripping job duties; utilizing false reasoning in disparate job series classification; denying an available work cubicle; denying staffing assistance; delaying consideration of NSF detail request; denying advanced sick leave; issuing of work conditions; reducing and denying awards; placement on leave restrictions; issuing a job offer as a 'tactical ploy'; and demanding excessive amounts of medical documentation.

151. The agency knowingly and intentionally engaged in discriminatory acts against Plaintiff Nurriddin.

152. As a direct and proximate result of the Agency's unlawful and discriminatory actions, Plaintiff Nurriddin has suffered and will continue to suffer considerable stress, embarrassment, loss of enjoyment of life, and loss of salary and other material benefits, including prospective retirement benefits.

## COUNT VII

[Failure To Reasonably Accommodate Disability]

153. Paragraphs 1 through 152 are herein incorporated by reference.

154. At all times since August 5, 1998, Plaintiff Nurriddin has been an individual with a disability.

155. At all time since August 5, 1998, Plaintiff Nurriddin has met the experience and education requirements for several positions within NASA and elsewhere in the federal government.

156. Plaintiff Nurriddin requested that NASA and its officials were aware of his need and desire for, reasonable accommodations such as, but not limited to, providing him with a position which he was medically capable of performing and within a reasonable commuting distance.

157. NASA could have accommodated Plaintiff Nurriddin by finding an appropriate position. Because Plaintiff was able to perform some of the positions within NASA, the defendant

25

was obligated to accommodate Plaintiff with a comparable position, which he was
medically able to perform. See 29 U.S. § 791 et seq.

158. The agency placed its energy into the effort to "find him a job and make an offer to close
off the OWCP claim" rather than fulfilling its obligation to accommodate Plaintiff
Nurriddin.

159. In 2001, according to Paulette Quinn Britt, the agency headquarters did not have specific
policies and procedures for reasonable accommodation. This failure should not relieve the
defendant of his obligation.

160. The agency knowingly and intentionally engaged in discriminatory acts against Plaintiff
Nurriddin.

161. As a direct and proximate result of the Agency's unlawful and discriminatory actions,
Plaintiff Nurriddin has suffered and will continue to suffer considerable stress,
embarrassment, loss of enjoyment of life, and loss of salary and other material benefits,
including prospective retirement benefits.


## COUNT VIII

[Retaliation In Failure To Reasonably Accommodate Disability]

162. Paragraphs 1 through 161 are herein incorporated by reference.

163. At all times since August 5, 1998, Plaintiff Nurriddin has been an individual with a
disability.

164. At all time since August 5, 1998, Plaintiff Nurriddin has met the experience and education
requirements for several positions within NASA and elsewhere in the federal government.

165. Plaintiff Nurriddin requested that NASA and its officials were aware of his need and desire
for, reasonable accommodations such as, but not limited to, providing him with a position
which he was medically capable of performing and within a reasonable commuting
distance.

166. NASA could have accommodated Plaintiff Nurriddin by finding an appropriate position.
Because Plaintiff was able to perform some of the positions within NASA, the defendant
was obligated to accommodate Plaintiff with a comparable position, which he was
medically able to perform. See 29 U.S. § 791 et seq.

167. The agency placed its energy into the effort to "find him a job and make an offer to close off the OWCP claim" rather than fulfilling its obligation to accommodate Plaintiff Nurriddin.

168. In 2001, according to Paulette Quinn Britt, the agency headquarters did not have specific policies and procedures for reasonable accommodation. This failure should not relieve the defendant of his obligation.

169. The agency knowingly and intentionally engaged in retaliatory acts against Plaintiff Nurriddin.

170. As a direct and proximate result of the Agency's unlawful and retaliatory actions, Plaintiff Nurriddin has suffered and will continue to suffer considerable stress, embarrassment, loss of enjoyment of life, and loss of salary and other material benefits, including prospective retirement benefits.

**COUNT IX**
[Maintenance of a Hostile Work Environment]

171. Paragraphs 1 through 170 are herein incorporated by reference.

172. The Agency through, *inter aila.* its agents and Plaintiff Nurriddin's first level-supervisors, Dr. Malcom Phelps, and Ms. Sherri McGee; and through Plaintiff Nurriddin's second level-supervisor Mr. Franklin Owens; and through top-level agency officials – Administrator Daniel Goldin and Associate Administrator for Human Resources and Education Vicki Novak and Deputy General Counsel Robert Stephens have permitted, maintained, and sustained a discriminatory and retaliatory hostile work environment for Plaintiff Ahmad B. Nurriddin.

173. Such hostile work environment included the presence of documents and publications within Plaintiff Nurriddin's workplace, which constituted ethic and racially offensive material, such as the laptop computer documents entitled, "Racist jokes and stories" and "WAMERICAN HERITAGE", which, on information and belief, was retained in the custody of Dr. Phelps on his Agency-purchased laptop computer and which was discovered by Plaintiff Nurriddin in February 1995. Mr. Owens then placed Dr. Phelps as Plaintiff Nurriddin's first-level supervisor.

174. Such hostile work environment included cover-up activities, *inter alia,* the March 8, 1999, Supplemental Investigator Report of Ms. Andrea DeCoteau, wherein it is noted, "Attempts

27

to obtain information pertaining to travel requests and promotion were unsuccessful. According to Mr. Owens, Director, Office of Education Division, information pertaining to Code FE's FY 95 and 96 promotion data was unavailable, because they destroyed after a promotion had been made.   With regard to travel requests, he does not maintain copies of travel requests."

175. Such hostile work environment included Plaintiff Nurriddin receiving a threat of a reprimand because Plaintiff Nurriddin questioned a co-worker, whose breath smelled of alcohol, and Plaintiff Nurriddin return-shipped excess Agency materials to the Agency warehouse after a co-worker abandoned the materials following an exhibit.

176. Such hostile work environment included Plaintiff Nurriddin receiving an oral admonishment for late arrival at a staff meeting although other staff members had been late and on one occasion the meeting was taped to accommodate an absent co-worker.

177. Such hostile work environment included Plaintiff Nurriddin receiving an e-mail admonishment after a staff assistant's hard drive had been removed.

178. Such hostile work environment included Mr. Owens claiming that Plaintiff Nurriddin's promotion was delayed because of the "Turner Plan".   Mr. Owens confirmed his "promise" to promote Plaintiff Nurriddin upon "approval of the "Turner Plan".

179. Such hostile work environment included a lowered performance evaluation issued ten days after a "verbal altercation", which was instigated by Dr. Phelps.

180. Such hostile work environment included being told by Dr. Dasch that Dr. Phelps had stated that Plaintiff Nurriddin's performance evaluation would be lowered because he [Plaintiff Nurriddin] attended "too many minority conferences".

181. Such hostile work environment included other NASA employees in the position classification series 1701 received greater award amounts than Plaintiff Nurriddin.

182. Such hostile work environment included seeing that the "required education" justification was deemed bogus as Ms. Marra was placed in the 1701 series without the "required education" when the Personnel Office and Mr. Owens decided to change her classification in December 1996.

183. Such hostile work environment included being denied the opportunity to obtain an available work cubicle.

184. Such hostile work environment included having a significant segment of work responsibilities [NPSC] removed by Mr. Owens.

185. Such hostile work environment included the defendant's attempt to sabotage Plaintiff Nurriddin's work effort through drastically reducing the funding for the GSRP.

186. Such hostile work environment included the defendant failing to provide Plaintiff Nurriddin with adequate staff support after the GSRP assistant, Ms. Barbara Toyer left the agency and in the refusal to provide essential documentation from the Space Science Office, thereby causing a backlog in grant processing.

187. Such hostile work environment included Mr. Owens soliciting Pam Bacon and Kevin Durham to "report on" Plaintiff Nurriddin during the NAACP Convention.

188. Such hostile work environment included Plaintiff Nurriddin having to file a report with the United States Protective Police because he was stalked and intimidated by Dr. Phelps after returning from sick leave.

189. Such hostile work environment included understanding that the requirement, specified by Mr. Owens, amounted to requiring Plaintiff Nurriddin to withdraw his EEO complaints before he would be granted a detail.

190. Such hostile work environment included returning from sick leave and being (a) placed on strict leave restrictions in September 1998; (b) having his work was closely scrutinized; (c) being issued two letters of reprimand; (d) being denied travel opportunities to two minority conferences; and (e) having his request for administrative leave for EEO related business partially denied.

191. Such hostile work environment included having Dr. Phelps berate his EEO activities, terming them "bull shit".

192. Such hostile work environment included the meeting with NASA Administrator Daniel Goldin, and having him express that in his perception of the visual effects of the harassment on Plaintiff Nurriddin caused him to say that Plaintiff Nurriddin "looked like crap", while failing to take remedial actions.

193. Such hostile work environment included being told by Mr. Reese of Ms. Novak's unwillingness to consider his request to accept the detail being offered by the National Science Foundation (NSF), and indicating that he was being slated for progressive disciplinary action - including termination.

194. Such hostile work environment included having Mr. Andrew Falcon, send an email message addressed to Ms. McGee and others, "I am not sure that we should be conceding that his [Plaintiff Nurriddin's] documentation is adequate, because we don't really think

that it is, and accepting it here means that we may have to accept any similar
documentation in the future."

195. Such hostile work environment included Mr. Castillo's email message to Mr. Hillard
Harrison, Dr. Phelps, Ms. McGee, Mr. Falcon, and Ms. Quinn indicating, "It seems that
Ahmad intends to resist working in FE in any way he can, witness today's visit to the IG,
and now this leave request, and tomorrow, who knows what else."

196. Such hostile work environment included being transported, via ambulance, to the George
Washington University Hospital Emergency Room, with a suspected cardiac arrest.

197. Such hostile work environment included Mr. Castillo sending an e-mail message to several
agency officials, wherein he urged that Dr. Conway's opinion be ignored. Mr. Castillo
termed Dr. Conway's review a "professional cop-out" and he suggested that the defendant
consider requesting a second opinion of the agency's own doctor. Mr. Castillo did not have
adequate medical expertise to question the medical reports; however he and other NASA
managers continued to demand additional medical documentation.

198. Such hostile work environment included Doris Wojnarowski sending an email message to
Dr. Phelps and Mr. Falcon advising, "he [Plaintiff Nurriddin] should be coded as AWOL
and if he provides appropriate documentation it can be later changed to sick leave. (Once
you approve sick leave it is very difficult to then change to AWOL.) We should also start
disciplinary action for his failure to follow leave request procedures."

199. Such hostile work environment included being willfully placed on AWOL by Dr. Phelps,
although he had received appropriate documentation, prior turning in time and attendance
records.

200. Such hostile work environment included Mr. Castillo's email message, "Yegads! Will we
ever finish with this guy? I was aware of and did sign the leave transfer authorization, but
that's because I'm working on many different actions during the day and just didn't think
through this one when I was signing it... For the time being, I'm going to let the AWOL
stand as charged."

201. Such hostile work environment included Dr. Phelps' June 29, 2000, email message to Mr.
Falcon, Ms. Quinn, Mr. Castillo, and Mr. Harrison, read, "He's nearly out of leave. As of
the beginning of the current pay period he only had 39 hours of AL that had been donated.
Unless more has been donated he won't get a full paycheck."

202. Such hostile work environment included Mr. Falcon's email message, which urged, "put him on AWOL; prepare charges for failure to follow the leave restriction and AWOL; as I understand it, he doesn't have much of a disciplinary record, so unless someone has a better idea, short term suspension (5-10 days ?) is probably the best place to start ... even considering the litigation..."

203. Such hostile work environment included Mr. Castillo's email message, which read, "Absent compelling reason for further accommodations, medical or otherwise, it's time to take corrective action for the continuing absence without acceptable reasons. I will have my staff get up to speed and get the action started again."

204. Such hostile work environment included being wrongly placed on AWOL from September 12, 2000, through December 1, 2000.

205. Such hostile work environment included Ms. Novak's email message, entitled 'Favorite Subject' to Ms. McGee, Mr. Castillo, Mr. Owens, and Dr. Phelps read, "AN, I really do not want to offer him another job in F. He's not qualified and he'll just create major problems if he should accept. A while back, Bob Stephens suggested that we (FE) take him back, give him work (they have a job for him) and document it if he can't handle it... I think it is better to work this at other than our level [Novak & Stephens were Associate Administrator for Human Resources and Education and Deputy General Counsel], if we can."

206. Such hostile work environment included Mr. Castillo's September 18, 2001, email response, which read, "legal counsel, below Bob's level, asked if CP could find him a job and make an offer to close off the OWCP claim (expecting that he won't take it and therefore lose his case at OWCP). That claim, backed by his doc and supported by OWCP docs, is that he CANNOT work in FE because that's the source of his 'medical' problem. The offer is a tactical ploy to chip away at all his complaints..."

207. Such hostile work environment included Ms. Novak's September 20, 2001, email to Mr. Mark Batkin, Mr. Harrison, Mr. Owens, Mr. Castillo, Mr. Stephens, Ms. McGee, and Dr. Phelps, which read, "Ladies and gents, I am asking Denise Gross of my staff, to set up a meeting with all of us, to discuss the AN 'case' in terms of where we are going on this. It has become clear to me in the last few days that everyone is NOT on the same wavelength in terms of strategy. I think a meeting of this nature will be constructive and helpful. From there, we will take whatever action is necessary."

208. The agency knowingly and intentionally engaged in maintaining and sustaining a discriminatory and retaliatory hostile workplace environment against Plaintiff Nurriddin.

209. As a direct and proximate result of the Agency's unlawful retaliatory and discriminatory actions, in maintaining and sustaining a discriminatory and retaliatory hostile workplace, Plaintiff Nurriddin has suffered and will continue to suffer considerable stress, embarrassment, loss of enjoyment of life, and loss of salary and other material benefits, including prospective retirement benefits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment on his behalf on all Counts stated herein, and grant him the following relief:

a) Order the Defendant Agency to promote Plaintiff Nurriddin, retroactivity to an Education Program Specialist position, NASA Position Classification Series 1701, at Grade GS-15, effective not later than January 1, 1997, with accompanying back pay and awards, including, without limitation, within grade increases, ancillary compensation, sick leave, vacation, TSP and all other retirement accruals;

b) Order the Defendant Agency to pay Plaintiff Nurriddin not less than $300,000 in compensatory damages, pecuniary and non-pecuniary losses, or such other monetary amounts as may be determined by a jury in this proceeding.

c) Award to Plaintiff Nurriddin the costs of bringing and maintaining this Civil Action and the administrative actions, which preceded it, including all attorneys' fees and costs; and

d) Grant such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Nurriddin demands a Trial by Jury on all issues of fact and damages presented hereinbefore.

Respectfully Submitted,

Ahmad Nurriddin,
Plaintiff
740 – Sixth Street, SW
Washington, DC 20024

November 24, 2004