## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Ahmad B. Nurriddin
Plaintiff,

v.

Michael Griffin, Administrator, et. al.
National Aeronautics and Space
Administration
Defendants

Civil Action No. 04-2052 (JDB)

**RECEIVED**

MAY 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Plaintiff Ahmad Nurriddin (Nurriddin) brought this civil action after his National Aeronautics and Space Administration (NASA) supervisors discriminated against him on the basis of his race (African American), his gender (male), religion (Islam), and disabling conditions (Major Depression, anxiety and back pain). Nurriddin's civil action also challenges NASA's retaliation, which resulted from his prior protected activity and intensified after he sought reasonable accommodations for his disabling conditions and again following after his request for leave under the provisions of the Family Medical Leave Act (FMLA). Nurriddin contends that NASA managers knowingly and willingly created and maintained a hostile work environment, subsequently; his federal career was wrongfully terminated.

On June 18, 2004 Ahmad Nurriddin filed his Second Amended Complaint (second complaint), in this Honorable Court. The allegations outlined in Nurriddin's second complaint are resultant from actions and or inactions transpiring between July 1997 and February 2004; as well they were the subject of eight separate EO complaints filed with NASA's Office of Equal Opportunity Programs (OEOP). Although NASA challenged some of the individual allegations, the complaints were all accepted and investigated by OEOP before that Office issued Final Agency Decisions (FAD), for all but one complaint. In compliance with EEOC regulations, more

than 180 days had elapsed before Nurriddin brought that complaint to this Court, amending his existing federal court claim (second amended complaint).

Nurriddin's second complaint specifically names Vicki Novak, Alfred Castillo, Malcom Phelps, and Mark Batkin in their individual capacities because actions that they took were beyond the scope of their specific, authorized duties and responsibilities.   Nurriddin notes that NASA has not challenged the service to Novak, Castillo, Batkin, and or Phelps, and that the U.S. Attorney has filed a motion to certify their immunity.

Individually and collectively Novak, Castillo, Batkin and Phelps abused the authority of their offices as they conspired with others to deprive Nurriddin of several constitutional rights and privileges.  Additionally, Novak, Castillo, and Phelps lied about their involvement, while Batkin has unjustifiably claimed privilege to shield the full scope his participation.  Many of the actions occurred after Novak convened a meeting for the purpose of "getting every one on the same wave length" for dealing with Nurriddin, according to Novak, "by any means necessary".

Nurriddin alleges that he was discriminated against, based upon his race, gender and or religion, when he was: (a) wrongly terminated; (b) placed on AWOL for 59 days; (c) denied work related travel to minority conferences; (d) denied a promotion; (e) denied prompt use of donated leave while on medical leave; (f) denied performance awards; and (g) denied a timely within grade increase. Nurriddin alleges that he was discriminated against because he was "perceived as" disabled when he was: (a) wrongly terminated; (b) placed on AWOL for 59 days; (c) denied prompt use of donated leave; (d) denied a prompt within grade increase; and denied performance awards.

Nurriddin also alleges that he was retaliated against, because of his prior protected activity, when he was (a) wrongly terminated; (b) placed on AWOL for 59 days; (c) denied work-related travel to minority conferences; (d) denied a promotion; (e) denied prompt use of leave that had been donated because he had exhausted his leave and he had been approved for the leave sharing program; (f) denied performance awards; and (g) denied a prompt within grade increase. Nurriddin further alleges that he was retaliated against because of his request to be granted leave under the provisions of FMLA when his FMLA request was not responded to for 12-weeks. Additionally, Nurriddin was retaliated against after he sought the assistance of Congresswoman Eleanor Holmes Norton.

NASA's schemes to destroy Nurriddin's federal career included a failed "tactical ploy", which was devised to 'close off' the OWCP claim and 'undermine all his [EEO] complaints' against NASA. Briefly, OWCP terminated Nurriddin's benefits; however NASA's perverted effort was thwarted by the diligent inquiry of Congresswoman Eleanor Holmes Norton.

As OWCP restored Nurriddin's benefits, NASA waited two years before resuming the effort to terminate his federal employment. According to the scant information that has been provided, the termination, like the foiled OWCP plot was implemented following the urging and guidance of the Office of General Counsel (OGC). Indications are that it was Batkin, who choreographed the termination. Like Andrew Falcon before him, Batkin became a 'one-stop' Nurriddin management advisor on (a) personnel matters; (b) simultaneously functioning as agency counsel, therein opposing Nurriddin's administrative and judicial claims; (c) while functioning as principal contact on Nurriddin-related matters, in the OEOP.

NASA responded to Nurriddin's federal claim with a motion to dismiss under Rule 12(b)(1) and 12(b)(6) or, in the alternative, for summary judgment under Rule 56. In its motion, NASA asks this court to find that Nurriddin: (a) failed to provide a plain statement of this Court's jurisdiction, a valid legal citation, and failed to exhaust administrative remedies in respect to the defendants' conspiracy to deprive him of constitutional rights beyond those subsumed in his Title VII claims; (b) failed to produce evidence sufficient to show that he was subjected to a hostile environment based upon racial and sexual discrimination [NASA does not challenge Nurriddin's claims of hostile environment based upon retaliation, disability and or religious animus]; (c) improperly named defendants Novak, Castillo, Batkin, and Phelps; (d) failed to exhaust administrative remedies on the contentions raised in his seventh complaint (NCN-99-HQs-A0); (e) cannot make out a prima facie case of discrimination and or retaliation because there were no adverse employment actions; (f) failed to state a claim under the Rehabilitation Act; and (g) was not illegally terminated.

This is a case with subplots that mirror the gripping news headlines, it features high-ranking government officials lying under oath, senior managers manipulating the personnel system to lavishly reward girlfriends, false diagnosis and missing documents.

## BACKGROUND

Mr. Ahmad Nurriddin is a former employee of the National Aeronautics and Space Administration, who successfully and beneficially managed core NASA programs in the Education Division (formerly the Educational Affairs Division) since he was converted to the federal service by the agency in May 1991. A Muslim, African-American, male, Nurriddin was extremely successful achieving the duties and responsibilities of his position at NASA, receiving top ratings from his supervisors until he continued to file EO complaints.

In around 1997, Nurriddin began to suffer depression, anxiety and back pain, as a result of the constant harassment and intimidation that he experienced at NASA. Nurriddin was "perceived as disabled" by managers and top agency officials, as his federal career was terminated on February 4, 2004, allegedly for "medical inability to perform the duties of his position".

At the time of Nurriddin's termination, the duties of his position had been removed; paradoxically, NASA alleged that Nurriddin was unable to perform the duties of his position. Two years earlier, the U.S. Department of Labor's Office of Workers' Compensation Programs (OWCP) had determined that Nurriddin was able to return to work. That was at the same approximate time that, Nurriddin had requested Congresswoman Eleanor Holmes Norton to intervene after OWCP terminated his benefits following an elaborate scheme concocted by the NASA Office of General Counsel. OWCP later rescinded the termination of Nurriddin's benefits.

Nurriddin began receiving OWCP compensation in December 2000, because of the Major Depression that he suffered while performing his work requirements, under harassing conditions. The OWCP benefit termination was "set-up" by an October 12, 2001, 'return-to-work' letter from NASA. The October letter, allegedly in compliance with OWCP requirements, presented Nurriddin with a bogus "job offer".   When Nurriddin refused to accept the bogus "job offer", OWCP terminated his compensation benefits. Following Congresswoman Norton's intervention, OWCP realized that NASA officials had lied and Nurriddin's benefits were reinstated.

In February 2004, Nurriddin was terminated based upon the agency's (mis) perception of his medical condition. According to Dorothy Egbert, the Labor Relations Officer who advised Houston and Diaz to terminate Nurriddin, "the OWCP accepted his claim and placed him on full compensation 'which served as proof of his inability to work'". (Exhibit 111 at ¶2)

4

Fundamentally, NASA managers had created a hostile work environment, which caused Nurriddin's disabling conditions. When Nurriddin continued to file EO complaints, while receiving OWCP benefits, NASA managers plotted to "close off" his OWCP claim by offering a job as a "tactical ploy to chip away at all his complaints." When OWCP realized that the job offer was bogus, NASA revised its strategy and decided to terminate Nurriddin, for "medical inability".

OWCP found that Nurriddin was capable of working, some NASA officials knew about this determination. (Exhibit 13 at ¶12) Because NASA had removed the duties of position E80009 and the supervisory changes were not sufficient to resolve the issues associated with the original claim. The October 2001 job offer was ruled invalid. When Nurriddin was terminated in 2004, it was for being "medically unable to perform the duties of his position"; however his position still without duties and at that time, he was able to work.

**Summary Judgment**

Summary judgment is warranted only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[S]ubstantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. A material fact is one that "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If, in considering a motion to dismiss for failure of the complaint to state a claim upon which relief can be granted, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." FED. R. CIV. P. 12(b).

Summary judgment is appropriate only if the pleadings, depositions, answers to

interrogatories admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. C. P. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (stating that a court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). In reviewing a motion for summary judgment, the "evidence of the non-movant is to be believed, and all inferences are drawn in favor of the non-moving party.

**Motion to Dismiss For Failure to State a Claim**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. FED.R.CIV.P. 12(b)(6). *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir.2002). Under the modern approach to notice pleading, a complaint need only set forth a short and plain statement of the claim, and grounds on which it rests. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir.2003). *See* FED.R.CIV.P. 8(a)(2).

The Supreme Court has specifically addressed the "question [of] whether a complaint in an employment discrimination lawsuit must contain specific facts establishing a prima facie case of discrimination" to survive a motion to dismiss. *Swierkiewicz v. Sorema*, 534 U.S. 506, 508 (2002). The Court rejected a heightened pleading standard and held that "an employment discrimination plaintiff need not plead a prima facie case of discrimination and that petitioner's complaint is sufficient to survive respondent's motion to dismiss." *Id.* at 515. This guidance is clear and unequivocal. Nurriddin's complaint satisfies the Supreme Court's guidance.

**"Regarded As" Disabled**

The Disabilities Act provides that a covered employer shall not "discriminate" against a disabled individual because of his disability. 42 U.S.C. §§ 12112(a); 29 C.F.R. §§ 1630.4. A "disability" is not just a "physical or mental impairment," as common usage might suggest. 42 U.S.C. §§ 12102(2)(A); 29 C.F.R. §§ 1630.2(g)(1). The Disabilities Act also prevents employers from taking adverse employment actions against those they "regard[] as having" a physical or mental impairment. 42 U.S.C. §§ 12102(2)(C) (emphasis added); 29 C.F.R. §§ 1630.2(g)(3). n6 The purpose of "regarded as" claims is to protect employees from "misperceptions [that] often

'result from stereotypic assumptions not truly indicative of . . . individual ability.'" *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999) (quoting 42 U.S.C. §§ 12101(7)) (second and third alterations in original). An employer therefore may run afoul of the Disabilities Act "when it makes an employment decision based on a physical or mental impairment, [whether] real or imagined." *Id.* at 490.

The Supreme Court has recognized two ways an individual may be "regarded as" disabled. *See Sutton v. United Airlines, Inc.,* 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L.Ed. 2d 450 (1999) (employer's mistaken belief either that employee has a disability or that employee's actual disability substantially limits major life activity); *see also Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 521-22, 119 S. Ct. 2133, 144 L. Ed. 2d 484 (1999); *Haynes v. Williams, 364 U.S. App. D.C.* 108, 392 F.3d 478, 481 n.2 (D.C. Cir. 2004). The Equal Employment Opportunity Commission's regulations suggest a third. 29 C.F.R. §§ 1630.2(l)(2) (substantial limitation arising from others' attitudes about impairment).

According to a June 12, 2002, demographic profile that detailed persons within Code F by organization code, name, title, minority code, gender and disability, Nurriddin (91) is classified with a type of disability code that is different from the majority of employees, as is Marra (47), Lloyd (88), Nickols (57), Peterson (1) and Robinson (1). Although the codes were not translated within the report, the remainder of the employees was either (4 -21) or (5 - 36). This classification is different from another undated report with similar categories that details "EFDATE", name, gender, disability, mincode. On the second chart Nurriddin is (5) as is the case for 35 persons, 15 in category 4, 2 in category 1, and 1 in category 86.

Egbert's statements "Complainant had filed a claim with the Labor Dept's Office of Workers Compensation Programs (OWCP), which OWCP accepted. In the claim that he submitted to OWCP, he himself documented his inability to work. <u>The OWCP accepted his claim and placed him on full compensation, which served as proof of his inability to work.</u>" Further, she explained, "Complainant has been on Workers' Comp all of this time and is presently still receiving comp. This is what I meant about him being unable to work." (Exhibit 111)

Egbert's perception of Nurriddin's ability to work directly conflicts with Castillo's "Information which we received from the Office of Workers' Compensation indicated that the

Complainant could return to work.  This information was a factor in the decision to instruct the Complainant to return to work." (Exhibit 13)  Clearly, there is a differing classification for Nurriddin on the two listings, which may also be a factor in the perception of other, particularly managers.

## Exhaustion of Administrative Remedies

Defendant argues that several of Nurriddin's claims are subject to dismissal because he did not adhere to the administrative procedures for bringing a Title VII claim.  Specifically, NASA argues that Nurriddin failed to file his formal complaint in accordance within 15 days of his final counseling interview.  29 C.F.R. § 1614.106(b).

Fundamentally, the Court need not address the defendant's contention of failure to exhaust administrative remedies because (a) there is no dispute that, while NASA accepted Nurriddin's claims for investigation, investigated them, and decided on the merits all of the issues in the EEO complaints that are being challenged, the agency never raised  the timeliness of Nurriddin's complaints during the administrative process; and (b) the defendant offers no proof that Nurriddin's formal complaint was not filed 15 days after his receipt of the notice of final interview with the EEO Counselor.

Circuit precedent is clear.  NASA waived the exhaustion defense.  *Bowden v. United States,* 106 F.3d 433 (D.C. Cir.1997) ("if [an agency] not only accept[s] and investigate[s] a complaint, but also decide[s] it on the merits – all without mentioning timeliness – [its] failure to raise the issue in the administrative process may lead to waiver of the defense when the complaint files suit.") *see also Johnson v. Billingsly*, 404 F. Supp. 2d 157, 162 (D.C.C. 2005) ("when a complaint has proceeded through administrative channels prior to arriving at the federal courthouse, and the agency has accepted, investigated and decided that complaint on its merits without raising the exhaustion issue, the exhaustion defense may have be found to have been waived.").

NASA not only (a) accepted the complaint; (b) investigated it; (c) issued a FAD on the complaint issues; the agency also (d) filed an opposition memorandum to the EEOC Office of Federal Operations in response to Nurriddin's appeal of the FAD.  NCN-99-HQs-A014 was filed formally on January 14, 1999.  On May 21, 1999, the agency OEOP accepted the complaint

issues and specifically declared them timely and within the purview of 29 CFR, Part 1614. (Exhibit 44)

According to NASA's August 23, 2002, Statement in Opposition to the Appeal, Nurriddin's complaint alleged "discrimination on the bases of his race (African American), sex (male), religion (Muslim) and prior EEO activity in connection with certain on-going acts of harassment and a hostile work environment. The agency accepted ten issues for investigation, which was conducted between July 8, 1999 and September 3, 1999." (Exhibit 23). The FAD was issued on April 15, 2002. At no time did NASA OEOP claim that Nurriddin's complaint was untimely.

Defendant cites, "the purpose of the administrative process is to give the employer notice of the claim and provide the parties with an opportunity to resolve the complaint." *Nurriddin v. Goldin*, 382 F.Supp. 2d 79, 91 (D.C.C. 2005). Implying lack of notice with regard to the issues identified, within Nurriddin's EEO complaint # 7 – (1) stalked and intimidated by Malcom Phelps on August 24, 1998; (2) issued the August 26, 1998, letter of reprimand; (3) placed on leave restriction; (4) denied travel opportunities; (5) partially denied administrative leave; (6) issued the October 30, 1998, letter of reprimand; (7) denied a non-competitive promotion; and (8) denied accommodations for medical disability, the agency asks that these issues be dismissed. Def. Mot., pg 13-15.

Nurriddin also complained that his first-level supervisor: (a) established working conditions that did not apply to others; (b) berated his work, got angry and went on a profanity-laced tirade during a October 1, 1998, performance review, therein terming Nurriddin's EO claims "bullshit issues" that were "a crock of shit"; while (c) based upon advise from OGC, his second-level supervisor implied that Nurriddin would have to drop his EEO complaints before his IPA/detail request would be considered.   The defendant's Motion fails to refute these claims. Instead, defendant opines that Nurriddin did not seek counseling for his allegation that NASA management failed to provide adequate support staff and funding. Def. Mot. at 14.

Defendant's argument is spurious for Nurriddin challenged the lack of staff support within complaint NCN-98-HQs-A011 and again presented the lack of staff support and funding issue to the EEO Investigator assigned to NCN-98-HQs-A034, NCN-99-HQs-A034, and NCN-01-HQs-A020.

On May 21, 1999, NASA acknowledged timely receipt of Nurriddin's January 14, 1999, complaint. (Exhibit 44)  NASA's July 14, 2004, Response Motion to the EEOC offers:

> Complaint No. 7 (NCN-99-HQs-A014) was filed on January 14, 1999 and the Agency accepted it for further processing on May 21, 1999...By letter dated March 6, 2000, the Agency joined Complaint Nos. 6 and 7 for processing.  The joined complaints were thereafter referred to as Complaint No. 6(J) (NCN-98-HQs-A055).  Complainant responded with a letter dated March 22, 2000, wherein he requested that the Agency join all of his outstanding cases. On April 14, 2000, the Agency joined Complaints Nos. 4, 5, 6(J) and 8 for further processing.  The joined complaints are referred to as Complaint No. 4(J) (NCN-98-HQs-A011).

(Exhibit 20)

NASA has not proffered a legitimate reason for failing to raise exhaustion during the administrative procedures.  The Court should conclude that NASA has waived failed exhaust administrative remedies as a defense.

Were the Court inclined to consider granting NASA an unsought waiver, Nurriddin requests that the Court grant him equitable tolling, in that NASA has failed to produce the US Postal return receipt, which would prove whether or not he filed the formal complaint within the 15-day period. The Final Interview and Notice of Right to File Formal Complaint advised Nurriddin of his right "to file a complaint of discrimination within 15 calendar days **after receipt of this notice.**"  The notice was sent by certified mail, thus the exact date that Nurriddin received the notice should be found on the return receipt.

Additionally, during the time that the formal complaint would have been due to the NASA Equal Opportunity Programs Office (OEOP), Nurriddin was in communication with the OEOP regarding failure to receive a copy of the EO Counselor's report and he would direct the Court's attention to his December 15, 1999, letter to Mr. George Reese, NASA Associate Administrator for Equal Opportunity Programs.  (Exhibit 41) Therein Nurriddin challenged the OEOP's letter of delineation and the attached EEO Counselor Report for complaint No. 7

Courts have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies... where the complainant has been induced or tricked by his adversary's misconduct...). *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984).

The undue influence of the NASA Office of General Counsel (OGC) became apparent during the administrative processing of Nurriddin's complaints.  The excessive OGC involvement

in Nurriddin's complaint activity – i.e. the same attorneys serving as "advisors" to his immediate supervisory managers, while simultaneously "reviewing NASA EOP communications", and also involved in litigation of his complaints before the EEOC and the Merit Systems Protection Board (MSPB) - created a quagmire.   Additionally, the agency was sanctioned twice, by the EEOC, for failing to timely investigate two of Nurriddin's complaints. (Exhibits 21, 22)

The agency blatantly and routinely ignored the same administrative requirements [29 C.F.R. § 1614] that it now wants this Court to enforce upon Nurriddin. (Exhibit 46)  Indeed, Nurriddin's concern for adhering to the exhaustion requirements, as specified by 29 C.F.R. § 1614 motivated his motion to this Court before proceeding to file his second amended complaint.

## Constant Discrimination, Harassment, and Retaliation

At least once per month, each and every month between July 1997 and February 1999, Ahmad Nurriddin engaged in some form of protected activity pertaining to his federal career. During that twenty month period, Nurriddin filed four formal complaints contesting the continuous discrimination, harassment, and retaliation that he experience in the NASA Headquarters Education Division.  Over the next five years Nurriddin filed an additional four EEO complaints and two claims in this Court.

During a five month period (July 1998 to November 1998), as the EO Counselor was conducting the counseling for two separate complaints (NCN-98-HQs-A055 and NCN-99-HQs-A014), Nurriddin was spied upon; had job duties and responsibilities removed; stalked by his supervisor; cursed by his first-level supervisor because of his EEO activity; stalked by his first level supervisor; not promoted; issued two meritless reprimands – one for allegedly violating non-existing conference attendance procedures; placed on leave restrictions; and denied travel that was essential to the performance of his work requirements.

As the constant harassment and intimidation (by Frank Owens, Malcom Phelps, and Sherri McGee) intensified, and was condoned by Vicki Novak, Nurriddin's health condition deteriorated. Following Congresswoman Eleanor Holmes Norton's inquiry, Nurriddin began a one-year detail to the National Science Foundation (NSF).   Nurriddin's health status revived during the NSF detail, February 1999 – February 2000.   NASA chose to return him to the same work environment in March and his health status began to relapse.

**Conflicting [Dual] Role of NASA Attorney**

In a blatant and inherent conflict of interest, the NASA attorney, functioning as the agency representative in Nurriddin's EEO cases and court actions, simultaneously served as a managerial advisor for human resource issues. NASA had the same person(s) - Adina Kanefield, Andrew Falcon, and Mark Batkin – (a) adjudicating Nurriddin's EEO claims (in both the administrative and judicial arenas); while (b) simultaneously advising his first- and second-level supervisors and human resource managers on matters regarding his leave, reasonable accommodation requests, proposed adverse actions and the FMLA. Truly, Nurriddin experienced the proverbial 'fox guarding the hen house'.

During 2000, Andrew Falcon was the agency representative. (Exhibit 17) Falcon's August 8, 2000, email entitled Re: Ahmad, he reported "Well, Malcom and I talked about composing the response to the Dr. [Echeverry] when the letter came in, and I don't think anything has changed that would affect the substance of that response. On the other hand, I had hoped to settle the case sooner rather than later...If it goes much further, we may have to get back on the track we were on." (Exhibit 63c)  (Emphasis added).

Again, on August 10, Falcon reported, "We had a settlement conference earlier today. Nurriddin representing himself, since he's fired his attorney...In the meantime, given the inevitable delay, and the fact that the outcome has now been thrown in doubt, we need to consider getting those charges back on track."  (Exhibit 64a)  Falcon's statement prompted Castillo to reply, "Absent compelling reason for further accommodations, medical or otherwise, it's time to take corrective action for the continuing absence without acceptable reasons." (Exhibit 64b)

Approximately one month earlier, Falcon sent an email message wherein he stated, "I'll continue to try to close a deal here, but, in the interim, we should:  1) [p]ut him on AWOL; and 2) [p]repare charges for failure to follow the leave restriction and AWOL.  As I understand it, he doesn't have much of a disciplinary record, so, unless someone has a better idea, short term suspension (5-10 days?) is probably the best place to start.  If anything comes up in mediation that changes this, I'll let everyone know, but, even considering the litigation, he's not giving us much choice." (Exhibit 62d)

The leave restriction policy that was imposed upon Nurriddin, stated that he was to report

to Phelps, McGee, Owens or the secretary each time that he left the building, was a pervasive encumbrance on Nurriddin's work environment. Nurriddin was the only employee who was subjected to constant supervision over a long period of time during his time of employment

In May 2000, as Sherri McGee circulated a draft response to Nurriddin's leave notification, it was Falcon who wrote, "I'm not sure that we should be conceding that his documentation is adequate, because we don't really think that it is, and accepting it here means that we may have to accept any similar documentation in the future." (Exhibit 55a) McGee, as the manager responsible handling leave in the Education Division, had written, "I have reviewed both the 5/11/00 letter from Dr. Echeverry and the 4/20/00 letter from Dr. Schroth, and believe that these letters provide the documentation required for sick leave for the period 4/20/00 – 5/12/00. (Exhibit 55a)

Falcon's conflicting roles were also evidenced within his September 25, 2000, email entitled Re: leave letter. Falcon also recommended changes to a letter [denial of advanced sick leave request] being crafted for delivery to Nurriddin stating, "I'm trying to make the assertion that the office is suffering from his absence be more than just a conclusory statement...Also, I took some liberties based on my second- and third-handed recollection with the characterization of his sporadic returns, so Malcom should probably confirm that they are accurate as well." (Exhibit 66a).

As NASA managers were deliberating a response to Nurriddin's FMLA request, it was Falcon, who advised, "AN [Nurriddin] has made another counter-offer. I don't think it flies, but there are some things that are worth bringing to Chris' attention anyway." (Exhibit 68b).

Falcon left the agency and was replaced by Mark Batkin. Batkin continued to proceed in an obvious conflict of interest, serving as agency representative in the litigation arena and legal advisor to management as the assault on Nurriddin's federal career continued.

As did Falcon, Batkin served as the human resource advisor on issues related to Nurriddin, he also provided advice for the internal EO processes. It was upon Batkin's advice that the EEO Investigator failed to take affidavits from Robert Stephens, Doris Wojnarowski, Andrew Falcon, and Mark Batkin. (Exhibit 91, 92, 89, 88)

When NASA initiated the processes to terminate Nurriddin, Dorothy Egbert, the Employee and Labor Relations Officer told the EO Counselor, "Legal was 'in on this [the

proposed removal]' from the beginning".  (Exhibit 19, pg. 8)

## Interagency Personnel Agreement (IPA) Proposed by NASA as Relief for Nurriddin's Nurriddin's Growing Health Concerns

In July 1998 the EO Counselor initiated contact with Vicki Novak regarding resolution of Nurriddin's pending EEO complaints.  Novak indicated that NASA management was looking into the possibility of reassigning Nurriddin.  The EO Counselor told Nurriddin that, NASA management (Novak, Owens, and Phelps) proposed a one-year IPA, as interim relief for his growing health concerns and to provide time to find a permanent placement outside of Code FE.  As related by the EO Counselor, the IPA would not be a permanent transfer and therefore it could not be used as the foundation for settling Nurriddin's complaints.

After Nurriddin documented his meeting with Novak, which she forwarded to Phelps for response, (Exhibit 106) Phelps subjected Nurriddin to a higher level of scrutiny and discipline than he applied to his co-workers.  Less than two weeks later, Phelps issued Nurriddin a letter of reprimand, in part for failure to adhere to non-existing conference attending policies.  (Exhibit 14, ¶10)

## National Science Foundation (NSF Detail)

In August 1998, after the EO Counselor informed Nurriddin of NASA's willingness to offer him an IPA "as interim relief", rather than leave the task completely to NASA managers, he actively sought detail and IPA opportunities.  Following Novak's suggestion, Nurriddin met with Owens on September 11th.  Owens stated that upon advice from 'Legal', Nurriddin needed to put all detail/IPA requests, in writing, through the OEOP.  As Nurriddin sought guidance from Ocela Hall, OEOP Deputy Associate Administrator, she stated that the requirement, as articulated by Owens, implied that Nurriddin would have to drop his EEO complaints before he was granted permission to be reassigned.  (Exhibit 42, pg 5 & 118)  This message was confirmed in November 1998 as Reese informed Nurriddin that James Gorman, Novak's Deputy, stated that the NSF detail would not be considered unless Nurriddin dropped the EEO complaints.  (Exhibit 42, pg 7 & Exhibit 43)

Nurriddin perceived that Owens, Phelps, McGee and others were either trying to harass

him into dropping his EO complaints; further compromise his health situation; or they were setting him up for termination, so he began to explore opportunities to be "detailed" to other internal and external departments and organizations. (Exhibit 29) Nurriddin persisted in his efforts, and in early October 1998 he found a detail to the National Science Foundation as a program officer. According to Novak and Owens, Nurriddin needed to get Phelps' approval in order to take the detail. Phelps, however, bristled at this idea, and he and Novak pressed Nurriddin to accept a six-month detail to the NASA Career Center. (Exhibits 32& Exhibit 33)

**Top NASA Officials Aware of Harassment and Discrimination but Fail to Mitigate**

Nurriddin's work environment became noticeably toxic. On October 1, 1998, Mr. Daniel Goldin, NASA's Administrator, candidly told Nurriddin that he "looked like crap". Administrator Goldin indicated that he would inquire about Nurriddin's situation, but he did not take any direct action to provide relief. Vicki Novak's October 27, 1998, memorandum to the Acting Deputy Administrator, although riddled with inaccuracies, provides information as a result of the meeting. (Exhibit 28)

After patiently waiting for a [non-existent] response from Goldin, Nurriddin sent him two letters, December 9 and 24, 1998. (Exhibits 34, 36) Novak responded on behalf of Goldin, stating "Mr. Goldin understands that you have raised these matters (concerns about work environment) with your immediate supervisor…[It is] the Administrator's belief that the above referenced offices (OEOP and OGC) are well positioned to address the matters that you have raised in your letter." (Exhibit 37)

Novak's September 19, 2001, affidavit acknowledged "…having a conversation with the Complainant [Nurriddin] about his health and his work environment shortly after I became the Associate Administrator in Code F." (Exhibit 14, para. 17) Nurriddin had additional meetings with Novak on September 4th, September 14th and October 8th; however she indicated that she was "advised" to deny his future requests. Id. para 20.

George Reese, NASA's Associate Administrator for Equal Opportunity Programs suggested to Novak that there be a "cooling off" period. As related by Novak's December 23, 1998, email message, Reese also suggested that a mediator might help to strike some compromise. (Exhibit 9)

Dan Goldin - NASA's Administrator, John Dailey – NASA's Deputy Administrator, Vicki Novak – NASA's Associate Administrator for Human Resources and Education, George Reese – NASA's Associate Administrator for Equal Opportunity Programs all knew that Ahmad Nurriddin was being harassed and that the harassment was having a detrimental impact on his health condition; however they all failed to take actions or cause actions to be taken to mitigate his situation. Instead, Novak proceeded to actively take actions or cause actions to be taken that exacerbated the harassment.

Novak made the decision to remove Phelps as Nurriddin's first-level supervisor as a "feature" of the bogus "job offer". In her June 19, 2002, affidavit Novak states, "The decision was made to assign Ms. Sherri McGee as the Complainant's first line supervisor <u>because of the allegations made by the Complainant against his former first line supervisor, Mr. Malcom Phelps. As a result of the allegations, it did not appear appropriate to have the Complainant return to work under the supervision of Mr. Phelps.</u> (Exhibit 15) In August 1998, Nurriddin requested that Novak provide the same relief. Nurriddin languished for more than three years before Novak attempted to provide relief from the constant harassment of Phelps, McGee and Owens, and then the relief was provided as a component of a "tactical ploy". Fortunately, OWCP realized that McGee as Nurriddin's first-level and Owens as his second-level supervisors would not correct the harassing work environment.

## Reasonable Accommodation Request

Kanefield's EO affidavit states, "I recall advising Paulette Quinn on how to deal with a letter she received from the Complainant's physician. <u>The letter was treated as a reasonable accommodation request.</u> However, the letter did not provide enough information for the agency to understand what disability the Complainant had and what accommodation he was seeking." (Exhibit 10) (Emphasis added.)

On April 27, 2000, Paulette Quinn [Britt], Chief of the NASA Headquarters Human Resources Operations Branch asked Dr. Steven Conway, MD and NASA Headquarters Senior Medical Director to review Nurriddin's medical documentation. Quinn wrote "I am forwarding his medical documentation to you for review, to <u>determine if it is medically sufficient to be used as the basis for a claim/request for such reasonable/medical accommodation.</u>" (Exhibit 53)

Dr. Conway responded,

"Medical information has been supplied to NASA Human Resources, by John Echeverry, Ph.D. and by W. Scott Schroth, M.D., M.P.H., Associate Professor of Medicine, George Washington University, both practitioners in the care of Mr. Nurriddin. It is their opinion that Mr. Nurriddin has a medical condition, which impacts on his ability to perform his work. It is also their opinion that working conditions at NASA aggravates this disorder. Accordingly, they recommend a transfer to a less stressful work site for Mr. Nurriddin and continued treatment for his illness. On the basis of their reports, I accept this opinion by these qualified practitioners."
(Exhibit 2).

The personnel specialist (Quinn) did not know whether or not Nurriddin was requesting a reasonable accommodation, in October 1998; the agency representative/legal advisor (Kanefield) treated the request from Nurriddin's doctor as if it was a reasonable accommodation request, but wanted "more information", in March 1999; the Senior Medical Director (Conway) reviewed the medical documentation and "accept[ed] the opinion by these qualified practitioners", in June 2000; however Nurriddin's request was formally denied by Phelps in October 2000.

On September 24, 2001, Quinn-Britt wrote, "In research of our files, we found no requests for medical accommodations from Mr. Nurriddin." (Exhibit 78).   Unless NASA had destroyed the documents, which Quinn asked Kanefield and Dr. Conway to review, a fact finder would deem Quinn-Britt's statement as a lie.   Additionally, in April 2000 Castillo told Nurriddin that he would coordinate and confer with appropriate offices regarding the requested that assist with a response to the reasonable accommodation request.  (Exhibit 51b)

**Quinn-Britt "...headquarters does not have specific [reasonable accommodation] policies."**

The arbitrary responses that were given as Nurriddin sought a reasonable accommodation were the result of institutional failure.  When Nurriddin sought a reasonable accommodation, NASA did not have standard policies and procedures to respond to his request.  The lack of standard policies and procedures combined with discriminatory and retaliatory animus was a tragic combination that weighed heavily against Nurriddin.

During a November 21, 2001, EEOC deposition, counsel for Nurriddin sought clarification on NASA's accommodations policy:

McKinney: Maybe it would be helpful if we talk a little bit about what policies, rules, regulations, and things like that the agency has concerning reasonable accommodation requests.

Quinn-Britt: I will say that headquarters does not have specific policies. We are now developing policies.

(Exhibit 80, pg 24).

Quinn's confession may explain why it took so long to answer Nurriddin's request. The NASA Procedures and Guidelines, NPG 2080.1, identifies the Office of Equal Opportunity Programs as the "Responsible Office". The effective date for these guidelines is December 18, 2001. (Exhibit 27) This is another instance where the OEOP's role was subverted by another organization, as the discriminatory and retaliatory animus of the [Legal] determined the agency's action and or inaction.


**Medical Evaluation**

On April 3, 2000, Castillo's email message Re: Ahmad, "It's now time for quick action to obtain a medical evaluation of this stress issue. We need to determine if there is indeed a case for "reasonable accommodation" if his alleged condition supports it, or, a case to propose his removal for inability to perform his duties. I suggest we issue him a memo requesting specific medical information as outlined in 5CFR 339." This message was addressed to Phelps, Falcon, McGee, Quinn, Wojnarowski, and Theodore Colbert. (Exhibit 48)

Adhering to this message, a Medical Documentation Meeting was scheduled for April 13, 2000. The objective of the meeting, as described by Castillo, was to "develop a strategy for dealing with Ahmad's medical condition." (Exhibit 49)

On April 27, 2000, Quinn [Britt] requested that Dr. Steven Conway, MD conduct a review of Nurriddin's medical documentation. Dr. Conway, NASA Headquarters Senior Medical Director, conducted an evaluation of the medical documentation that was submitted by Nurriddin's doctors. When Dr. Conway's evaluation was received, Castillo reported,

"I just received a copy of a memo from Dr. Conway. He cites that the *opinion* of AN's [Nurriddin] is that he has a medical condition, and in their *opinion*, the working conditions at NASA aggravate this disorder…I'm tempted to refer this to the Agency Medical Officer for a second opinion of our own doctor's opinion, but I don't have much faith that we'll get a firm answer from that level either.", wrote

18

Castillo on June 5, 2000.

(Exhibit 1)

## Nurriddin was wrongly listed as AWOL (4 days in June 2000) and then (57 days from September to December 2000)

On June 6, 2000, NASA attorney Doris Wojnarowski, sent an e-mail response entitled "Re: Ahmad", wherein she advised, 'Yes, he should be coded as AWOL and if he provides appropriate documentation it can be later changed to sick leave. (Once you approve sick leave it's very difficult to then change to AWOL.)  We should also start taking disciplinary action for his failure to follow leave request procedures.' (Exhibit 57)

Ten days later, on June 16th, Dr. Phelps sent and e-mail message entitled "Ahmad", wherein he acknowledged, 'Angela hand-delivered a letter from Dr. Echeverry re: Ahmad.  It's undated but was faxed on Wed at 11:45 am.  Don't know why but the first time is saw it was this morning attached to his time sheet.  Per discussion with you all, I had planned to count Mr. Nurriddin AWOL as of last Mon.' (Exhibit 59)

Dr. Phelps' email, on June 19, 2000, points to his desire to cover-up the wrongful placement of Nurriddin on AWOL, when he offered, 'The question of the day – Do we need to send correspondence to Ahmad that he's on AWOL?  If so, will CP prepare the letter?'  Further, he stated, 'As discussed the time sheet submitted last Friday for Ahmad reflects AWOL from Tue through Fri last week." (Exhibit 60a)  NASA Employee Relations Specialist, Hillard Harrison responded, 'I think we may have a problem since Mr. N[urriddin] has been accepted in the leave transfer program.' (Exhibit 60b)  Nurriddin was wrongly charged as AWOL for 4 days.

Phelps' letter explaining the placement on AWOL was sent to Nurriddin on June 23, 2000. In direct contradiction to the facts as established by his email messages, the letter states, "As a result of not receiving a request for leave or acceptable medical documentation, you were charged with AWOL for the period June 13 – 16, 2000." (Exhibit 61)  This statement is directly contradicted by Dr. Phelps' email acknowledgment of receipt of the hand-delivered letter from Dr. Echeverry, which he saw attached to Nurriddin's time sheet.

NASA managers, brazened by the urging of agency attorneys, were relentless in their efforts to destroy Nurriddin's career and ability to attend his life functions and to provide for the

well-being of his family.   In September, consistent with the Wojnarowski's advice, NASA managers, again, wrongly placed Nurriddin on AWOL, this time for 57 days.  This illegal placement was willful and intended to deprive Nurriddin of the wherewithal to provide for himself and his family as indicated by Harrison's September 15, 2000, email message, where he wrote, 'I would make it 15 days – since he is not getting pay anyway it really doesn't matter a whole lot.' (Exhibit 65)

Nurriddin had been approved for the donated leave program in June; however the managers conspired to deny him access to the leave that had been donated by employees around the nation.  Harrison's October 27, 2000, email message pointed, "I believe that if we plan to continue carrying Mr. N[urriddin] on AWOL, that we should drop him from coverage in the leave sharing program.  We need to do that now since more time has been donated and we need what to do with it." (Exhibit 67)

Not only did NASA managers intentionally place Nurriddin on AWOL without justifiable cause, they also prohibited him access to the hundreds of hours of leave that had been donated by other employees around the nation.  These actions were intended to deprive Nurriddin of his rights as a federal employee.  Additionally, the wrongful placement on AWOL and subsequently forbidding Nurriddin's access to the donated leave caused severe financial problems, as noted by Dr. Echeverry's having to provide him with free services because there was no income.  (Exhibit 16)

**Delayed Reply to Nurriddin's Family Medical Leave Act (FMLA) Request**

The FMLA allows an employee with a "serious health condition that makes the employee unable to perform the functions of the position of such employee" to take up to 12 weeks of unpaid leave.  29 U.S.C. § 2612(a)(1)(D).  On November 9, 2000, Nurriddin sought coverage under the provisions of the FMLA, based upon the continued intensive medical attention for his depression and back pain.  Nurriddin's request was approved on January 26, 2001, twelve weeks after it was received by NASA managers.  (Exhibit 50)

In his December 4, 2000 email message Harrison noted, "As you know Mr. N[urriddin] requested to be granted coverage under FMLA.  The request was dated 11/9.  I discussed this with our FMLA expert – Joanne Mueller – who indicated that we must approve the request…this

will take us into 1/01, but does not preclude taking the proposed action at that time." (Exhibit 69a)    Phelps responded, "As of now he's still on AWOL." (Exhibit 69b)

The three month delay was motivated by Phelps' animus. Although NASA's human resource policies supported the affirmative and expeditious reply to Nurriddin's FMLA request, for non-legitimate reasons, agency managers persisted in interrupting his access to privileges that he was guaranteed, as a federal employee. On January 18, 2001, Phelps indicated that a prompt response to Nurriddin's FMLA request was not sent because he had asked, "how AN's condition constituted an "emergency". Further stating, "I still object to this approval & certainly don't think it constitutes an "emergency" as required." (Exhibit 119b)

The FMLA provides substantive protections in the event that the employee is discriminated against for exercising his rights. *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir.1999) (in addition to 12 weeks of unpaid leave for qualified employees the FMLA "affords employees protection in the event they are discriminated against for exercising their rights under the Act."), *citing* 29 U.S.C. § 2615(a) and 29 U.S.C. § 825.220(c).


## "We Were Not Interested in Giving Ahmad an Opportunity"

On August 1, 2001, McGee's email message noted that, "Per Vicki's [Novak] request, I closed the loop with Al Castillo this afternoon and told him that we were not interested in giving Ahmad an opportunity to do an IPA at Anacostia High School." (Exhibit 72)   Clearly there was a concerted campaign to destroy Nurriddin's federal career. Other white, female, non-Muslim employees were considered for and accepted into IPA/detail opportunities.

McGee closed her message, indicating that, "...we were going down another path, and an IPA would only provide another year's delay." *Id.*   Deborah Galloway, Frank Owens, and Angela Diaz were employees of the Education Division who were permitted long-term IPA/detail opportunities. Information regarding the race, gender, religion and protected status of all employees who were afforded career enhancement opportunities has not been provided by the defendant.

Contrary to NASA's claim that the search failed to net any positions for which Nurriddin was qualified or could perform, other vacant jobs existed. One (3 positions open) such job was "Management Analyst" HQ-MP-00-160, it was disclosed by McGee. (Exhibit 7)

**Conspiracy – Novak "We will take whatever action is necessary"**

Vicki Novak's September 20, 2001, email message "Meeting" called together eight white managers to "discuss the AN [Ahmad Nurriddin] 'case' in terms of where we are going on this." Novak's message pointed out, "It has become clear to me in the last few days that everyone is NOT on the same wave length in terms of a strategy. I think a meeting of this nature will be constructive and helpful. From there, we will take whatever action is necessary." (Exhibit 74b)

Novak convened this meeting after she had spoken to Mark Batkin [the NASA attorney serving as the agency representative for Nurriddin's EEO complaints] and getting Robert Stephens' consent to attend the meeting. (Exhibit 74a)

Novak's role as convener of the 'whatever action is necessary' meeting sharply conflicts with the depiction of her role as revealed during her December 6, 2001, deposition testimony. Under oath, Novak proffered limited involvement as she stressed that, "I am unaware, based on where I am, of a lot of details, the conversations, and things that go on in the organization by virtue of my responsibilities" [Novak was the Associate Administrator for Human Resources and Education]. Reiterating that contention, Novak repeatedly stated that at her 'level' she did not get involved in the details of these things, offering that, "there is a chain of command and, the folks who we have in that chain of command I have great confidence in. They are there for a reason." (Exhibit 81, pgs. 36, 58, 59, 65-67)

Novak further emphasized this point as she stated, "…I have many, many, many responsibilities, and I am at a lot of meetings and involved at a lot of very high level broad issues. In code F the division chiefs, they have a lot of ability to operate independently. They are senior level managers…I have got great confidence in them, that they will and will involve me only if they absolutely feel that they need to." *Id.* at 65

Novak's participation, as revealed by the email messages signals a 180 degree departure from Novak's contention under oath and raises an issue of fact wherein Novak assumes a role outside of her official responsibilities, a role where she leads a conspiracy to deprive Nurriddin of his rights. There is evidence to suggest that the motivations upon which Novak relied, while conspiring to deprive Nurriddin was his extensive opposition and participation in protected activity and his racial identity. Numerous actions by Novak, like the conspiratorial meeting

convened to strategize depriving Nurriddin of his federal career, were outside the scope of her employment. Novak's other motivations will be explored in Nurriddin's proposed discovery.

## Novak and Castillo – Prime Conspirers to Undermine Nurriddin's OWCP claim

On September 14, 2001, Vicki Novak wrote Al Castillo, "Hey buddy, how are you?? Re: AN, I really don't want to offer him another job in [Code] F. He's not qualified and he'll just create problems if he should accept. A while back, Bob Stephens suggested that we (FE) take him back, give him work (they have a job for him) and document it if he can't handle it…Can we do this? Do Bob and I need to be involved? I think it is better to work this at other than our level, if we can." (Exhibit 73a)

Castillo's September 18, 2001, response entitled 'Re:Favorite Subject', offered "Hi, Vicki – doin' fine. Here's some background: legal counsel, below Bob's level, asked if CP could find him a job and make an offer to close off the OWCP claim (expecting he won't take it and therefore lose his case at OWCP). That claim, backed by his doc and supported by the OWCP doc's, is that he <u>CANNOT work in FE</u> because that's the source of his 'medical' problem. The offer is a tactical ploy to chip away at all his complaints. (Exhibit 73b)

Castillo testified that his work duties and responsibilities as an upper level management official prohibited him from intimate knowledge of the intricate interactions required in responding to Nurriddin's requests for accommodations and other workplace privileges traditionally monitored and provided by human resource departments.

## The Job Offer Was a 'Tactical Ploy'

Less than a month before the October 12, "bogus job" offer, Castillo sent an email message to Novak, wherein he aboasted, "legal counsel, below Bob's level, asked if CP could find him a job and make an offer to close off the OWCP claim (expecting he won't take it and therefore lose his case at OWCP). That claim, backed by his doc and supported by OWCP doc's, is that he <u>CANNOT work in FE</u> because that's the source of his 'medical' problem. The offer of a job is a tactical ploy to chip away at all his complaints." (Exhibit 73b)

Nurriddin contested the appropriateness of the "job offer" and refused to accept it. Despite Nurriddin's documentation indicating that the "job offer" was bogus, OWCP terminated

his benefits on December 26, 2001.  According OWCP, 'the employing agency has assured this Office that this is a valid job offer and the duties have not been removed.' (Exhibit 84)

The duties had been removed; thus the NASA officials lied to the OWCP staff, as the OWCP reiterated while terminating Nurriddin's benefits, "The employing agency **has assured this Office that this is a valid job offer and the duties have not been removed.** *Id.*

After inquires from Congresswoman Eleanor Holmes Norton's staff, OWCP reviewed the decision.  (Exhibit 87)  Upon review, the decision was vacated, therein restoring Nurriddin's benefits.  The February 5, 2002, OWCP Memorandum to the Director indicates that "after further review of the claim it has been determined that the claimant mentions both Ms. Sherrie McGee and Mr. Frank Owens in his initial claimant filed against management of NASA.  There is also an email message that circulated through NASA where the agency is discussing offering the claimant a job that he would not accept.  Therefore, his compensation would be terminated...[t]his is not satisfactory...**based upon the above evidence of file, it has been determined that the job offer is not suitable.**" (Exhibit 85)


**Position – E80009**

This position is within the NASA Headquarters, Office of Human Resources and Education Division (FE), with the title of Education Program Specialist. (Exhibit 25) Major duties and responsibilities of this position include overall policy and program direction at the Headquarters level of agency-wide graduate fellowship programs.  In this capacity incumbent develops policies, plans, and procedures for planning, implementing, and evaluating university level fellowship programs.  Specific programs include the Graduate Student Researchers Program (GSRP) and the National Physical Sciences Consortium Program (NPSC).

On April 30, 1998, Frank Owens terminated Nurriddin's responsibility for the NPSC program.  (Exhibit)  While Nurriddin was on detail to the National Science Foundation, the GSRP responsibility was stripped from his collection of duties as Code FE made an effort to bolster the duties and responsibilities associated with a newly formed university affairs position.

Nurriddin experienced a decline in his health status due to the constant harassment in the FE work environment and his compensable claim for Major Depression as the result of

occupational injury was accepted by the U.S. Department of Labor, Office of Workers' Compensation Programs in December 2000. (Exhibit 104)

On October 12, 2001, NASA Headquarters Human Resources Director Castillo notified Nurriddin that the agency had decided to return him full-time and unrestricted to the duties of his former position of Education Programs Specialist, GS-0301-13, Position Description number E80009. Castillo's letter noted that the 'decision was based on your [Nurriddin's] psychologist's assessment that there are no physical restrictions prohibiting you from performing your full range of duties'. Further, his letter indicated that 'OWCP Publication CA-8A expresses a preference for the Agency to return you to the tour of duty and location of the position held at the time of your injury, with modifications to accommodate any limitations'.

Lastly, Castillo noted '[w]e have changed your supervisor to accommodate any limitations...to further accommodate any limitations we have also changed the physical location of your office, thereby reducing the possibility of contact with your former supervisor [Phelps].' (Exhibit 79)

## October 12, 2001, Return-to-Work – False Compliance with OWCP

In accordance with plan developed in consultation with Stephens and Batkin (which was solidified during Novak's meeting), Castillo sent Nurriddin a letter on October 12, 2001, wherein he provided notification of NASA's "decision to return you [Nurriddin] to full-time unrestricted duties that shall include all of the duties associated with your former position." Castillo stated that the Agency had "a duty to return you [Nurriddin] to gainful employment as soon as we can as I am." (Exhibit 79)

Further, Castillo wrote, "This decision is based on your psychologist's assessment that there are no physical restrictions prohibiting you from performing your full range of duties and the fact that OWCP ...expresses a preference for the Agency to return you to the tour of duty and location of the position held at the time of your injury, with modifications to accommodate any limitations...We have changed your supervisor to accommodate any limitations." Id.

Coincidentally, Castillo and Novak provided affidavits to the EEO Investigator assigned to investigate Nurriddin's EEO complaints NCN-98-HQs-A034, NCN-99-HQs-A034, and NCN-01-HQs-A020 on September 18 and September 19, 2001, respectively. (Exhibits 12 & 14)

**Nurriddin was illegally terminated**

In December 2000 Nurriddin was diagnosed with Major Depression in Remission, by OWCP doctors and he was placed on that agency's compensation rolls. (Exhibit 104)  Prior to the issuance of Castillo's October 12, 2001, NASA crafted a plot to subversively controvert Nurriddin's benefits. (Exhibit 73b) OWCP staffers were deceived by the NASA plot and in December 2001 Nurriddin's benefits were terminated. (Exhibit 84)  Following Congresswoman Norton's intervention, OWCP restored his benefits in January 2002 because of the misrepresentations. (Exhibit 85)

NASA ceased all communication with Nurriddin between October 2001 and December 2003.  At that time Nurriddin's termination was proposed NASA had not inquired about his health and therefore could only speculate about his medical inability.

On January 28, 2004, Angela Phillips Diaz, Deputy Associate Administrator for Education, issued a termination letter to Nurriddin, therein noting that she had "decided to remove [him] from [his] position and from the Federal Service, effective February 6, 2004." Further, Diaz opined that she found that the "reason for your [Nurriddin's] proposed removal, 'Medical Inability to Perform the Duties of Your Position' is substantiated by the supporting documentation provided in Dr. Clifford Houston's notice ...dated December 4, 2003." *Id.*

Without offering Nurriddin a legitimate opportunity to return to work and lacking medical documentation establishing or confirming the agency's claim of 'medical inability', Diaz stated "you have been unable to perform your duties because of a medical condition which the U. S. Department of Labor (DOL) has accepted as an occupational disease claim, and for which DOL has approved worker's compensation benefits...this action is necessary in order to promote the efficiency of the service." *Id.*

On February 24, 2004, NASA responded to inquires from Congresswoman Eleanor Norton, stating "the proposed removal [of Nurriddin] is based on documentation regarding his inability to perform the duties of his position due to a work-related condition." (Exhibit 97)

There is sufficient evidence for a reasonable jury to find that Nurriddin was discriminated against for the reasons aforementioned; that he was retaliated against; that a hostile work environment was maintained; and that he was wrongfully terminated.

In this case, because Malcom Phelps, Frank Owens and Vicki Novak were Nurriddin's first- second- and third-level supervisors, respectably, there is presumption of employer liability or accompanying burden on the employer to establish an affirmative defense to liability.   As this Court has previously recognized, "[u]nder Title VII, much turns on whether the harassers are supervisors or coworkers. If supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) (holding that employer has affirmative defense to vicarious liability for supervisor's conduct if (1) employer acted promptly and reasonably to prevent and correct the alleged harassment and (2) employee unreasonably failed to take advantage of preventive opportunities offered to her).

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss, or alternatively, for summary judgment should be denied.

Respectfully submitted,

Ahmad Nurriddin
740 – Sixth Street, SW
Washington, DC 20024

May 10, 2007

27

## CERTIFICATE OF SERVICE

I certify that on May 10, 2007, I caused the foregoing to be served by hand delivery, to the Respondent at:

Charlotte Abel
Assistant United States Attorney
555 – 4th Street, NW
Washington, DC 20530

**Ahmad Nurriddin**
740 – Sixth Street, SW
Washington, DC 20024