## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**AHMAD B. NURRIDDIN,**

     **Plaintiff,**

        **v.**

**CHARLES F. BOLDEN, JR.,[1]**
**Administrator, National Aeronautics and**
**Space Administration, et al.,**

     **Defendants.**

                          **Civil Action No. 04-2052 (JDB)**

## <u>MEMORANDUM OPINION</u>

Plaintiff Ahmad Nurriddin was employed by the National Aeronautics and Space Administration ("NASA") from May 1991 through February 2004 in the Educational Affairs Division. His time there was beset by a years-long series of conflicts with his supervisors and other NASA employees, which has resulted in two employment discrimination lawsuits against the agency. His first lawsuit, Civil Action No. 99-3401, covering a series of events from 1991 through August 1996, was brought <u>pro se</u> under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e <u>et seq</u>, and alleged discrimination on the basis of race (African-American), gender (male), and religion (Muslim), hostile work environment, and retaliation. The Court entered summary judgment for defendant on all claims on August 17, 2005. <u>See</u> <u>Nurriddin v. Goldin</u>, 382 F. Supp. 2d 79, 92-109 (D.D.C. 2005) ("<u>Nurriddin I</u>"). The D.C. Circuit affirmed in all respects. <u>Nurriddin v. Griffin</u>, 222 Fed. Appx. 5 (D.C. Cir. Apr. 16, 2007).

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Charles F. Bolden, Jr., the current Administrator of NASA, is substituted as the named lead defendant.

The second lawsuit -- this action -- picks up where the first one left off, and covers a series of events from late 1996 through Nurriddin's termination on February 6, 2004.  See Second Am. Compl. ¶¶ 51-140 (filed Sept. 14, 2009).  As before, proceeding pro se, he brings claims against NASA under Title VII for allegedly discriminating against him on the basis of race, gender, and religion, hostile work environment, and retaliation.  Id. ¶¶ 2-3, 141-61, 185-93.  In this round of litigation, he has added claims of disability discrimination in violation of the Rehabilitation Act, as amended, 29 U.S.C. §§ 701 et seq., based largely on depression, anxiety, and back pain allegedly caused by the events underlying the first case.[2]  Id. ¶¶ 2, 162-84, 189-93.  He also has added four NASA employees as individual defendants -- Vicki Novak, Alfred Castillo, Mark Batkin, and Malcolm Phelps -- on the ground that they have been involved in a conspiracy to violate his constitutional rights, citing 42 U.S.C. § 1983.  Id. ¶¶ 6-7, 180-84.

Defendants have responded to the lawsuit with a motion to dismiss or, in the alternative, for summary judgment, prior to the taking of discovery.  Plaintiff has filed an opposition on the merits, and also moves for an order denying summary judgment pursuant to Fed. R. Civ. P. 56(f) on the ground that discovery is necessary before the motion can be resolved.[3]  Additionally, he has filed a motion seeking a preliminary injunction to prevent NASA from soliciting personal

---

[2]  Plaintiff's medical diagnosis was submitted under seal and, hence, the details of the sealed filing will not be described in this opinion. Pl.'s Ex. 83 (filed under seal May 10, 2007). However, his public filings characterize his condition generally as depression, anxiety, and back pain.  This is a fair characterization of the record thus far submitted, and the Court will employ those same generic characterizations.

[3]  Nurriddin filed his initial opposition brief with accompanying exhibits on May 10, 2007 (ECF #63) and then filed a corrected opposition brief without exhibits on July 12, 2007 (ECF #68).  For ease of reference, the Court will cite to Nurridin's corrected opposition brief simply as "Pl.'s Mem." and to his exhibits as "Pl.'s Ex."  Defendants' memorandum in support of the motion to dismiss will be cited as "Defs.' Mem." and their exhibits, which are scattered in the record, will be cited by ECF document number with the notation "Defs.' Ex."

information about him from the Department of Labor Office of Workers Compensation Programs ("OWCP"). Upon consideration of the voluminous record, the Court concludes  that only the Title VII claims concerning discrete adverse actions may proceed; the remainder of Nurriddin's claims will be dismissed for the reasons set forth below.

## BACKGROUND

The events underlying the current claims occurred from late 1996 through 2004, but for context, the Court, like the second amended complaint, will recount the most salient events of Nurriddin I to set the stage for evaluating the present claims. In May 1991, plaintiff, initially a contract employee working for NASA, was converted to a full-time civil servant as a Publications Specialist in NASA's Educational Affairs Division (also referred to as "Code FE"), at the GS-12 level. 382 F. Supp. 2d at 86. Shortly thereafter, he alleged that he had been hired at two grade-levels below others performing similar duties because of his race, and sought a noncompetitive promotion to the GS-13 and GS-14 levels, based on his level of duties and responsibilities. Id. at 86-87, 95-101; Second Am. Compl. ¶¶ 44-50.

Following his informal complaints about the discriminatory GS grade levels, plaintiff experienced what he perceived to be further discriminatory and retaliatory actions, including (1) a letter of reprimand citing him for a negative attitude, failure to follow instructions, failure to complete assignments on time, and failure to keep supervisors abreast of his location, (2) a failure by management to investigate offensive icons located on a co-worker's computer; (3) reassignment of duties; (4) denial of authorization to travel to a minority conference; and (5) further admonishments and reprimands by email. 382 F. Supp. 2d at 86-88. He made his first contact with an EEO counselor in December 1994, which was followed by an administrative complaint; he again contacted an EEO counselor on November 5, 1996, and filed a second

administrative complaint on April 3, 1997.  Id. at 88.  He then filed his first Title VII lawsuit on

December 21, 1999, alleging that the foregoing employment actions were motivated by

discrimination on the basis of race, gender, and religion, by retaliation for engaging in EEO

activity, and constituted a hostile work environment.  Id. at 85-88.

        This Court concluded that plaintiff had failed to exhaust his administrative remedies on

some of the claims, including the initial decision in 1991 to hire him two grade levels below

certain other employees; hence, summary judgment was entered for defendant on those claims.

Id. at 92-93 (citing 29 C.F.R. § 1614.105(a)).  The Court then examined the remaining claims on

the merits to determine whether plaintiff had presented evidence sufficient to support an inference

of discrimination or retaliation behind any of the actions, focusing on the letter of reprimand, the

decisions to deny him a noncompetitive promotion to GS-13 or GS-14 (once in the 1991 to 1994

time frame, and again in the 1994 to 1996 time frame), a refusal to fund travel to a minority

conference, and an "ultimatum" issued to him concerning reassignment or a change in duties.  382

F. Supp. 2d at 93-106.  In each instance, the Court found that there was insufficient evidence -- in

some instances, no evidence at all -- from which a reasonable jury could find that discrimination

or retaliation played a role in the challenged actions.  Id.  The Court also rejected plaintiff's claim

of hostile work environment in toto, explaining that "[f]irst and foremost, many of the

incidents . . . are not related to race or religion," and furthermore, that the alleged harassment was

not "severe," "pervasive," or "abusive."  Id. at 108-09.  The Court then entered summary judgment

for defendant on all claims.  Id. at 92-109.  That decision was subsequently affirmed.

        Although the events underlying Nurriddin I closed in late 1996, plaintiff's troubles at

NASA continued.  Here begins the story of Nurriddin II -- the current action -- as recounted in the

second amended complaint.  Because the Court is reviewing the sufficiency of that complaint

against defendants' motion to dismiss, the Court will presume the factual allegations are true.

By the time of the events under review, plaintiff had been assigned to manage the Graduate Student Research Program ("GSRP") and the National Physical Sciences Consortium ("NPSC") training grant, where he had been placed since October 1995, still at the GS-12 level. Id. ¶ 52; see also 382 F. Supp. 2d at 102-04, 106 (rejecting plaintiff's claim that placement at the GS-12 level from 1994 to 1996 was discriminatory or retaliatory). On August 14, 1996, plaintiff received a performance rating of "Outstanding" -- the highest rating possible -- and was cited as an exemplary member of the Education Division. Second Am. Compl. ¶ 54. Subsequently, he received an $800 performance award for that rating, although workers outside of his protected classes received substantially higher amounts. Id. ¶ 55.

In June 1997, he filed a formal EEO complaint alleging continued disparate treatment based upon his race, gender and religion, and in reprisal for prior EEO activity. Id. ¶ 56. The next month, he was issued a lower performance evaluation -- "Fully Successful" -- which was based on the comments of Malcolm Phelps and Sherri McGee, his first-level supervisors; Franklin Owens, his second-level supervisor; and a "Dr. Dasch," who is described as an "informal supervisor."[4] Id. ¶¶ 57, 61. Phelps, McGee, Owens, and Dasch are each white; McGee is a woman. Id. ¶¶ 7, 10, 11. This evaluation came ten days after plaintiff had a verbal altercation with Dr. Phelps over his plans concerning an NAACP Youth Convention.[5] Id. ¶ 58. Plaintiff then initiated contact with an

---

[4]  Plaintiff presumably refers to Dr. Julius Dasch, a white male GS-14 employee discussed in Nurriddin I. 382 F. Supp. 2d at 97 n.4.

[5] Plaintiff alleges that Dr. Phelps became "upset" with him in response to plaintiff's proposal to introduce an African-American student at the convention. Second Am. Compl. ¶ 58. Plaintiff characterizes this as a "race-based verbal altercation," although his description does not indicate that Dr. Phelps made race an issue in their disagreement. Id.

EEO Counselor on September 16, 1997 and filed another formal complaint on December 11, 1997.  Id. ¶ 24.  This and the June 1997 complaint were among the first of at least nine EEO complaints in the years to come.

In or around November 1997, plaintiff received a long-sought noncompetitive promotion to GS-13.[6]  Id. ¶¶ 8, 49.  That same month, however, plaintiff  received another "lowered" performance evaluation.  Id. ¶ 59.  He heard, through Dr. Dasch, that this was due to Dr. Phelps' comment that plaintiff had attended "too many minority conferences."  Id.  As a result of the lowered rating, plaintiff received a diminished performance award.  Id. ¶ 60.  Plaintiff believes the lowered evaluation was inconsistent with the positive comments he received from others within and outside of the agency, including notes of appreciation from the NAACP and the American Indian Science and Engineering Society and a note stating "GSRP Success" from Dr. Gerald Soffen at the NASA Goddard Space Flight Center.  Id. ¶ 62.

At some unspecified points in 1997, plaintiff also was pursuing reclassification of his position into the "1701 series" -- which the record implies would grant him improved promotion potential.  Id. ¶ 63.  He submitted documentation in support of the reclassification to Cliff Woods in Human Resources, but Woods allegedly told an EEO counselor that he stopped working on the reclassification "because the General Counsel's Office told him to stop after [Nurriddin] did not accept the agency's proposed EEO settlement offer."  Id. ¶ 64.  Woods also told the EEO counselor that plaintiff lacked the "required education" for reclassification to the 1701 series, but at least one other employee -- Ms. Lynn Marra -- was placed in the 1701 series without the

_____

[6]  The circumstances surrounding the promotion to GS-13 are not apparent from the complaint or the parties' briefs.  The complaint only summarily indicates that plaintiff's GS-12 status changed in November 1997, and plaintiff reports his next grade as being GS-13.

required education.  Id. ¶ 66.  The reclassification review was never completed.  Id. ¶ 65.

Plaintiff then catalogs a series of negative management actions that occurred throughout

1997 and 1998: Ms. McGee's denial of cubicle space that was distributed by lottery (July 11,

1997) (¶ 67); Mr. Owens' decision to remove plaintiff's responsibilities for the NPSC program and

to reassign them to Ms. McGee (¶ 68-69); lack of support staff and funding for plaintiff's Graduate

Student Research Program work (¶ 70); criticisms for untimely grant processing (¶ 70-71); Mr.

Owens' solicitation of co-workers to "report on" plaintiff while he attended an NAACP

Convention in June 1998 (¶ 72); and management opposition to his travel to minority conferences

or liaison activities with minority groups (¶ 73).

Beginning in August 1998, the administrative investigation into plaintiff's pending EEO

complaints advanced significantly, and in plaintiff's view, he suffered because of it.  On or around

August 26, 1998, the EEO counselor concluded her interviews of Owens, McGee, Phelps, and

Vicki Novak, the Associate Administrator of Human Resources and Education.  Id. ¶ 80.  That

same day, plaintiff was issued a letter of reprimand for failure to follow conference attendance

procedures with respect to his attendance at the Blacks in Government Conference.  Id. ¶ 79.  That

month, he was also denied a noncompetitive promotion (presumably to GS-14); but Gary Gans, a

lesser qualified white co-worker, received a noncompetitive promotion.  Id. ¶ 78.  He was then

placed on strict leave restrictions that September; received two more letters of reprimand; was

denied travel to two minority conferences; and was partially denied administrative leave for EEO-

related matters.  Id. ¶ 84.

As these events transpired, plaintiff began the process of pursuing additional

administrative grievances under Title VII by initiating contact with an EEO counselor -- on

January 6, 1998; May 21, 1998; and September 9, 1998.  Id. ¶¶ 26-31.  Each contact resulted in

the filing of a formal complaint.  Id.  During plaintiff's 1998 performance evaluation, Dr. Phelps

told plaintiff that his EEO complaints were "a crock of shit" and "just bull shit."  Id. ¶ 85.  In

response to a question from plaintiff about the profanity, Dr. Phelps remarked, "Go file another

complaint."  Id.

Plaintiff alleges that his health began to suffer as a result of the stress at the office.  Id. ¶¶

74, 77.  He felt "stalked" and "intimidated" by Dr. Phelps, and took two weeks of stress and

anxiety-related sick leave.  Id.  In response to his health concerns, a reassignment was explored by

Novak and other managers -- a "permanent placement" in another office.  Id. ¶ 74.  But after the

EEO interviews of management, Owens told plaintiff that the request for a detail or transfer would

have to be put in writing to the EEO office.  Id. ¶ 82.  Plaintiff apparently made a written request

for transfer, citing his health concerns, as reflected in an exchange of letters between his doctor

and Paulette Quinn, the Chief of the Human Resources Operations Branch.  See id. ¶ 82, 96-97;

Pl.'s Ex. 82 (Letter from Quinn to Dr. Echeverry dated Nov. 12, 1998); Pl.'s Ex. 83 (Letter from

Dr. Echeverry to Quinn dated Dec. 16, 1998) (submitted under seal).  Plaintiff also met personally

with the then-head of NASA, Daniel Goldin, regarding his discrimination and harassment

complaints, but experienced no improvements to his situation.  Id. ¶¶ 86-87.  Plaintiff alleges that

George Reese, the Associate Administrator for Equal Opportunity Programs, advised him that he

"was being set-up for progressive disciplinary action -- including termination."  Id. ¶ 90.

Plaintiff ultimately was granted a one-year detail to the National Science Foundation

("NSF"), which began in February 1999.  Id. ¶ 92.  Plaintiff attributes this to an inquiry into his

EEO case by Congresswoman Eleanor Holmes Norton, although the record contains little on the

specifics of how the detail came about.[7]  See id.  In any event, plaintiff considered the detail

successful.  Id. ¶ 93.  Working under Dr. Joseph Reed at NSF, his performance was rated as

"Outstanding."  Id.

Upon his return to NASA in February or March 2000, problems arose once again -- this

time focused on a request for a reasonable accommodation of a disability.  Nurriddin was initially

assigned to work in the Human Resources Office with Alfred Castillo as his supervisor.  Id. ¶ 95.

But by March, he was instructed to return to the Education Division, which meant returning to Dr.

Phelps' supervision.  Id.  Plaintiff believed that Dr. Phelps and Franklin Owens took a "negative

view" of his minority program activities.  Id. ¶ 127.  Furthermore, plaintiff believed that Dr.

Phelps had denied him a within-grade increase because of a bias against him stemming from his

numerous EEO complaints naming Phelps as a discriminating official, as well as plaintiff's 1995

allegation against Phelps regarding a government laptop computer containing racist and sexual

icons.[8]  Id.  Plaintiff immediately began pursuing a transfer away from the Education Division,

based on his 1998 request for a permanent transfer, which he and at least one other manager

considered a request for reasonable accommodation of a disability.  Id. ¶ 96.

After getting past some initial confusion on whether and when plaintiff had formally

submitted a reasonable accommodation request, the agency began treating his request as such.

_____

[7]  Plaintiff alleges that he located the NSF position through his own efforts, and only
obtained approval for the detail after some initial management resistance.  See Pl.'s Mem. at 16.

[8]  Plaintiff's allegation regarding the government laptop is discussed in Nurriddin I.  In
particular, the Court notes that Nurriddin I found the laptop allegations not probative of
discrimination.  See 382 F. Supp. 2d at 87, 108 (noting that folder icons on computer labeled
"racist jokes and stories" and "sex bulletin board" were empty, the icons were not directed at
plaintiff, and Phelps was unaware of the origin of the icons).  Those events may, however, be
relevant to a claim of retaliation.

See Pl.'s Ex. 51a-c.  On April 27, 2000, Ms. Quinn from Human Resources requested that an

agency doctor, Dr. Steven Conway, review plaintiff's medical documentation to determine

whether a reasonable accommodation was supported by the information submitted.  Second Am.

Compl. ¶ 98.  Dr. Conway responded:

> Medical information has been supplied to NASA Human Resources, by John
> Echeverry, Ph.D., and W. Scott Schroth, M.D., M.P.H., Associate Professor of
> Medicine, George Washington University, both practitioners in the care of Mr.
> Nurriddin.  It is their opinion that Mr. Nurriddin has a medical condition [related to
> depression and anxiety], which impacts on his ability to perform his work.  It is
> also their opinion that working conditions at NASA aggravate[] this disorder.
> Accordingly, they recommend a transfer to a less stressful work site for Mr.
> Nurriddin and continued treatment for his illness.
>
> On the basis of their reports, I accept this opinion by these qualified
> Practitioners.

Pl.'s Ex. 2 (Mem. dated June 2, 2000).  Based on the same medical documentation, one of

plaintiff's first-line supervisors, McGee, circulated a draft email proposing to grant plaintiff sick

leave for the period April 20th to May 12th.  Second Am. Compl. ¶ 100; see also Pl.'s Ex. 55a-b.

Other managers opposed the authorization of sick leave, as did NASA's legal counsel handling

EEO matters, and plaintiff was ultimately coded as AWOL for that period as well as other periods.

Second Am. Compl. ¶¶ 101-11, 117.

Around the same time, plaintiff applied for and was accepted into the NASA Voluntary

Leave Transfer Program, which permits eligible employees to receive annual leave donated by

other federal employees.  Id. ¶ 112.  Plaintiff's acceptance into the program was based on his

medical condition and the documentation provided by his doctors.  Id.  Ultimately, his access to

donated leave was severely restricted, and he was denied access to at least one instance of leave

donated specifically to him.  Id. ¶ 126.  His managers characterized his acceptance into the

program as a "problem" in light of the decision to designate him as AWOL and to deny other

leave requests.  Id. ¶ 113 & Pl.'s Ex. 60a-c.  When the problem was raised in a series of emails, Castillo responded "Yegads! will we ever finish with this guy?" and decided to let the AWOL code remain in place.  Second Am. Compl. ¶ 114 & Pl.'s Ex. 60a-c.

On August 8, 2000, Hillard Harrison, another NASA employee, noted by email that the pending litigation in Nurriddin I might affect their approach to plaintiff, stating "I guess this week might be key to know if there will be a settlement [from the mediation], but if it doesn't happen, we may want to take another look at how to proceed."  Second Am. Compl. ¶ 118.  The mediation was unsuccessful.  Id.  On August 10, Castillo sent an email to other managers stating: "Absent compelling reason for further accommodations, medical or otherwise, it's time to take corrective action for the continuing absences without acceptable reasons."  Id. ¶ 119.  Plaintiff, in turn, pursued administrative recourse on additional claims, contacting an EEO counselor on August 18, 2000.  Id. ¶ 34.

Plaintiff's leave status remained an ongoing issue for management, as his leave requests accumulated and he ultimately sought and was granted workers' compensation based on his depression and anxiety. Second Am. Compl. ¶ 115-31.  Indeed, the record reveals, undisputed by plaintiff, that he stopped reporting for duty after July 15, 2000, but remained an employee while out on various forms of leave and workers' compensation.  See Defs.' Mem. at 28 (citing Affidavit of Sharmila de Mello-Zieschang ¶ 2)).  On August 30, 2000, he requested 150 hours of advanced sick leave for the period September 12 through December 1.  Id. ¶ 120.  The request was denied. Id. ¶ 122.  Hence, for over two months, he was considered AWOL, and had no source of income. Id. at 120-21.  Plaintiff then requested coverage under the Family and Medical Leave Act on November 8, 2000.  Id. ¶ 123.  While that request was pending, on November 11th, the Department of Labor Office of Workers' Compensation Programs -- through Dr. Theodore

Postolache -- diagnosed plaintiff with major depression, and also determined that there was a

causal relationship between plaintiff's depression and certain employment-related incidents,

including criticisms for attending "too many minority conferences." Id. ¶ 123-24.  Ten weeks

later, NASA approved his Family and Medical Leave Act request, retroactive to November 11,

2000, for a period of 12 weeks, expiring February 9, 2001.  Id. ¶ 125.  Plaintiff began receiving

workers' compensation through the Department of Labor for "occupational disease" in late 2000 or

early 2001, which continues to date.  Defs.' Mem. at 28 (identifying effective date of workers'

compensation as March 2001) (citing Affidavit of Dorothy Egbert ¶ 2); see also Pl.'s Ex. 104

(filed under seal May 10, 2007) (identifying effective date as December 6, 2000).

Although plaintiff was out on workers' compensation, his request for a transfer continued

to be the subject of much discussion among management and NASA's legal office.  Novak was

against granting a transfer to another office.  Second Am. Compl. ¶ 128.  She sent an email on

September 14, 2001, stating:

> I really do not want to offer him another job in [Code] F.  He's not qualified and
> he'll just create major problems if he should accept.  A while back, Bob Stephens
> suggested that we (FE) take [Nurriddin] back, give him work (they have a job for
> him) and document it if he can't handle it . . . . I think it is better to work this at
> other than our level if we can.

Id.; Pl.'s Ex. 73a.  In response, Castillo noted that "legal counsel" had suggested offering plaintiff

a job that he would not accept as a "tactical ploy" that would enable the agency "to close off the

OWCP [worker's compensation] claim."  Second Am. Compl. ¶ 129; Pl.'s Ex. 73b.  Novak then

sent an email to Nurriddin's managers -- Castillo, Stephens, Batkin, Owens, McGee, Phelps, and

Harrison -- to organize a meeting:

> Ladies and gents, I am asking Denise Gross, of my staff, to set up a meeting with
> all of us to discuss the AN [Ahmad Nurriddin] "case" in terms of where we are
> going on this.  It has become clear to me in the last few days that everyone is NOT

on the same wave length in terms of strategy. . . . From there, we will take whatever action is necessary.

Second Am. Compl. ¶ 130; Pl.'s Ex. 74a-b. Plaintiff alleges that, at that meeting, a decision was made to close off his workers' compensation claim by making him a job offer in "Code FE" -- the office that was the source of his stress -- that his managers believed he would not accept. Second Am. Compl. ¶¶ 131, 135-36. This was called "the FE option" or "the FE approach." Id.

On October 9, 2001, Pamela Covington, an African American employee, suggested that a detail assignment was a "strong possibility at GSFC [Goddard Space Flight Center]." Id. ¶ 132. Novak rejected the option, also stating "looks like we are heading toward the FE option." Id. ¶ 133. Harrison echoed her comments: "A detail does nothing positive for us except delay whatever will happen. So moving ahead with FE appears to be the best way to proceed at this point." Id.

By letter dated October 12, 2001, management notified plaintiff of the decision to return him to his duties as an Education Programs Specialist in "FE", but with a "change" of supervisors -- McGee and Owens, instead of Dr. Phelps -- to "accommodate any limitations" -- referring to the stress and depression allegedly caused by his former situation -- and a change in the physical location of his office to "reduc[e] the possibility of contact with [his] former supervisor [Phelps]." Pl.'s Ex. 79 (Letter from Castillo to Nurriddin, dated Oct. 12, 2001); Second Am. Compl. ¶ 136. Plaintiff believed the accommodations offered were inadequate because he would be returned to the environment that caused his anxiety and depression, under the supervision of those who were the subject of his EEO complaints, and he refused the offer. Second Am. Compl. ¶ 137. He then initiated contact with an EEO counselor later that month. Id. ¶ 36. Based on the representations in the Castillo return-to-work letter, however, the Office of Workers' Compensation Programs terminated plaintiff's benefits on December 26, 2001. Pl.'s Ex. 84 (Letter from OWCP to

Nurriddin, dated Dec. 26, 2001).

The OWCP then vacated its decision less than two months later.  Second Am. Compl. ¶ 138. It explained that the workers' compensation claim was originally granted based on plaintiff's "Occupational Disease claim . . . [of] depression as a result of his federal job duties," and noted a physician's determination that "claimant could perform duties without necessary stress, such as perceived discriminatory treatment."  Pl.'s Ex. 85 (Mem. dated Feb. 5, 2002).   It further explained that:

> [I]t has been determined that the claimant mentions both Ms. Sherrie McGhee [sic] and Mr. Frank Owens in his initial claim[] filed against management of NASA. There is also an email message that circulated through NASA where the agency is discussing offering the claimant a job that he would not accept.  Therefore, his compensation would be terminated.  Although the location of the job is different, Mr. Owens and Ms. McGhee [sic] would still supervise the claimant.  This is not satisfactory because Mr. Owens and Ms. McGhee [sic] were named in the original complaint as contributing to Mr. Nurriddin's condition.
>
> Therefore, based on the above evidence of file, it has been determined that the job offer is not suitable.

Id.  Hence, plaintiff's workers' compensation benefits were restored on February 5, 2002.  Id.

The complaint is silent on events at the office post-dating the October 2001 Castillo return-to-work letter, presumably because plaintiff was no longer reporting to work.[9]  The next significant event came on December 4, 2003, when NASA sent him a letter proposing to terminate his employment based on a finding of "medical inability to perform the duties of your position." Pl.'s Ex. 95.   Plaintiff attributes this sudden termination proposal to his actions in the Nurriddin I litigation, including a motion he had filed the day before to amend his judicial complaint against

---

[9]  Plaintiff acknowledges that there were no adverse actions from October 2001 until December 2003, though he casts it as "NASA ceas[ing] all communication with him" for that period.  See Pl.'s Mem. at 28.

NASA.  See Nurriddin Decl. at 6 (filed July 12, 2007); see also Nurriddin v. Goldin, Civil Action

No. 99-3401, ECF #93 (Pl.'s Mot. for Leave to Amend Compl.).  He also believes defendants took

this action against him because of his disability (depression).  Second Am. Compl. ¶140.  The

termination was finalized on February 6, 2004.  Id. ¶ 22.

After challenging the termination administratively, plaintiff then filed this lawsuit seeking

promotion to GS-15, retroactive to January 1, 1998, with accompanying backpay, and $300,000 in

compensatory damages.  Id. ¶¶ 38-39 & Prayer for Relief.  The second amended complaint

enumerates nine causes of action.  He brings six counts under Title VII: race discrimination

(Count One); sex discrimination (Count Two);  religious discrimination (Count Three); retaliation

(Count Four); hostile work environment (Count Eight, but mislabeled Count Nine), and wrongful

termination based on race, sex, religion, disability, and reprisal (Count Nine).[10]  He also alleges

two counts under the Rehabilitation Act: failure to reasonably accommodate an individual with a

disability or perceived to have a disability (Count Five), and the denial of his request for

reasonable accommodation as retaliation (Count Six).  Furthermore, he alleges that four

individuals -- Novak, Castillo, Phelps, and Batkin -- were engaged in a conspiracy to deprive him

of his constitutional rights, on account of his race and religion (Count Seven).

The second amended complaint does not, for the most part, specify which of the many

events cataloged are the focus of each of the Title VII and Rehabilitation Act counts, in contrast to

background information.[11]  Instead, most counts simply incorporate all of the prior paragraphs and

---

[10]  Plaintiff also makes a reference to age discrimination in Count Nine, which appears to
be a mistake, as no other paragraph of his 193-paragraph second amended complaint makes any
reference to age discrimination.

[11]  Indeed, it is clear that at least some of the events described therein are the subject of
Nurriddin I, and were provided only for background information.

then summarily allege "discrimination" or "retaliation."  However, plaintiff's memorandum in opposition to defendants' motion to dismiss itemizes which of the management actions described are being challenged as violations of law, and the Court will tailor its analysis of each count accordingly.[12]  Specifically, with respect to his Title VII claims, plaintiff states that "he was discriminated against, based upon his race, gender, and religion, when he was (a) wrongly terminated; (b) placed on AWOL for 59 days; (c) denied work-related travel to minority conferences; (d) denied a non-competitive promotion; (e) denied prompt use of donated leave while on medical leave; (f) denied performance awards; and (g) denied a timely within-grade increase."  See Pl.'s Mem. at 2.  He identifies the same management actions as the subject of his Title VII retaliation claim.  Id. at 3.  With respect to his Rehabilitation Act claims, he alleges he was the victim of disability discrimination when he was "(a) wrongly terminated; (b) placed on AWOL for 59 days; (c) denied prompt use of donated leave; (d) denied a prompt within-grade increase; (e) denied reasonable accommodations; and (f) denied performance awards."  Id. at 2.  Defendants' motion to dismiss requests dismissal of the entire action based on a combination of arguments: failure to state a claim upon which relief can be granted with respect to the conspiracy counts; failure to allege a disability or perceived disability; failure to adequately exhaust administrative remedies with respect to certain claims; and failure to allege facts sufficient to support an inference of discrimination or retaliation.  See Defs.' Mem. at 11-26.  In the alternative, defendants seek summary judgment on the discrimination and retaliation claims on the ground that the record does not support an inference of discrimination, in particular with respect to his termination.  Id. at 26-30.  The Court addresses each of these arguments below.

---

[12]  Without such tailoring, the Court would be left to guess which of the dozens of emails and letters that were issued over the course of eight years were the subject of each count.

## STANDARD OF REVIEW

I.   **Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)**

All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); accord Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555-56; see also Papasan v. Allain, 478 U.S. 265, 286 (1986).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570); Atherton v. District of Columbia Office of the Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009).  A complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949.  This amounts to a "two-pronged approach" under which a court first identifies the factual allegations entitled to an assumption of truth and then determines "whether they plausibly give rise to an entitlement to relief." Id. at 1950-51.

The notice pleading rules are not meant to impose a great burden on a plaintiff. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002).  When the sufficiency of a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should

be liberally construed in his or her favor.  Leatherman v. Tarrant County Narcotics Intelligence &

Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968

(D.C. Cir. 1979); see also Erickson, 551 U.S. at 94 (citing Twombly, 550 U.S. at 555-56).  The

plaintiff must be given every favorable inference that may be drawn from the allegations of fact.

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Sparrow v. United Air Lines, Inc., 216 F.3d 1111,

1113 (D.C. Cir. 2000).  However, "the court need not accept inferences drawn by plaintiffs if such

inferences are unsupported by the facts set out in the complaint."  Kowal v. MCI Commc'ns Corp.,

16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nor does the court accept "a legal conclusion couched as a

factual allegation," or "naked assertions [of unlawful misconduct] devoid of further factual

enhancement."  Iqbal, 129 S. Ct. at 1949-50 (internal quotation marks omitted); see also

Aktieselskabet AF 21. November 21 v. Fame Jeans Inc., 525 F.3d 8, 17 n.4 (D.C. Cir. 2008)

(explaining that the court has "never accepted legal conclusions cast in the form of factual

allegations").

## II.    Summary Judgment Pursuant to Fed. R. Civ. P. 56(c)

        When, on a Rule 12(b)(6) motion, "matters outside the pleadings are presented to and not

excluded by the court, the motion must be treated as one for summary judgment under Rule 56"

and "[a]ll parties must be given a reasonable opportunity to present all the material that is

pertinent to the motion."  Fed. R. Civ. P. 12(d); see Yates v. Dist. of Columbia, 324 F.3d 724, 725

(D.C. Cir. 2003).  Summary judgment is appropriate when the pleadings and the evidence

demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment

bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.

See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully

support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" which it believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## DISCUSSION

Plaintiff's long history of EEO activity and Title VII litigation have given rise to a series of actions by NASA management that plaintiff perceives to be discriminatory and retaliatory.  In an apparent attempt to plead all available causes of action, plaintiff has cast his net wide, alleging all manner of discriminatory and retaliatory animus under Title VII, as well as disability discrimination and conspiracy.  However, some allegations are stronger than others; indeed, the present record indicates that, of all of plaintiff's legal theories, his claim of retaliation is far better supported (and more plausible) than any other claim.  However, at this early stage of litigation, the Court is limited to assessing whether plaintiff's complaint states a claim upon which relief can be granted, and whether the record is sufficient to warrant the entry of summary judgment on any

claims.  As discussed below, plaintiff's claims of retaliation under Title VII are supported by

detailed factual allegations indicating retaliatory animus and will be allowed to proceed to

discovery.  The factual allegations in support of discrimination based on race, gender and religion

are far less substantial, but suffice to survive defendants' motion to dismiss or for summary

judgment under the law of this circuit.  In contrast, his claims of conspiracy, disability

discrimination, and hostile work environment fail as a matter of law.  No discovery is necessary

for the Court to reach these resolutions; hence, plaintiff's motion under Rule 56(f) as to these three

claims will be denied.  The Court will begin with the latter claims.

## I.      Conspiracy to Deprive Plaintiff of His Constitutional Rights

This action is primarily against the Administrator of NASA in his official capacity.

However, plaintiff brings a claim for conspiracy to violate his constitutional rights against Novak,

Castillo, Phelps, and Batkin in their individual capacities based on the various actions they took

against him during the course of his employment.   See Second Am. Compl. ¶¶ 1, 179-84.  He

cites "the Conspiracy Act § 1983" as the basis of this claim, referring, presumably, to 42 U.S.C. §

1983.  In response, defendants contend that plaintiff fails to state a claim cognizable under § 1983

because that section applies only to states and municipalities, rather than the federal government,

and further contends that the head of the agency is the only proper defendant with respect to the

claims under Title VII and the Rehabilitation Act.  See Defs.' Mot. at 1 n.1; Defs.' Mem. at 11-12.

The Court agrees that, as a matter of law, plaintiff may not pursue a conspiracy claim against any

of the defendants.

The Supreme Court has held that Title VII is the "exclusive pre-emptive administrative

and judicial scheme for the redress of federal employment discrimination." Brown v. Gen. Servs.

Admin., 425 U.S. 820, 829 (1976).  Hence, aggrieved individuals have not been permitted to

pursue redress for discrimination in federal employment under provisions of the Civil Rights Act
of 1871 -- 42 U.S.C. §§ 1981, 1983, and § 1985(3) -- or under the Constitution. Id. at 835
(affirming dismissal of claim under § 1981 because Title VII provides "the exclusive judicial
remedy for claims of discrimination in federal employment"); Great American Fed. Savings &
Loan Ass'n v. Novotny, 442 U.S. 366. 378 (1979) (applying reasoning of Brown to preclude
employment discrimination claims labeled as "conspiracy to deprive [plaintiff] of equal protection
of the laws" under § 1985(3)); Ethnic Employees of the Library of Congress v. Boorstin, 751 F.2d
1405, 1415 (D.C. Cir. 1985) ("federal employees may not bring suit under the Constitution for
employment discrimination that is actionable under Title VII"); Brug v. Nat'l Coalition for the
Homeless, 45 F. Supp. 2d 33, 42 (D.D.C. 1999) (holding that federal employee was precluded
from bringing claims of constitutional violations under § 1983 based on holdings of Brown and
Novotny). Of course, defendants are also correct that plaintiff's § 1983 claim fails because that
statute is limited to "state action," which is wholly absent here. See Dye v. United States, 516 F.
Supp. 2d 61, 71 (D.D.C. 2007) ("[b]oth statutes [§§ 1983 and 1985(3)] are addressed to state
action, not federal action"). Therefore, the Court holds that plaintiff's claim of a conspiracy to
violate his civil rights (Count Seven) -- whether brought under § 1983 or § 1985(3) -- must be
dismissed for failure to state a claim upon which relief can be granted.

Because the conspiracy claim is the only claim in which he names Novak, Castillo, Phelps,
and Batkin as individual defendants, those defendants are dismissed from this lawsuit. To the
extent that Novak is sued in her official capacity (see Second Am. Compl. ¶ 6), she is dismissed in
that capacity as well. The only proper defendant in a civil action under Title VII is "the head of
the department, agency, or unit." See 42 U.S.C. § 2000e-16(c); Hackley v. Roudebush, 520 F.2d
108, 115 n.17 (D.C. Cir. 1975); accord Nichols v. Truscott, 424 F. Supp. 2d 124, 131 n.8 (D.D.C.

2006).  The same is true of a civil action under the Rehabilitation Act.  Marshall v. Potter, 634 F.

Supp. 2d 66, 68 (D.D.C. 2009) ("Since the Rehabilitation Act draws from the procedures of Title

VII, the only proper defendant is the head of the department, agency, or unit.") (citations and

internal quotation marks omitted).  Here, that person is defendant Bolden, the Administrator of

NASA, now the sole remaining defendant in the case.

## II.      Disability Discrimination under the Rehabilitation Act

Plaintiff also alleges disability discrimination under the Rehabilitation Act, based on his

conditions of major depression, anxiety disorder, and back pain.  He alleges failure to reasonably

accommodate an individual with a disability or perceived to have a disability (Count Five), and

that the denial of his request for reasonable accommodation was in retaliation for his disability

(Count Six).  He also alleges that he was the subject of other adverse actions because of his

disability or perceived disability, including ultimately his termination (Count Nine).

Section 501 of the Rehabilitation Act prohibits federal agencies from engaging in

employment discrimination against disabled individuals and further requires agencies to make

reasonable accommodations for persons with disabilities unless such accommodations would

impose undue hardship on the agency.  See Adams v. Rice, 531 F.3d 936, 942 (D.C. Cir. 2008);

Taylor v. Rice, 451 F.3d 898, 905 (D.C. Cir. 2006).[13]  A person is disabled under the

Rehabilitation Act if he "has a physical or mental impairment which substantially limits one or

more of such person's major life activities; has a record of such an impairment; or is regarded as

---

[13]  The literal text of section 501(b) requires federal agencies to create affirmative
programs for the hiring, placement, and advancement of individuals with disabilities, but courts
have long recognized that this section recognizes a private action for challenging individual
employment decisions.  Taylor, 451 F.3d at 390 & n.11.

having such an impairment." 29 U.S.C. § 705(20)(B).[14] Defendants move to dismiss plaintiff's

Rehabilitation Act claims on the ground that plaintiff's impairments do not constitute a

"disability" because they do not substantially limit one or more of his major life activities.

Plaintiff responds that acceptance of his claim by the Office of Workers' Compensation Programs

proves that he is unable to work and, hence, is disabled, and furthermore, that agency officials

necessarily regarded him as disabled in light of their decision to terminate him based on "medical

inability to perform the duties of his position." See Pl.'s Mem. at 4-5, 8-9.

### A.    Substantial Limitation of a Major Life Activity

The primary dispute on the disability claim hinges on whether, during the relevant time

periods, plaintiff's condition substantially limited one or more major life activities. As the

Supreme Court has emphasized, "merely having an impairment does not make [an individual]

disabled." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002).[15] A claimant

must demonstrate that the impairment "substantially limits" a "major life activity." Id.

Furthermore, the Supreme Court has cautioned that these terms "need to be interpreted strictly to

---

[14] Significant changes to the Rehabilitation Act and the Americans with Disabilities Act ("ADA") took effect on January 1, 2009, long after the events under review took place. See ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). This circuit has held that "the Amendments do not apply retroactively," agreeing with other courts that have addressed the issue. Lytes v. D.C. Water and Sewer Auth., 572 F.3d 936, 938-42 (D.C. Cir. 2009) (citing EEOC v. Agro Distribution, LLC, 555 F.3d 462, 470 n.8 (5th Cir. 2009), and Moran v. Premier Educ. Group, LP, 599 F. Supp. 2d 263, 271-72 (D. Conn. 2009)); accord Fredricksen v. United Parcel Serv., 581 F.3d 516, 521 n.1 (7th Cir. 2009). Hence, courts are to apply the law prior to enactment of the Amendments to determine whether a person is an "individual with a disability." Lytes, 572 F.3d at 942.

[15] The liability standards of the Rehabilitation Act and the ADA are the same in employment discrimination cases, and thus cases interpreting either statute are applicable in defining the term "disability" and otherwise determining liability. See Adams, 531 F.3d at 943; Breen v. Dep't of Transp., 282 F.3d 839, 841 (D.C. Cir. 2002).

create a demanding standard for qualifying as disabled," in order to be consistent with legislative findings regarding the number of disabled Americans. Id. at 197; Lytes, 572 F.3d at 942 (noting that the protections of the ADA are triggered only "after [the] 'demanding standard' [of Toyota] is met.") (brackets in original).

Neither the ADA nor the Rehabilitation Act defines "major life activity."  However, the Supreme Court has interpreted "major life activities" to mean "those activities that are of central importance to daily life." Toyota, 534 U.S. at 197; see also Bragdon v. Abbott, 524 U.S. 624, 638 (1998) (considering an activity's "comparative importance" in life and its general "significance"). In deciding whether something is a major life activity, courts consider the activity's significance as contemplated by the statute, rather than its importance to a particular individual.  See Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir. 1999); Colwell v. Suffolk Cty. Police Dep't, 158 F.3d 635, 642 (2d Cir. 1998).

Because Congress intended the existence of a disability to be determined by defining disability "with respect to an individual," the determination of whether an individual is substantially limited in a major life activity must be made on a case-by-case basis. Toyota, 534 U.S. at 198. Merely submitting a medical diagnosis of an impairment is insufficient to establish disability status. Id. Instead, a plaintiff must "[offer] evidence that the extent of the limitation [caused by the impairment] in terms of their own experience ... is substantial.'" Id. (citations omitted).  The impairment must "prevent or severely restrict" the individual in the major life activity at issue and must have a permanent or long-term impact. Id.

Plaintiff suggests that he is substantially limited in the major life activity of working. Pl.'s Mem. at 8.   He contends that he is substantially limited in working in NASA's Education Division because of the stress and depression brought on by the discrimination and retaliation

from the supervisors there.  Id. at 4; Second Am. Compl. at 99.  Both the Supreme Court and the

D.C. Circuit have assumed without deciding that working is a major life activity, and this Court

will do the same here.  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999); Duncan v.

Washington Metro. Area Transit Auth., 240 F.3d 1110, 1114 n.1 (D.C. Cir. 2001) (en banc)

     To establish that an impairment substantially limits the ability to work, a plaintiff must

"allege and prove that in his particular circumstances ... his impairment prevents him from

performing a "'substantial class' or 'broad range' of jobs otherwise available to him."  Duncan, 240

F.3d at 1115.  To be substantially limited in working, "one must be precluded from more than one

type of job, a specialized job, or a particular job of choice."  Sutton, 527 U.S. at 492.  In this case,

plaintiff's claim cannot succeed because he has not alleged that he is excluded from a substantial

class or broad range of jobs.  He has effectively conceded that he is not precluded from a broad

range of jobs by alleging that he can work successfully outside the negative atmosphere that exists

within NASA's Education Division.  For example, in an April 18, 2000, email that plaintiff

characterizes as a request for reasonable accommodation, he states: "This message is to officially

request that I be given an assignment that is not in the FE office and does not have extensive

interface with the FE office."  See Pl.'s Ex. 51a.  Indeed, plaintiff's own doctor determined that

plaintiff was able to work "provided he has the opportunity to work in an environment where he

can feel respected, useful, and able to perform his duties without unnecessary stress."  Pl.'s Ex.

83.[16]

     Plaintiff cites the decision by the Office of Workers' Compensation Programs to accept his

---

[16]  This exhibit was filed under seal because it contains a medical evaluation of plaintiff.
However, the Court has determined that the quoted text regarding plaintiff's ability to work
discloses no confidential information and may be placed on the public record.

claim for workers' compensation as evidence of his inability to work.  But to the contrary, that office's decision acknowledges plaintiff's ability to work in an appropriate environment.  Pl.'s Ex. 85.  In its decision to restore workers' compensation on February 5, 2002, that office explained that "the most current report dated November 7, 2001 indicates that [Nurriddin] could perform duties without necessary stress, such as perceived discriminatory treatment."  Id.

Indeed, plaintiff's own complaint underscores his ability to work outside of NASA's Education Division.  He highlights his one-year detail to NSF, where he received an "outstanding" rating, as an example of his ability to succeed when away from the allegedly discriminatory and retaliatory environment at NASA.  Second Am. Compl. ¶¶ 92-93.  Plaintiff makes no attempt to argue that his condition precludes him from a broad range or class of jobs that exist in the geographical areas to which he has access, including, of course, positions both within and entirely outside of NASA.  In short, neither the complaint, nor any evidence offered outside of the complaint, suggests that plaintiff is substantially limited in the major life activity of working.  Therefore, his contention that he has a disability fails as a matter of law.

**B.**     **Being "Regarded As" Having a Disability**

Plaintiff also argues that, by terminating him based on "medical inability to perform the duties of his position," defendants necessarily "regarded" him as having a disability under the third definition of "individual with a disability," 29 U.S.C. § 705(20)(B)(iii).  See Pl.'s Mem. at 4-5, 8-9.  An individual is "regarded as" disabled if his employer "mistakenly believes that [the] person has a physical impairment that substantially limits one or more major life activities" or "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  Sutton, 527 U.S. at 489.  In other words, to qualify as disabled under the "regarded as" prong, plaintiff must "do more than show that [he] . . . was regarded as having an impairment

of some sort.  Rather, [he] must show that [his] alleged impairment . . .  was believed to be one that 'substantially limits one or more . . . major life activities.'"  <u>Adams</u>, 531 F.3d at 943 (quoting 29 U.S.C. § 705(20)(B)).

The statement cited by plaintiff fails to support the contention that defendants "regarded" him as disabled.  In relevant part, that letter states he is medically unable to perform the functions of his former position as an Education Programs Specialist: "This is a notice of proposal to remove you from your position of Education Programs Specialist, GS-0301-13, and from the Federal service . . . . The reason for this proposed removal is your medical inability to perform the duties of your position."  Pl.'s Ex. 95.  But to establish that an impairment substantially limits the ability to work, he must allege that the impairment prevents him from performing a "substantial class" or "broad range" of jobs.  <u>Duncan</u>, 240 F.3d at 1115.

The finding regarding medical inability arguably covers other jobs in the Education Division at NASA.  <u>See</u> Pl.'s Ex. 95 ("The medical documentation provided on your behalf by . . . Dr. John Echeverry states . . . that you cannot work in the office environment to which you were assigned in the Education Division at NASA Headquarters.").  But this is a far cry from indicating that NASA believed plaintiff was unable to perform a "substantial class" or "broad range" of jobs.  <u>See</u> <u>EEOC v. J. B. Hunt Transp., Inc.</u>, 321 F.3d 69, 75 (2d Cir. 2003) (holding that employer with policy of not hiring applicants taking medications that impaired driving ability did not "regard" applicants as disabled because "driving freight-carrying tractor-trailer trucks over long distances for extended periods of time" did not constitute a broad range or class of jobs). Moreover, as discussed above, plaintiff's own doctor attested to plaintiff's ability to work in an environment "without necessary stress" -- an opinion that was communicated to defendants.  Hence, plaintiff's claim that defendants "regarded" him as disabled fails as a matter of law.

In summary, plaintiff was not an "individual with a disability" under the Rehabilitation Act. Accordingly, his claims of failure to provide reasonable accommodation for his disability and claims of disparate treatment based on actual or perceived disability will be dismissed.

### III.   Claims of Discrete Acts of Discrimination and Retaliation under Title VII

#### A.   Exhaustion of Administrative Remedies

Defendants move to dismiss several of plaintiff's discrimination claims for failure to exhaust administrative remedies -- in particular, the denial of travel opportunities to two minority conferences and the denial of a noncompetitive promotion, both in late 1998.[17]  See Defs.' Mem. at 12-16.  Defendants acknowledge that plaintiff initiated contact with an EEO counselor for each of these claims within 45 days, but contend that he failed to file a formal complaint thereafter in a timely manner.  Id.  In response, plaintiff contends that defendants waived the exhaustion defense by accepting and investigating the EEO complaints, and then issuing a final decision on the merits, all without mentioning timeliness.  See Pl.'s Mem. at 9-10.

Pursuant to 29 C.F.R. § 1614.105(a)(1), an employee alleging discrimination must contact an EEO counselor in order to try to informally resolve the matter, and must do so "within 45 days of the date of the matter alleged to be discriminatory, or in the case of personnel action, within 45 days of the effective date of the action."  The EEO counselor must conduct a "final interview" with the employee and, if the matter has not been resolved, must provide him written notice of the

---

[17]  Defendants also contend that plaintiff failed to exhaust his administrative remedies with respect to the following events from 1998: the allegation of stalking and intimidation by Phelps and "spying" by co-workers at another supervisor's request; various reprimands and close scrutiny of plaintiff's work; leave restrictions; and failure to provide adequate support staff and funding to plaintiff.  However, plaintiff has not challenged these events, standing alone, as constituting violations of Title VII (see Pl.'s Mem. at 2-3), and the Court construes the complaint as alleging these incidents simply as background information in support of his enumerated claims, in particular, his hostile work environment claim.

right to file an administrative complaint with the agency that allegedly discriminated against him. Id. § 1614.105(d).  The employee must file the administrative complaint within 15 days of receipt of that notice.  Id. § 1614.106(a)-(b).  A party must exhaust his administrative remedies within the Title VII limitations period for each discrete act of discrimination alleged or lose the ability to recover for it.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114-15 (2002).  However, exhaustion of administrative remedies, "like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir. 1985).

Defendants' exhaustion argument suffers from two fatal flaws.  First, the employer bears the burden of proving failure to exhaust.  See Brown, 777 F.2d at 12-13; accord Hudson v. Children's Nat'l Med. Ctr., --- F. Supp. 2d ---, 2009 WL 2568008, at *2 (D.D.C. 2009). Defendants have failed to do that here.  They contend that plaintiff failed to file a timely administrative complaint for the claims concerning denial of travel opportunities and denial of a noncompetitive promotion on the ground plaintiff's complaint was not filed within 15 days of the "final counseling interview" or "last contact with the EEO counselor."  See Defs.' Mem. at 13, 14. But under § 1614.105(d) and § 1614.106(b), the period runs from "receipt of the [written] notice" of a right to file a discrimination complaint -- not from the date of the final interview.  The record offered by defendants does not provide the date of plaintiff's receipt of the notice.  Moreover, the Court finds it plausible that the administrative complaint covering the travel and nonpromotion claims was timely, given the date of the final counseling interview (December 16, 1998), the filing date of plaintiff's administrative complaint (January 14, 1999), and the lag time that often accompanies the preparation of paperwork during the winter holiday period and the U.S. mail. Hence, defendants have failed to establish, on the present record, that plaintiff failed to exhaust

his administrative remedies.

Second, and more significantly, plaintiff has raised a serious issue as to whether defendants have waived this defense by issuing a final agency decision on the merits.  Under Bowden v. United States, 106 F.3d 433, 438 (D.C. Cir. 1997), an agency waives the exhaustion defense if it accepts and investigates a discrimination complaint, and also "decide[s] it on the merits -- all without mentioning timeliness."  Defendants contend that Bowden is a narrow decision that is "expressly limited to the facts of the case," referring to the agency's excessive delay in Bowden in raising the defense in judicial proceedings.   Defs.' Reply at 3.  To be sure, the court highlighted the egregious delays by the agency in Bowden in raising the exhaustion defense in district court.  Bowden, 106 F.3d at 439.  However, the rationale of Bowden rests primarily on the agency having responded to the employee's claim on the merits during the administrative process without raising timeliness:

> Because [the agency] responded to the merits of [the employee's administrative] complaint without ever questioning its timeliness, we think the agency now has no legitimate reason to complain about a judicial decision on the merits.  Had it been concerned that information needed to resolve [the employee's] complaint was stale or that deciding his case would upset settled expectations -- traditional objectives of statutes of limitations -- it could easily have raised the [time] limitation during the administrative process.  What we have repeatedly stated regarding Title VII exhaustion requirements applies here as well:  They are "practical and pragmatic" . . . and should not be invoked when [they] serve[] no practical purpose."

Id. at 438-39 (quoting Wilson v. Pena, 79 F.3d 154, 165 (D.C. Cir. 1996)).  Subsequent decisions analyzing Bowden have construed it consistent with its stated rationale -- "waiver occurs when the agency decides the [administrative] complaint on the merits without addressing the untimeliness defense."  Horton v. Potter, 369 F.3d 906, 911 (6th Cir. 2004) (citing Bowden, 106 F. 3d at 438); accord Ester v. Principi, 250 F.3d 1068, 1071-72 (7th Cir. 2001) ("when an agency decides the merits of a complaint without addressing the question of timeliness, it has waived a timeliness

defense in a subsequent lawsuit"); Kriesch v. Johanns, 468 F. Supp. 2d 183, 186-87 (D.D.C. 2007)

("[T]he [agency] accepted for investigation, investigated fully, and decided on the merits all of

[the employee's] EEO complaints and . . . never raised untimeliness during the administrative

process.  Circuit precedent [Bowden] is clear that, under these circumstances, [the agency] may

have waived its exhaustion defense."); Johnson v. Billington, 404 F. Supp. 2d 157, 162-63

(D.D.C. 2005) ("defendant has waived his exhaustion defense by not asserting it timely [during

administrative proceedings]").

In this case, the Court is aware of at least two final agency decisions issued by NASA --

one dated April 15, 2002 and another dated February 14, 2003.  Those two agency decisions have

not been made part of the record in this case, but the Court takes judicial notice of an EEOC

appeal decision that has been publicly reported and reviewed the merits of the main final agency

decision at issue.  See Nurriddin v. O'Keefe, Appeal No. 01A23148, 2004 WL 2271191 (EEOC

Sept. 30, 2004).[18]  According to the EEOC, the agency issued a final agency decision on 42

claims, including the claims that "on August 11, 1998, [plaintiff] was not promoted to a non-

competitive GS-14 position," and that he was "denied the opportunity to travel" to two

conferences in 1998.  Id. at *2-*4.  Although three grievance claims (not relevant here) were

dismissed on procedural grounds,[19] the EEOC reports that the agency investigated and decided the

---

[18]   The EEOC issued at least one additional decision concerning plaintiff, which is not
relevant to the exhaustion arguments currently presented to the Court. See Nurriddin v. O'Keefe,
Appeal No. 01A32569, 2004 WL 73646 (EEOC Jan. 12, 2004).

[19]  Plaintiff reportedly filed two grievances over reprimands and one over a performance
narrative.  See 2004 WL 2271191, at *2-*3 (labeling the grievances claims 26, 27 and 28).  The
EEOC reports that an administrative judge dismissed those claim for failure to state a claim
because they constituted an impermissible collateral attack on the outcome of grievance
proceedings, and that the agency adopted that determination in the final agency decision.  Id. at
*3.

remaining claims on the merits, and makes no reference to the agency having raised an

untimeliness argument.  Id. at *3-*4 (noting that the final agency decision held that plaintiff was

not an individual with a disability, and "as to the remaining claims . . . the agency thoroughly

discussed each claim and the relevant evidence of record, and concluded that complainant had

failed to establish that he had been subjected to unlawful discrimination or retaliation").  In short,

the current record indicates that NASA accepted and investigated the claims at issue, and then

issued a final agency decision on the merits; indeed, the agency has not made any contention that

it raised the issue of untimeliness during those proceedings.  Following Bowden, the Court finds

that defendants have waived the exhaustion defense under these circumstances,.  Hence, the Court

denies defendants' motion to dismiss for failure to exhaust administrative remedies, and proceeds

to consider the merits of plaintiff's discrimination and retaliation claims.

### B.      The Merits of Plaintiff's Title VII Claims

#### 1.      The McDonnell Douglas Framework

The framework for establishing a prima facie case of discrimination or retaliation was

introduced for Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

The first step in the analysis requires a plaintiff to carry the burden of establishing a prima facie

case by a preponderance of the evidence.  Id.; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S.

248, 252-53 (1981).  In order to make out a prima facie case of discrimination, a plaintiff must

show that "(1) she is a member of a protected class; (2) she suffered an adverse employment

action; and (3) the unfavorable action gives rise to an inference of discrimination."  Stella v.

Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting Brown v. Brody, 199 F.3d 446, 452 (D.C.

Cir. 1999)).  To establish a prima facie case of retaliation, a plaintiff must establish: "(1) that he

engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his

employer; and (3) that a causal link connects the two." Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009); Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007).  Under the Supreme Court's decision in Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 70 (2006), a materially adverse action in the retaliation context is one that could conceivably dissuade a reasonable worker from making or supporting a charge of discrimination.  See also Velikonja v. Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006); Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's burden, however, is merely one of production.  Burdine, 450 U.S. at 254-55. The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Id.

Where assessment of the employer's legitimate, nondiscriminatory reason becomes necessary, a prolonged evaluation of the sufficiency of plaintiff's prima facie case is unnecessary, for the central inquiry then becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis."  See Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008); see also Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 511 (1993), and U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-16 (1983)).  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's

prima facie case, the probative value of the proof that the employer's explanation is false, and any

other evidence that supports the employer's case and that properly may be considered on a motion

for judgment as a matter of law."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-

49 (2000); accord Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc);

see also Waterhouse v. District of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).  In other

words, the McDonnell Douglas shifting burdens framework effectively evaporates -- the sole

remaining issue is discrimination or retaliation vel non, and "to survive summary judgment the

plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse

employment decision was made for a discriminatory reason."  Lathram v. Snow, 336 F.3d 1085,

1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43.

2.        The Discrimination Claims

a.        Adverse Employment Action

Defendants contend that several of plaintiff's claims must be dismissed because the actions

challenged are not "adverse employment actions" -- a necessary element of the prima facie case of

discrimination.  See Defs.' Mem. at 16-20.  Defendants focus on the non-assignment of plaintiff to

a window cubicle, the reprimands, the changes in duties, the co-workers "report[ing] on" plaintiff,

and the denial of travel and leave requests.  Id.  After defendants filed their motion to dismiss,

plaintiff clarified that his Title VII claims are focused on just seven of the many actions alleged in

the second amended complaint.  See Pl.'s Mem. at 2-3.  This approach makes sense considering

that, after the filing of the second amended complaint, the court of appeals affirmed the dismissal

of several of plaintiff's claims in Nurriddin I for lack of an adverse employment action.  See

Nurriddin I, 382 F. Supp. 2d at 94, 101-02, aff'd, 222 Fed. Appx. 5.

Nonetheless, one of the seven management actions that plaintiff continues to challenge as

-34-

discriminatory is the denial of travel to minority conferences.  However, this Court already has

held that denial of travel to conferences is not an adverse employment action.  Nurriddin I, 382 F.

Supp. 2d at 101-03.  As explained there, to establish an adverse employment action in a Title VII

discrimination case, a plaintiff must show "materially adverse consequences affecting the terms,

conditions, or privileges of employment or future employment such that a reasonable trier of fact

could find objectively tangible harm."  Id. at 103 (quoting Brown v. Brody, 199 F.3d at 457)

(emphasis added).  Diminishment of one's "general stature," and the apparent unfairness of

availability of travel to co-workers, does not rise to the level of "objectively tangible harm."  Id. at

102-03; see also Murray v. Chicago Transit Auth., 252 F.3d 880, 888 (7th Cir. 2001) (denial of

travel to a conference not a "tangible employment action").  There are no facts indicating that

denial of travel caused any objectively tangible harm -- neither in Nurriddin I nor here; hence,

plaintiff's claim that defendants violated Title VII by denying travel to two minority conferences is

dismissed for failure to state a claim upon which relief can be granted.[20]

   With respect to the denial of leave, defendants provide little for the Court to consider.

They summarily contend that denial of leave is not an adverse action, but do not elaborate on this

argument.  Considering that the leave at issue, as alleged in the complaint, had a financial impact

on plaintiff -- he alleges he was in AWOL status for 59 days -- the Court cannot dismiss that claim

for lack of an adverse employment action.

---

   [20]  To the extent that plaintiff challenges the refusal to provide a window cubicle, the
reprimands, and "spying" by co-workers, as discrete acts of discrimination under Title VII, those
claims are dismissed as they, too, fail to qualify as adverse employment actions because there is
no allegation of objectively tangible harm.  See Nurriddin I, 382 F. Supp. 2d at 94 (holding that
reprimand was not adverse employment action); see generally Russell v. Principi, 257 F.3d 815,
818 (D.C. Cir. 2001) ("not everything that makes an employee unhappy is an actionable adverse
action").

The remaining five challenged actions -- termination of employment, denial of a noncompetitive promotion (i.e., to GS-14), denial of use of donated leave, denial of performance awards, and denial of a timely within-grade increase -- plainly impact plaintiff's compensation and tangible benefits. Therefore, the Court readily concludes that plaintiff satisfies the adverse employment action element of a prima facie case of discrimination.

### b.  Inference of Discrimination

Defendants move to dismiss plaintiff's remaining claims of discrimination on the ground that plaintiff has failed to establish any causal connection between his protected class (race, gender, and religion) and the adverse employment actions he challenges -- in other words, that there is an absence of factual allegations supporting an inference of discrimination. See Defs.' Mem. at 21-22. Defendants' argument is not well-developed -- it consists of just one paragraph -- but the Court has nonetheless conducted a comprehensive review of the second amended complaint, construing it liberally in plaintiff's favor, to determine whether plaintiff has alleged facts supporting an inference of discrimination.

In evaluating the sufficiency of the complaint, the Court is mindful of the D.C. Circuit's caution that the threshold for pleading facts in support of a Title VII discrimination claim is a low one, and that district courts should not undertake a "full causation analysis" in evaluating the sufficiency of the prima facie case. See Brady, 520 F.3d at 493 & nn. 1 & 2; Adeyemi, 525 F.3d at 1226 n.1. Merely alleging that the employer's proffered reasons for the adverse employment actions is false may support an inference of discrimination sufficient to survive a motion to dismiss. See George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005) (reversing district court for requiring plaintiff to support prima facie case with evidence that she was treated differently than similarly situated employees not part of the protected class because "[e]limination of [employer's

legitimate] reasons . . .is sufficient, absent other explanation, to create an inference that the

decision was a discriminatory one"). Here, plaintiff alleges throughout his complaint -- and in his

EEO documents -- that defendants' proffered reasons for the actions taken are false.   He also

alleges specific instances where similarly situated persons outside of his protected class received

more favorable treatment, in particular with respect to performance awards (Second Am. Compl.

¶¶ 24, 55, 71) and a noncompetitive promotion (id. ¶ 78).   Whether he can develop evidence in

support of these factual allegations remains to be seen.   Indeed, many of his factual allegations, if

taken as true, would more strongly support his parallel claim that the actions at issue were taken in

retaliation for his long history of EEO activity and Title VII litigation.   But at this stage of the

case, the Court must deny defendants' motion to dismiss the remainder of plaintiff's Title VII

discrimination claims, even though the more plausible reading of plaintiff's claims is that

defendants acted with a retaliatory motive.[21]

### 3.       Retaliation

#### a.       Materially Adverse Action

An adverse employment action is necessary to sustain a claim of retaliation, just as it is for

discrimination claims.   However, in the retaliation context, an employment action that is

"materially adverse" is defined as one that is "likely" to "dissuade[] a reasonable worker from

making or supporting a charge of discrimination."   Burlington Northern, 548 U.S. at 68, 70;

Ginger v. Dist. of Columbia, 527 F.3d 1340, 1346 (D.C. Cir. 2008).   Defendants next argue that

---

[21]   The Court emphasizes, however, that plaintiff may not relitigate the claims already decided in Nurriddin I.   For example, plaintiff alleges that his 1991 hiring was marked by racial and gender discrimination (see Second Am. Compl. ¶ 52), and challenges his GS-12 placement thereafter.   The Court already has held that the refusals to promote him from 1991 through 1996 were not discriminatory or retaliatory, and that holding will not be revisited in this case.

plaintiff's retaliation claims should be dismissed on the ground that none of the actions are sufficiently "adverse" under the "reasonable person" standard set forth in Burlington Northern. See Defs.' Mem. at 25-26.

The threshold for "adverse" action in the retaliation context is lower than the standard for "adverse" action for discrimination claims (which requires a tangible impact on the terms, conditions or privileges of employment) because the statute is intended to provide broad protections to encourage the disclosure of discrimination. Burlington Northern, 548 U.S. at 63-67; see also Baloch v. Kempthorne, 550 F.3d 1191, 1198 n. 4 (D.C. Cir. 2008) (noting that, in the retaliation context, the term "adverse" encompasses "a broader sweep of action than those in a pure discrimination claim").  In light of the Court's determination above that six of the seven actions challenged by plaintiff constitute "adverse employment actions," then, it should come as no surprise that those same actions are also actionable in the retaliation context -- that is, they are likely to dissuade a reasonable worker from making a charge of discrimination.  The only unresolved question with respect to the retaliation claim is whether the denial of travel to minority conferences is "materially adverse" under Burlington Northern, notwithstanding that it is not an "adverse employment action" in the discrimination context.

In making this assessment, the Court must consider whether "based upon the combined effect of . . . alleged events, a reasonable worker could be dissuaded from engaging in protected activity."  Test v. Holder, 614 F. Supp. 2d 73, 84 (D.D.C. 2009) (emphasis in original); Hill v. Kempthorne, 577 F. Supp. 2d 58, 67 (D.D.C. 2008); see also Phillips v. Collings, 256 F.3d 843, 849 (8th Cir. 2001) ("[W]e consider the cumulative effect of [the employer's] discriminatory actions rather than determining whether any individual action upon which the claim relies was sufficiently adverse.").  Here, the context includes alleged lowered performance evaluations,

denial of performance awards, nonpromotion, and a refusal to transfer to another office.

Considering the combined effect of these events, then, the Court holds that the denial of the travel

at issue would be likely to dissuade a reasonable worker from engaging in protected activity.

This is because minority outreach was allegedly an important element of plaintiff's job and

plaintiff's job performance allegedly suffered from his inability to attend the minority conferences

at issue.  In short, all seven challenged actions, including denial of travel, are actionable adverse

actions with respect to the retaliation claim asserted in Count Four.

### b.     Causal Connection

Defendants move to dismiss plaintiff's retaliation claim on the ground that he has failed to

establish any causal connection between his protected EEO activity and the adverse actions he

challenges -- i.e., that there is an absence of factual allegations supporting an inference of

retaliation.  See Defs.' Mem. at 22.  As for the discrimination claim, defendants' assertion is more

of a conclusion than an argument.  Moreover, the Court observes that, with respect to plaintiff's

retaliation claim, plaintiff has produced both direct and circumstantial evidence of retaliatory

animus.  To be sure, he relies on the closeness in time of his protected activity (initiating contact

with an EEO counselor, filing EEO complaints, and pursuing the litigation in Nurriddin I) to

support an inference of retaliation.  This is, of course, one legitimate way to support a causal

connection between the protected EEO activity and the adverse action, and it is not surprising,

given the prolific nature of plaintiff's protected EEO activity, that a causal connection based on the

temporal relationship is met here.

But in light of defendants' cavalier request for dismissal of the retaliation claims, it bears

mentioning that plaintiff has come forward with much more than a temporal relationship.  For

example, during a 1998 performance evaluation, Dr. Phelps allegedly called plaintiff's EEO

complaints "a crock of shit" and "just bullshit," and then told him to "[g]o file another EEO complaint."  Second Am. Compl. ¶ 85.  When plaintiff requested permission in late 1998 to go on detail to the NSF, the Office of Human Resources allegedly stated that plaintiff "needed to drop the EEO claims in order for the NSF detail to be considered," a message also implied by his management's instructions to submit his request for detail to the EEO office.  Pl.'s Ex. 43, ¶ 11(d).  After plaintiff returned from his NSF detail in February 2000, he requested sick leave a few months later which was initially approved by his supervisor, but then partially overruled by the NASA attorney handling his EEO matters.  Pl.'s Ex. 55a.  When his management realized that he had been accepted into the Leave Transfer Program the following June, one manager allegedly responded "Yegads! Will we ever finish with this guy?"  Pl.'s Ex. 60a-c.  Around the same time, the parties were in mediation in <u>Nurriddin I</u>.  When mediation failed to resolve that case, Castillo advised Novak by email that "legal counsel . . . asked if [an office] could find him a job and make an offer . . . expecting he won't take it . . . ," and further stated that "[t]he offer of a job is a tactical ploy <u>to chip away at all his complaints</u> ."  Pl.'s Ex. 73a-b (emphasis added).  Hence, plaintiff has come forward with considerable evidence to support his claim that defendants acted with retaliatory animus.

        To be sure, some of the documents that are part of the record also generally refer to plaintiff as a "problem" employee, whose many absences interfered with his performance at the office.  <u>See</u>, <u>e.g.</u>, Defs.' Ex. 4 (ECF #9-6); Defs.' Ex. 9 (ECF #9-11); Pl.'s Ex. 73a.  But NASA has not yet sought summary judgment on the ground that it has a legitimate nondiscriminatory reason for each of the challenged actions, nor does it appear that summary judgment would be

appropriate now based on the Court's review of the current record.[22]  Accordingly, defendants'

motion to dismiss or, in the alternative, for summary judgment on plaintiff's retaliation claim will

be denied.

## IV.   Hostile Work Environment

Employers may not create or condone a hostile or abusive work environment.  Such an

environment exists "'[w]hen the workplace is permeated with discriminatory intimidation, ridicule

and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'"  Oncale v. Sundowner Offshore Servs.,

Inc., 523 U.S. 75, 78 (1998) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993));

Singletary v. Dist. of Columbia, 351 F.3d 519, 526 (D.C. Cir. 2003).  The key terms, then, are

"severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct rises to

an actionable hostile work environment.  Under Faragher v. City of Boca Raton, 524 U.S. 775,

787-88 (1998), in determining whether a work environment is sufficiently hostile to be actionable,

a court should consider:  (1) the frequency of the discriminatory conduct; (2) the severity of the

conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether

the conduct unreasonably interferes with the employee's performance.

> These standards for judging hostility are sufficiently demanding to ensure that Title
> VII does not become a "general civility code."  Properly applied, they will filter out
> complaints attacking "the ordinary tribulations of the workplace, such as the
> sporadic use of abusive language, gender-related jokes, and occasional teasing."

---

[22]  With respect to plaintiff's termination, defendants contend that plaintiff could not
perform the essential functions of his job, in the context of seeking summary judgment on his
Rehabilitation Act claim.  Defs.' Mem. at 26-30.  Defendants suggest that this argument also
shows they had a legitimate nondiscriminatory reason for termination, warranting the entry of
summary judgment on the Title VII claims regarding plaintiff's termination.  Id. at 29.  In light of
plaintiff's direct evidence of retaliatory animus, and with no discovery having yet taken place, the
Court concludes that summary judgment on the termination claim is premature.

Id. at 787 (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)); Clark County School Dist. v. Breeden, 532 U.S. 268, 271 (2001) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient).

Plaintiff bases his claim of hostile work environment on a series of events dating primarily to the period running from 1997 to late 2001, that allegedly targeted him because of his protected status (race, gender, and religion) and his protected EEO activity.  Second Am. Compl. ¶¶ 54-140. He alleges that, over the course of about four years, his management passed him over for performance awards, lowered his performance evaluations, unfairly reprimanded and criticized him, made disparaging remarks about his EEO complaints, closely scrutinized his work, refused him a window cubicle, removed some of his duties, and denied his requests to travel or otherwise failed to provide support for his work with staffing and funding.  Id.  ¶¶ 54-79.  He also alleges that management opposed his career advancement in more direct ways, including the denial of a noncompetitive promotion, denial of a within-grade increase, and opposition to his transfer to another office or detail assignment.  Id. ¶¶ 79, 95-133.   And he alleges that, after he developed health problems, management denied many of his leave requests and engaged in a series of discussions to end his eligibility for workers' compensation and to terminate his employment at NASA, before finally firing him in February 2004.  Id. ¶¶ 98-137.

Plaintiff's allegations of disparaging remarks, criticisms of his work, and other negative comments do not sufficiently demonstrate a significant level of offensiveness.  See, e.g.,Stewart v. Evans, 275 F.3d 1126, 1134-35 (D.C. Cir. 2002) (use of term "idiot" and other profanities inadequate where language was not pervasive); see also Bell v. Gonzales, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) (holding that the sporadic use of abusive language is insufficient to establish a hostile work environment).  Nor can the removal of important assignments, lowered performance

evaluations, and close scrutiny of assignments by management be characterized as sufficiently intimidating or offensive in an ordinary workplace context.  See Bell, 398 F. Supp. 2d at 92 ("Occasional instances of less favorable treatment involving ordinary daily workplace decisions are not sufficient to establish a hostile work environment.").  Furthermore, the alleged events are temporally diffuse, spread out over a four-year period, suggesting a lack of pervasiveness.  See Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) (holding that occurrence of alleged incidents intermittently over a seven-year period suggests the absence of a condition sufficiently "pervasive" to establish liability).   Indeed, during the period at issue, plaintiff, by his own account, received a long-sought promotion to GS-13 (Second Am. Compl. ¶ 8), received at least one performance award (albeit not as much as he allegedly deserved) (¶ 55), and also was granted permission to work a one-year detail at the National Science Foundation from February 1999 to February 2000 (¶¶ 92-95)  -- events that substantially undermine his claim of a hostile work environment.

Plaintiff, in effect, seeks to transform his challenges to discrete acts of alleged discrimination or retaliation (e.g., nonpromotions, denial of leave, and termination) into a hostile work environment claim by combining those events with a series of ordinary workplace difficulties.  But "mere reference to alleged disparate acts of discrimination against plaintiff cannot be transformed, without more, into a hostile work environment." Childs-Pierce v. Utility Workers Union of America,  383 F. Supp. 2d 60, 79 (D.D.C. 2005), aff'd 187 Fed. Appx. 1 (D.C. Cir. 2006).

Plaintiff alleged a series of similar events in support of a hostile work environment claim in Nurriddin I -- reprimands, denials of travel, disparaging remarks, interference with his work, multiple failures to promote, and so on.  There, this Court held that the history of events "indicates

less a pervasive pattern of harassment, and more just isolated employment incidents occurring over a long period of time" -- an observation that applies with equal force here.  Nurriddin I, 382 F. Supp. 2d at 108.  The Court further noted that "plaintiff was in no way physically threatened by any of the alleged incidents." Id.  (citing Faragher, 524 U.S. at 787-88).  That remains the case here -- even accepting his allegation that he felt "stalked" by the constant scrutiny of his supervisor, none of the factual allegations support an inference of a physical threat.  Assuming the truth of the alleged events and considering them in their totality, plaintiff has fallen far short of alleging conduct that, under Harris and Oncale, amounts to "intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment."  Accordingly, the Court will grant defendants' motion to dismiss plaintiff's claim of a hostile work environment.

## V.      Plaintiff's Motion for Preliminary Injunction

Plaintiff has filed a motion seeking a temporary restraining order and preliminary injunction to "prohibit [NASA] from . . . solicit[ing] information from OWCP regarding Plaintiff Nurriddin." See Pl.'s Emergency Mot. for Temporary Restraining Order and Prelim. Inj. at 4 & Proposed Order.  Plaintiff sought this relief upon learning that in January 2009 NASA had contacted the OWCP to obtain documents concerning his workers' compensation benefits.  Id. at 7.  Plaintiff considers NASA's actions an effort to terminate his workers' compensation benefits, in retaliation for his protected EEO activity.  See Pl.'s Reply at 4.

In response, defendants contend that an injunction is not warranted because the request for information was not harassment or retaliation, but instead was a communication undertaken pursuant to NASA's general policy of reviewing and verifying workers' compensation costs, which are charged back to NASA under the relevant statutory provisions.  See Defs.' Opp'n to Pl.'s Mot.

at 2-5.  Defendants have submitted the declaration of Frances Corradino, a NASA contractor

holding the position of Workers' Compensation Specialist, which describes both NASA's policies

with respect to reviewing workers' compensation cases involving NASA employees and the nature

of the particular communications at issue.  See Defs.' Notice of Filing Under Seal (Feb. 23,

2009).[23]

"Injunctive relief, not usually available in employment cases, is an extraordinary remedy

and must be sparingly granted."  Rahman v. Johanns, 501 F. Supp. 2d 8, 19 (D.D.C. 2007).  With

that in mind, the standard for a temporary restraining order or preliminary injunction is well-

established.  To prevail, the moving party must demonstrate four things:  (1) a substantial

likelihood of success on the merits; (2) that the moving party would suffer irreparable injury if the

injunction were not granted; (3) that an injunction would not substantially injure other interested

parties; and (4) that the public interest would be furthered by the injunction.  See Chaplaincy of

Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (citing Mova Pharm. Corp.

v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998)); see also Winter v. NRDC, Inc., 129 S. Ct. 365,

374 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.")

(citing, inter alia, Munaf v. Geren, 128 S. Ct. 2207, 2218-19 (2008)).

"If the movant makes an unusually strong showing on one of the factors, then it does not

necessarily have to make as strong a showing on another factor."  Davis v. Pension Ben. Guaranty

---

[23]   The Corradino affidavit was submitted under seal because it refers to various medical
records.  See Defs.' Consent Mot. to File Under Seal (filed Feb. 18, 2009).  None of the medical
information in the Corradino affidavit is discussed in this opinion.

Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (citing WMATC v. Holiday Tours, 559 F.2d 841, 843 (D.C. Cir. 1977)); see also Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985) ("The test is a flexible one [and] [i]njunctive relief may be granted with either a high likelihood of success and some injury, or vice versa."). The inverse, of course, is true as well -- "[i]f the plaintiff makes a particularly weak showing on one factor . . . the other factors may not be enough to compensate." Morgan Stanley DW Inc. v. Rothe, 150 F. Supp. 2d 67, 72 (D.D.C. 2001); see also Hunter v. FERC, 527 F. Supp. 2d 9, 14 (D.D.C. 2007). This approach has been referred to as a "sliding scale." Davis, 571 F.3d at 1291. "'Despite this flexibility, though, a movant must demonstrate 'at least some injury' for a preliminary injunction to issue, for 'the basis of injunctive relief in the federal courts has always been irreparable harm.'" Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995), and Sampson v. Murray, 415 U.S. 61, 88 (1974)).

Injunctive relief is not warranted here because plaintiff can demonstrate neither a substantial likelihood of success on the merits nor irreparable harm. First, the particular instance of retaliation that is the subject of the requested injunction is not part of plaintiff's second amended complaint. As defendants correctly point out, if plaintiff believes NASA's January 2009 contact with OWCP constitutes an additional act of retaliation -- one that comes almost five years after the termination currently being challenged -- plaintiff first must exhaust his administrative remedies and then pursue his judicial remedies in accordance with Title VII and/or the Rehabilitation Act. See Defs.' Opp'n at 5. Moreover, even if this act could properly be considered part of this case, the record does not establish a substantial likelihood that he would prevail on the merits of the claim. As the Court discussed earlier, the record shows that there will be a fact-intensive dispute over whether NASA had legitimate nondiscriminatory reasons for the adverse

actions at issue.

More significantly, plaintiff has failed to show any irreparable harm whatsoever.  Plaintiff

acknowledges that OWCP denied NASA's request for documents.  See Pl.'s Opp'n at 4 & Ex. 1

(Letter from OWCP to deMello-Zieschang).  Moreover, OWCP denied the request in terms

indicating it would deny similar requests in the future, stating "[w]e are denying your request for

copies under the provisions of the Privacy Act" and that it would provide information only if

NASA showed it would "use the requested documents independently from our office."  Id. Ex. 1.

In addition, the Corradino affidavit establishes that the January 2009 request for information was

in accordance with NASA's routine policy of tracking workers' compensation cases.  See

Corradino Affidavit & Summary at 1-4.  Indeed, OWCP had, on its own, undertaken actions to

terminate plaintiff's workers' compensation benefits, before concluding in June 2008 that his

benefits should be restored.  See id. at 2-3.  In the wake of those events, an inquiry from NASA

cannot reasonably be considered harassment, but rather is more fairly considered a legitimate

question about plaintiff's continued eligibility for workers' compensation benefits.

Considering plaintiff's failure to demonstrate any likelihood of success on the merits or

irreparable harm, even a substantial showing on the remaining two factors would be insufficient to

justify the extraordinary relief that he seeks.  Therefore, the motion for injunctive relief will be

denied.

## **CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part defendants' motion to

dismiss or, in the alternative, for summary judgment, and denies plaintiff's motion for a temporary

restraining order and preliminary injunction.  Plaintiff's claims of disability discrimination

(Counts Five and Six), conspiracy to violate constitutional rights (Count Seven), and hostile work

environment (Count Eight) are all dismissed.  No discovery is necessary to resolve defendants'

motion in those respects, and hence plaintiff's Rule 56(f) motion to deny defendants' motion as

premature is denied on those issues as well.

The claims that remain pending are plaintiff's claims alleging discrimination and

retaliation under Title VII (Counts One, Two, Three, Four, and Nine) based on the following

actions:  (a) wrongful termination; (b) placement on AWOL for 59 days; (c) denial of a

noncompetitive promotion; (d) denial of use of donated leave while on medical leave; (e) denial

of performance awards; and (f) denial of a timely within-grade increase.  He also may challenge

the denial of travel to minority conferences as retaliatory.  All these claims may proceed only

against the Administrator of NASA in his official capacity.  Vicki Novak, Alfred Castillo, Mark

Batkin, and Malcolm Phelps are dismissed from this case.

Defendant Bolden shall answer the second amended complaint by not later than January 8,

2010.  The Court anticipates setting the initial scheduling conference contemplated by Fed. R.

Civ. P. 16(b) shortly thereafter.  A separate order accompanies this memorandum opinion.


                              _____/s/_____
                                        JOHN D. BATES
                                  United States District Judge

Date:   December 4, 2009