**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AHMAD B. NURRIDDIN,

    Plaintiff,

    v.

    Civil Action No. 04-2052 (JDB)

CHARLES F. BOLDEN, JR.,
Administrator, National Aeronautics and
Space Administration,

    Defendant.

<u>MEMORANDUM OPINION</u>

    Plaintiff Ahmad Nurriddin brought this suit against the Administrator of the National Aeronautics and Space Administration ("NASA"), Nurriddin's former employer. In an earlier opinion, the Court dismissed Nurriddin's claims of disability discrimination, conspiracy to violate constitutional rights, and hostile work environment. <u>See</u> Dec. 4, 2009 Mem. Op. [ECF No. 97] & Order [ECF No. 98]. His remaining claims are brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e <u>et seq.</u>, alleging discrimination based upon his race (African-American), sex (male), and religion (Muslim), as well as retaliation for protected activity. Now before the Court are [183] Nurriddin's motion for partial summary judgment (primarily regarding damages) and [185] [190] NASA's motion for summary judgment (on liability). Upon careful consideration of the motions and the parties' memoranda, the applicable law, and the entire record, and for the reasons set forth below, the Court will deny Nurriddin's motion and will grant NASA's motion.

## BACKGROUND

This suit is Nurriddin's second action against NASA. His first suit was filed in 1999, alleging that certain employment actions that occurred between 1991 and 1996 constituted a hostile work environment and were motivated by discrimination on the basis of race, sex, and religion, and by retaliation for his engagement in protected activity. See Nurriddin v. Goldin, 382 F. Supp. 2d 79 (D.D.C. 2005) ("Nurriddin I"). On August 17, 2005, this Court entered summary judgment for NASA on all claims. See id. The D.C. Circuit affirmed in all respects. See Nurriddin v. Griffin, 222 F. App'x 5 (D.C. Cir. Apr. 16, 2007). The events underlying the current suit began where Nurriddin I left off and chronicle the continuation of Nurriddin's tumultuous relationship with his supervisors at NASA. See 2d Am. Compl. [ECF No. 49] ¶¶ 56-140. The relevant facts recounted below are largely undisputed[1] and relate to Nurriddin's remaining claims, which are based on the following alleged events in his employment history: (1) denial of a noncompetitive increase in grade from GS-13 to GS-14 in 1998; (2) diminished performance award in 1997-1998; (3) denial of a performance award in 1998-1999; (4) denial of two travel requests in 1998; (5) designation as "absent without leave" ("AWOL") for 59 days in 2000; (6) denial of donated leave after 2000; (7) denial of a timely "Within Grade Increase" ("WGI") around 2000-2001; and (8) termination in 2004.

In 1996, Nurriddin was a federal employee at level GS-12 in NASA's Education Division. Def.'s Stmt. ¶¶ 1-2, 6. His "first-level supervisor" was Dr. Malcolm Phelps and his "alternate first-level supervisor" was Sherri McGee. Id. ¶ 7; 2d Am. Compl. ¶¶ 7, 11. Nurriddin's "second-level supervisor" was Frank Owens. 2d Am. Compl. ¶ 10. Annual

---

[1] These facts are drawn primarily from NASA's Statement of Material Facts Not in Genuine Dispute [ECF No. 190] ("Def.'s Stmt.") and the exhibits cited therein. Nurriddin has filed a Response to NASA's Statement [ECF No. 201] ("Pl.'s Resp."), which largely concedes the content of NASA's Statement and adds some supplemental details or commentary favorable to Nurriddin.

performance evaluations of Nurriddin were conducted each summer and covered his performance for the preceding 12 months.  See, e.g., Def.'s Stmt. ¶¶ 8, 10.  For the 1995-1996 evaluation period, he received a performance rating of "Outstanding" and an $800 performance award for that rating.  2d Am. Compl. ¶¶ 54-55.  At the time, NASA used a five-level scale in which "Outstanding" was the highest possible rating.  Id.; Def.'s Stmt. ¶ 8.

Nurriddin filed two EEO complaints alleging disparate treatment in February 1995 and April 1997 that were addressed in Nurriddin I.  See 382 F. Supp. 2d at 87-88.  He filed his third EEO complaint in June 1997, naming Owens and McGee as "responsible management officials," and alleging continued disparate treatment based upon his race, sex, and religion, and in reprisal for his prior EEO activity.  2d Am. Compl. ¶ 56; Ex. 2 to Def.'s Mot. for Summ. J. [ECF No. 190] ("Def.'s MSJ"), Nurriddin's List of His Complaints [ECF No. 187-2] ("Pl.'s List") ¶ 7C. Nurriddin then filed another formal complaint in December 1997, naming Owens, McGee, and Phelps.  2d Am. Compl. ¶ 24; Pl.'s List ¶ 7D.  This and the June 1997 complaint were followed by seven additional EEO complaints in the years to come.  Pl.'s List ¶¶ 7E-8.

In November 1997, Nurriddin received a long-sought noncompetitive promotion to GS-13.  2d Am. Compl. ¶¶ 8, 49; Def.'s Stmt. ¶ 2.  In April 1998, he filed another formal complaint, naming Owens, McGee, Phelps, and others.  Pl.'s List ¶ 7E.  Thereafter, he began to take significant sick leave.  Def.'s Stmt. ¶¶ 11, 13; Ex. 13 to Def.'s MSJ, Sept. 16, 1998 Official Reprimand ("9/16/98 Official Reprimand").

For the 1997-1998 annual performance evaluation, which covered the period of July 1, 1997, to June 30, 1998, NASA switched from a five-level scale to a pass-fail system.  Def.'s Stmt. ¶ 8.  Nurriddin received a "pass" on his performance evaluation, but Phelps noted in the text of his review a "'pattern of missed deadlines and unresponsiveness to his management that

must be addressed and improved during the next year for [Nurriddin's] work to continue to be judged satisfactory.'" Id. ¶ 9 (quoting Ex. 7 to Def.'s MSJ, Nurriddin's 1997-1998 Performance Evaluation ("Pl.'s 1997-1998 Performance Evaluation")). Nurriddin received an $800 performance award for the 1997-1998 period on August 17, 1998. Id. ¶ 10.

Two other events occurred in August 1998: Nurriddin received an official reprimand for failing to follow procedures regarding conference attendance and for failing to follow directions, 2d Am. Compl. ¶ 79; Ex. 2 to Def.'s Mot. to Dismiss [ECF No. 9-3], Aug. 26, 1998 Official Reprimand ("8/26/98 Official Reprimand"); and one of Nurriddin's co-workers, Gary Gans, received a grade increase from GS-13 to GS-14, but Nurriddin did not receive a grade increase, 2d Am. Compl. ¶ 78.

Nurriddin took sick leave for "'a significant part of the time from August 1998 through January 1999.'" Def.'s Stmt. ¶ 11 (quoting Ex. 9 to Def.'s MSJ, Affidavit of Sherri McGee ("McGee Aff.") ¶ 15). In September 1998, Phelps issued an official reprimand of Nurriddin concerning his "continuing attendance problems," stating that Nurriddin had been out of the office for 408 hours between May and September 1998, and that 161 of those hours were unplanned leave, and warning him "about the need to provide medical documentation when citing illness as a reason for absence." Def.'s Stmt. ¶ 13; 9/16/98 Official Reprimand. Also in September 1998, Nurriddin filed another formal complaint, naming Owens, McGee, and Phelps. Pl.'s List ¶ 7H. In October 1998, Phelps issued another official reprimand of Nurriddin for his "continuing attendance problem and . . . failure to follow leave procedures." Ex. 40 to Def.'s MSJ, Oct. 30, 1998 Official Reprimand ("10/30/98 Official Reprimand").

Thereafter, Nurriddin's requests to attend conferences in November and December 1998 were denied, 2d Am. Compl. ¶ 84, and Nurriddin filed another EEO complaint, naming Owens,

McGee, and Phelps, Pl.'s List ¶ 7G.  In February 1999, he left the office for a one-year detail assignment at the National Science Foundation.  Def.'s Stmt. ¶ 11.  Nurriddin did not receive a performance award for the July 1998 to June 1999 timeframe, and his annual performance evaluation for that period is not in the record.[2]  Id.  His supervisors, McGee and Phelps, explained that he was not given a performance award because he had been mostly out of the office on leave and then on a detail assignment.  Id.  In August 1999, Nurriddin filed another EEO complaint, naming Owens, McGee, and others.  Pl.'s List ¶ 7H.

Nurriddin returned to NASA from his one-year detail assignment in February or March 2000.  Def.'s Stmt. ¶¶ 11, 12.  Not long after, he took leave from NASA for medical reasons.  Id. ¶ 12.  On April 12, 2000, Phelps sent Nurriddin a memorandum stating that he had failed to provide sufficient medical documentation for his leave requests.  Id. ¶ 15; Ex. 16 to Def.'s MSJ, Apr. 12, 2000 Memorandum from Phelps to Nurriddin ("4/12/00 Memo from Phelps to Nurriddin").  Nurriddin briefly returned to work from May 15, 2000, through May 18, 2000, but then resumed medical leave.[3]  Def.'s Stmt. ¶ 12.  On June 15, 2000, Phelps again sent Nurriddin a memorandum stating that he had failed to provide sufficient medical documentation for his leave requests.  Id. ¶ 15; Ex. 17 to Def.'s MSJ, Jun. 15, 2000 Memorandum from Phelps to Nurriddin ("6/15/00 Memo from Phelps to Nurriddin").  "On July 6, 2000, NASA noted that [Nurriddin] hadn't 'made any attempt even to request leave in a month; he has apparently refused to provide any medical documentation in support of his most recent absences, much less acceptable documentation.'"  Def.'s Stmt. ¶ 15 (quoting Ex. 18 to Def.'s MSJ, July 6, 2000 Email Chain ("7/6/00 Email Chain")).  Around the same time, Nurriddin applied for and was accepted

_____

[2] Neither party has stated whether there is a 1998-1999 performance evaluation of Nurriddin, and it is unclear from the record whether any such evaluation exists.

[3] It is disputed whether Nurriddin reported to work after May 18, 2000.  NASA states that he did not report to work again, Def.'s Stmt. ¶ 12, while Nurriddin states that records show that he worked a half-day on September 6, 2000, and part of the day on September 13, 2000, Pl.'s Resp. ¶ 12.

into NASA's Voluntary Leave Transfer Program, which permits eligible employees to receive annual leave donated by other federal employees.  Def.'s Stmt. ¶ 16; Pl.'s Resp. ¶ 17.

From September 12, 2000, through December 1, 2000, Nurriddin's employment status was changed to AWOL.  2d Am. Compl. ¶ 121.  At some point in September 2000, he requested advance sick leave.  On September 26, 2000, Phelps sent Nurriddin a letter denying his request for advance sick leave because he had been out of the office for over 1,000 hours since his return from detail, had failed to complete assignments, and had "fail[ed] to live up to [his] commitments concerning [his] return to work," and because "we are not confident that you will return to work for a long enough period to repay the advance leave."  Ex. 45 to Def.'s MSJ, Sept. 26, 2000 Letter from Phelps to Nurriddin ("9/26/00 Letter from Phelps to Nurriddin").  Also on September 26, 2000, Nurriddin's doctor, Dr. John Echeverry, sent a letter to Phelps recommending that Nurriddin be permanently transferred away from Phelps' supervision to an environment where "confrontations or incidents are non-existent."  Def.'s Stmt. ¶ 20 (quoting Ex. 23 to Def.'s MSJ, Sept. 26, 2000 Letter from Echeverry to Phelps (sealed) ("9/26/00 Letter from Echeverry to Phelps")).  In December 2000, Nurriddin filed another EEO complaint, naming Phelps, Owens, and others.  Pl.'s List ¶ 7I.

The Office of Workers' Compensation ("OWCP") referred Nurriddin to Dr. Teodor Postolache, who examined him in November 2000.  Def.'s Stmt. ¶ 18 (citing Ex. 22 to Def.'s MSJ, Nov. 23, 2000 Letter from Postolache (sealed)).  Postolache diagnosed Nurriddin with "major depression."  Id.  Around this time, Nurriddin began receiving workers' compensation through OWCP for the "occupational disease" of "major depression," which he claimed resulted from "his federal job duties."  Id. ¶ 17; Ex. 27 to Def.'s MSJ, Feb. 5, 2002 Letter from OWCP to

Human Resources ("2/5/02 Letter from OWCP to HR"). Nurriddin remains on workers'
compensation to this day. Def.'s Stmt. ¶ 19.

In 2001, while he was still on leave, Nurriddin received a WGI from GS-13, step 4 to GS-
13, step 5. Id. ¶ 15a.[4] Also while Nurriddin was on leave, Echeverry sent a letter to Phelps on
March 16, 2001, recommending that Nurriddin work "at another worksite in NASA or outside of
NASA." Id. ¶ 20 (citing Ex. 24 to Def.'s MSJ, Mar. 16, 2001 Letter from Echeverry to Phelps
(sealed)). Thereafter, NASA conducted a job search for Nurriddin within NASA in an attempt to
find him a different position. Id. ¶ 21. In October 2001, NASA offered him a job as an
Education Programs Specialist under McGee and Owens, individuals who he had previously
named in his EEO complaints for disparate treatment. Id. Echeverry informed Human
Resources at NASA Headquarters that Nurriddin could not accept the position because it did not
resolve his "perceived discriminatory treatment." Id. ¶ 22 (quoting Ex. 26 to Def.'s MSJ, Nov. 7,
2001 Letter from Echeverry to Castillo (sealed)). Because the proposed supervisors had been
named in Nurriddin's complaints "as contributing to [his] condition," OWCP decided that the
2001 job offer was "not suitable," id. ¶ 23; 2/5/02 Letter from OWCP to HR, and Nurriddin
remained on medical leave. In January 2002, he filed another EEO complaint, naming Owens
and others. Pl.'s List ¶ 7J.

On July 11, 2003, Nurriddin was evaluated by Dr. John K. Hsiao, for a second opinion
for workers' compensation. Def.'s Stmt. ¶ 31 (citing Ex. 38 to Def.'s MSJ, July 11, 2003 Letter
from Hsiao to QTC Medical Services (sealed) ("7/11/03 Letter from Hsaio to QTC")). Hsaio
stated that "there is no way that [Nurriddin] could work for NASA. . . . [I]t would be foolish to
try to place him back at NASA. . . . [Nurriddin] should not return to work for NASA. Regardless

---

[4] NASA's Statement of Undisputed Material Facts lists two successive paragraphs as paragraph 15. For
ease of reference, the second paragraph 15 will be referred to as paragraph 15a.

of the position or supervisor, his level of distrust is such that conflicts and worsening of his condition are inevitable."  7/11/03 Letter from Hsaio to QTC.

NASA underwent a reorganization in 2002, which included elevating the role of education in the organization.  Def.'s Stmt. ¶ 24.  Dr. Clifford Houston became Nurriddin's new first-level supervisor.  Id. ¶ 24a.[5]  Houston had never met Nurriddin and had not started working at NASA's Office of Education until February 2003.  Id.  In October 2003, Houston ordered that another job search be conducted for Nurriddin.  Id. ¶ 26.  The job search did not result in any potential positions.  Id.  Houston subsequently proposed that Nurriddin be terminated because he "needed [Nurriddin's] 'encumbered' position in the Office of Education to be filled with an employee who could ease the office's work demands."  Id.

By 2004, Angela Phillips Diaz had become Nurriddin's third-level supervisor.  Id. ¶ 27. "After five years away, Diaz had returned to the Office of Education in October 2003, a little over three years after [Nurriddin] had left NASA [on medical leave]."  Id.  Diaz terminated Nurriddin, effective February 6, 2004, because he "was medically unable to perform his duty and his removal was necessary to proceed with the efficient operation of the education organization and to meet the mission of our organization."  Id. (quoting Ex. 28 to Def.'s MSJ, Affidavit of Angela Philips Diaz ("Diaz Aff.") ¶ 2).  Diaz explained that she "alone" made the decision to remove Nurriddin from his position based on "the proposal for termination submitted to [her] by Dr. Houston and the record [provided] to [her] by Dorothy Egbert in NASA Headquarters Human Resources."  Id.  Human Resources Officer Mello-Zieschange explained that, "[i]f a person is disabled for longer than a year and it doesn't look like they can come back to work,

---

        [5] NASA's Statement of Undisputed Material Facts lists two successive paragraphs as paragraph 24.  For ease of reference, the second paragraph 24 will be referred to as paragraph 24a.

then it's practice to terminate the employee because they're encumbering a position."  Id. ¶ 28

(quoting Ex. 35 to Def.'s MSJ, Deposition of Sharmila de Mello-Zieschang).

In June 2004, Nurriddin filed another EEO complaint, naming Houston, Diaz, and others.

Pl.'s List ¶ 8.  In November 2004, he brought this action against NASA.

## STANDARD OF REVIEW

### A.      Summary Judgment

Summary judgment is appropriate when the pleadings and the evidence demonstrate that

"there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its

motion by identifying those portions of "the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made

for purposes of motion only), admissions, interrogatory answers, or other materials," which it

believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1);

see also Celotex, 477 U.S. at 323.

In determining whether there exists a genuine dispute of material fact sufficient to

preclude summary judgment, the Court must regard the non-movant's statements as true and

accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than

the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing

to the absence of evidence proffered by the non-moving party, a moving party may succeed on

summary judgment.  Celotex, 477 U.S. at 322.  Moreover, "[i]f the evidence is merely colorable,

or is not significantly probative, summary judgment may be granted." <u>Id.</u> at 249-50 (citations omitted). Summary judgment, then, is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." <u>Id.</u> at 252.

Recognizing the potential difficulty for a plaintiff in an employment discrimination or retaliation action to uncover clear proof of discriminatory or retaliatory intent, district courts approach summary judgment in such actions with "special caution." <u>Aka v. Washington Hosp. Ctr.</u>, 116 F.3d 876, 879-80 (D.C. Cir. 1997), <u>vacated on other grounds</u>, 156 F.3d 1284 (D.C. Cir. 1998) (en banc). Nevertheless, the plaintiff is not relieved of his obligation to support his allegations with competent evidence. <u>Brown v. Mills</u>, 674 F. Supp. 2d 182, 188 (D.D.C. 2009). "As in any context, where the plaintiff will bear the burden of proof at trial on a dispositive issue, at the summary judgment stage, he bears the burden of production to designate specific facts showing that there is a genuine dispute requiring trial." <u>Mason v. Geithner</u>, 811 F. Supp. 2d 128, 175 (D.D.C. 2011) (citing <u>Ricci v. DeStefano</u>, 557 U.S. 557 (2009)). Absent this burden, the plaintiff could effectively defeat the "central purpose" of the summary judgment device, "which is to weed out those cases insufficiently meritorious to warrant . . . a jury trial," simply by offering conclusory allegations and speculation. <u>Greene v. Dalton</u>, 164 F.3d 671, 675 (D.C. Cir. 1999).

## B.    Title VII

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[6] 42 U.S.C. § 2000e–2. Title VII also prohibits

---

[6] Title VII also provides that "[a]ll personnel actions affecting employees or applicants for employment" in the federal government "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). "It is well-established that this provision 'legislated for federal employees essentially the same guarantees against . . . discrimination that previously it had afforded private employees.'"

retaliation against an employee because he has opposed any practice made illegal by Title VII or has otherwise participated in a Title VII proceeding. 42 U.S.C. § 2000e–3(a).

To prove a violation of Title VII, a plaintiff must demonstrate by a preponderance of the evidence that the actions taken by the employer were "more likely than not based on the consideration of impermissible factors" such as race, sex, or religion.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981) (internal quotation marks and citation omitted).  A plaintiff may prove his claim with direct evidence or, absent direct evidence, he may indirectly prove discrimination under the burden-shifting framework created by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See, e.g., Olatunji v. District of Columbia, 958 F. Supp. 2d 27, 31 (D.D.C. 2013); Pollard v. Quest Diagnostics, 610 F. Supp. 2d 1, 18 (D.D.C. 2009).  Under that framework, the plaintiff carries the initial burden of establishing a prima facie case by a preponderance of the evidence.  McDonnell Douglas, 411 U.S. at 802.  A plaintiff makes out a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007); Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999).  A plaintiff makes out a prima facie case of retaliation by showing that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal link connects the two.  Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009); Wiley, 511 F.3d at 155.

For an employment action to qualify as "adverse," the employee must experience "materially adverse consequences affecting the terms, conditions, or privileges of [his]

---

Ponce v. Billington, 679 F.3d 840, 844 (D.C. Cir. 2012) (quoting Barnes v. Costle, 561 F.2d 893, 988 & n. 43 (D.C. Cir. 1977)).  Accordingly, the D.C. Circuit has "held that Title VII places the same restrictions on federal and District of Columbia agencies as it does on private employers.'"  George v. Leavitt, 407 F.3d 405, 411 (D.C. Cir. 2005) (citing Singletary v. Dist. of Columbia, 351 F.3d 519, 523-23 (D.C. Cir. 2003)).

employment or [his] future employment opportunities." Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002). Thus, "'not everything that makes an employee unhappy is an actionable adverse action.'" Douglas v. Donovan, 559 F.3d 549, 551-52 (D.C. Cir. 2009) (quoting Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001)).

Notably, there is a difference between "adverse actions" that support a claim for discrimination and "materially adverse actions" that support a claim for retaliation. See Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006). Unlike discriminatory actions, retaliatory actions need not be employment-related or even occur in the workplace, id. at 67, nor must they result in "a materially adverse change in the terms or conditions of [one's] employment," id. at 70. Nonetheless, the alleged retaliatory action must produce "an injury or harm." Id. at 67. The injury or harm must be "material," meaning that it could "'dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.'" Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

If a plaintiff makes out a prima facie case under the McDonnell Douglas framework, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action.[7] 411 U.S. at 802; accord Ford v. Mabus, 629 F.3d 198, 201 (D.C. Cir. 2010). If the employer is successful, the burden shifts back to the plaintiff to show that the employer's explanation was mere pretext for discrimination or retaliation. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000). At this point, "the McDonnell Douglas framework— with its presumptions and burdens—disappear[s], and the sole remaining issue [is]

---

[7] In recent years, the D.C. Circuit has stated that whether a plaintiff has made out a prima facie case is "almost always irrelevant" and "is a largely unnecessary sideshow." Brady v. Office of the Sgt. at Arms, 520 F.3d 490, 493-94 (D.C. Cir. 2008). Consequently, when "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—and should not—decide whether plaintiff actually made out a prima facie case under McDonnell Douglas." Id. at 494 (emphasis in original). Brady will be discussed further in the Court's discussion of Nurriddin's motion for partial summary judgment.

discrimination vel non." Id. (internal quotations and citations omitted). Accordingly, "the 'one central inquiry' on summary judgment is 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.'" Hamilton v. Geithner, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008)); see also Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003) ("[To] survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason."). In performing this inquiry, a court considers whether the jury could infer discrimination "'from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff or any contrary evidence that may be available to the employer.'" Hamilton, 666 F.3d at 1351 (quoting Aka, 156 F.3d at 1289). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. The same framework applies to claims of retaliation. See, e.g., Pardo-Kronemann v. Donovan, 601 F.3d 599, 603-04 (D.C. Cir. 2010).

## DISCUSSION

The Court will first address Nurriddin's motion for partial summary judgment, before turning to NASA's summary judgment motion on liability.

### I. NURRIDDIN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Nurriddin argues that the Court's earlier opinion, which granted in part and denied in part NASA's pre-discovery motion to dismiss or for summary judgment, forecloses the Court's

reconsideration of the first step of the <u>McDonnell Douglas</u> framework, <u>i.e.</u>, whether Nurriddin has presented a prima facie case of discrimination or retaliation.[8]  <u>See</u> Pl.'s Mot. for Partial Summ. J. [ECF No. 183] ("Pl.'s MSJ") at 7.  He offers two different arguments in support of his contention.

He first invokes the "law-of-the-case" doctrine, arguing that "the Court found that Mr. Nurriddin met his burden under step one nearly four years ago, prior to expanded discovery that included depositions," and that "[t]he law-of-the-case doctrine therefore precludes NASA's attempts to revisit whether or not Mr. Nurriddin has met his burden on the first step of <u>McDonnell Douglas</u>."  Pl.'s Opp'n to Def.'s MSJ [ECF No. 201] ("Pl.'s Opp'n") at 6.  In other words, he argues that because the Court declined to dismiss his Title VII claims in its earlier opinion, the Court now, post-discovery, cannot review whether he has provided evidence to support a prima facie case.  This argument is without merit.

The law-of-the-case doctrine represents "the general concept that a court involved in later phases of a lawsuit should not re-open questions decided (<u>i.e.</u>, established as the law of the case) by that court or a higher one in earlier phases."  <u>Crocker v. Piedmont Aviation</u>, 49 F.3d 735, 739 (D.C. Cir. 1995).  This Court's earlier opinion dismissing some parts of Nurriddin's complaint and preserving others was not, however, a final judgment, and "any order or other decision . . . that adjudicates fewer than all the claims . . . may be revised at any time before the entry of [final] judgment."  Fed. R. Civ. P. 54(b); <u>see also</u> <u>Filebark v. U.S. Dep't of Trans.</u>, 555 F.3d 1009, 1013 (D.C. Cir. 2009) (explaining that the district court may reconsider any non-final judgment).

_____

[8] Nurriddin also makes three other arguments: (1) that his alleged inability to work cannot reduce his recovery in this case; (2) that his recovery cannot be reduced by both his worker's compensation payments and his alleged failure to mitigate damages; and (3) that he is eligible for an award of front pay or reinstatement at NASA. Each of these arguments concerns damages.  Because the Court will grant NASA's motion for summary judgment on liability, the Court will deny as moot Nurriddin's motion for partial summary judgment on damages.

Moreover, the previous opinion was decided using the motion-to-dismiss standard of review, which examined pleading sufficiency and assumed the factual allegations in Nurriddin's complaint to be true.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Applying this standard, the Court found that Nurriddin pled viable factual allegations of Title VII discrimination that should not be dismissed pre-discovery.  Now, however, the parties have completed discovery and submitted motions for summary judgment, which are evaluated under an entirely different standard.  See, e.g., Anderson, 477 U.S. at 252-55.  In conducting this evaluation, the Court finds it appropriate to use the expanded record in determining whether there are any genuine disputes of material fact, including whether Nurriddin meets his burden under the McDonnell Douglas framework.  See Murphy v. PricewaterhouseCoopers, LLP, 580 F. Supp. 2d 4, 9 n.7 (D.D.C. 2008) (holding that plaintiff's law-of-the-case argument fails because the arguments presented in defendant's motion for summary judgment were based, at least in part, on an expanded record); Mazloum v. District of Columbia Metro. Police Dep't, 522 F. Supp. 2d 24, 47 (D.D.C. 2007) (same).  The law-of-the-case doctrine, therefore, does not preclude the Court's consideration of Nurriddin's prima facie case.

Nurriddin's second argument in support of his contention that the Court should not revisit the prima facie inquiry of McDonnell Douglas relies on Brady, in which the D.C. Circuit stated that, "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, nondiscriminatory reason for the decision, the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas."  520 F.3d at 494 (emphasis in original).  Instead, the district court should immediately

proceed to the ultimate issue of discrimination or retaliation, i.e., "has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" Id.

Nurriddin argues that, "[t]o the extent that Brady only applies upon a showing that an employee has suffered an adverse employment action, this Court has already held that Mr. Nurriddin has done so." Pl.'s Opp'n at 8. As stated before, however, the Court has decided— using the liberal standard applicable to a motion to dismiss— only that Nurriddin has pled viable Title VII claims. Moreover, where an employer contests whether an alleged action is legally "adverse," as is true here, a court does not immediately proceed to the ultimate question of discrimination or retaliation, but instead must first determine whether the action was "adverse" within the meaning of Title VII. See Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008). Furthermore, "[w]hen determining whether summary judgment . . . is warranted for the employer, the court considers all relevant evidence presented by the plaintiff and defendant," Brady, 520 F.3d at 495 (citing Reeves, 530 U.S. at 148-49; Aka, 156 F.3d at 1289), which includes "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination [or retaliation] that may be available to the plaintiff or any contrary evidence that may be available to the employer,'" Hamilton, 666 F.3d at 1351 (quoting Aka, 156 F.3d at 1289); accord Pardo-Kronemann, 601 F.3d at 603-04; Jones, 557 F.3d at 679. Hence, the question of whether Nurriddin makes out a prima facie case has not become irrelevant, as Nurriddin suggests. With this in mind, the Court will now turn to NASA's motion for summary judgment on liability.

NASA has moved for summary judgment on all of Nurriddin's remaining discrimination and retaliation claims.  At the outset, the Court notes that Nurriddin cites no evidence supporting discrimination based on race, sex, or religion.  Instead, he cites a series of workplace actions that he believes were unjust.  He argues that he suffered these injustices at the hands of his supervisors, who he speculates are biased against him based on his race, sex, or religion.  No evidence in the record, however, supports his speculation.  Nurriddin provides no evidence of disparate treatment between himself and similarly situated employees, and no evidence that he was targeted because of his race, sex, or religion.  Without any evidence supporting an inference of unlawful discrimination, Nurriddin's claims cannot survive summary judgment.  Similarly, for his retaliation claims, Nurriddin merely speculates that his supervisors acted with retaliatory animus during the incidents of which he complains.  That is not enough to survive a summary judgment motion.  Hence, the Court will grant summary judgment in favor of NASA on all of Nurriddin's claims.

### 1.    Denial of Noncompetitive Grade Increase in 1998

Nurriddin alleges that NASA discriminated and retaliated against him in August 1998, when it granted another employee a noncompetitive grade increase from GS-13 to GS-14 within that employee's position, but did not promote Nurriddin from GS-13 to GS-14 within his position.  2d Am. Compl. ¶ 78.

### A.  Discrimination

When a plaintiff claims he was denied a promotion in grade and salary within his own position (rather than into a vacant position), to establish a prima facie case he "must show [1] that []he sought and was denied a promotion [2] for which []he was qualified, and [3] that 'other

employees of similar qualifications . . . were indeed promoted at the time the plaintiff's request for promotion was denied.'"  Taylor v. Small, 350 F.3d 1286, 1294 (D.C. Cir. 2003) (quoting Bundy v. Jackson, 641 F.2d 934, 951 (D.C. Cir. 1981)).  Like other courts before it, this Court analyzes the prima facie case "not to 'evade[] the ultimate question of discrimination vel non,' but rather because [the plaintiff's] prima facie case is part of the evidence [the Court] must consider in addressing that question."  George, 407 F.3d at 413 (quoting U.S. Postal Serv. Bd. Of Governors v. Aikens, 460 U.S. 711, 714 (1983)).  Here, it is clear Nurriddin has not shown any of the required factors for a prima facie case.  First, he does not dispute NASA's assertion that he did not request or seek a promotion in August 1998.  Instead, he argues that he should not have to show that he sought a promotion because the grade increase in question was not competitive, but rather "in-position" based on an "accretion" of duties.  Pl.'s Opp'n at 11-12.  This argument finds no support in the law.  See, e.g., Taylor, 350 F.3d at 1294 (requiring plaintiff to show that noncompetitive, in-position promotion was requested); Nurriddin I, 382 F. Supp. 2d at 95 (same).  Moreover, he does not cite evidence to show that there was any "accretion" of duties in his position.

    Second, Nurriddin provides no evidence to show that he was qualified for a grade increase in 1998.  See Bolden v. Office of the Architect of the Capitol, 2002 WL 1364275, at *1 (D.C. Cir. May 9, 2002) (explaining that "appellant has not established a prima facie case of race discrimination [in a refusal-to-promote claim] because he did not provide any evidence that he was otherwise qualified for a promotion").  For its part, NASA asserts that Nurriddin was not qualified.  To support that assertion, NASA cites Nurriddin's 1997-1998 performance evaluation, which preceded the refusal to promote in August 1998.  Def.'s MSJ at 14-15.  In that evaluation, Nurriddin's immediate supervisor, Phelps, noted that he "must be more attentive to the timely

completion of actions and must ensure that his work is consistent with the Education Division's policies and strategies" and that there was "a pattern of missed deadlines and unresponsiveness to his management that must be addressed and improved during the next year for Mr. Nurriddin's work to continue to be judged satisfactory." Id. (citing Pl.'s 1997-1998 Performance Evaluation).

In response, Nurriddin submits a memo and follow-up email from 1997 in which he asks his supervisor for assistance in completing a project. See Pl.'s Resp. ¶ 9 (citing Ex. 17 to Pl.'s Opp'n, April 1997 Email from Nurriddin to McGee & June 1997 Email Chain between Nurriddin and McGee).[9] Nurriddin claims that his request for support was "rebuffed." Id. He does not state that he missed a deadline on the project, so it is unclear what he intends to argue by referencing these documents. Giving Nurriddin the greatest possible benefit of interpretation, the Court will assume he is implying that, because he was not given assistance, he was unable to complete a project on time. But even with that generous interpretation of his evidence and cryptic argument, the email would serve only as an explanation for a single late assignment. It does not address the "pattern of missed deadlines" in his performance review. Pl.'s 1997-1998 Performance Evaluation. Moreover, he fails to offer evidence to contradict the other concerns in the performance review regarding "unresponsiveness to management" and the need for him to "ensure that his work is consistent with the Education Division's policies and strategies," id., and he fails to offer any other evidence showing that he was qualified for an increase in grade.

Third, Nurriddin has not shown that similarly situated co-workers were promoted during the relevant time period. A plaintiff must establish that his employment situation was similar in all relevant respects to any individual he seeks to use for comparison. See Holbrook v. Reno,

---

[9] Nurriddin also includes in his exhibit an October 1996 email in which he requests additional support on a project. See Ex. 17 to Pl.'s Opp'n. This email, however, was sent far outside the timeframe of the 1997-1998 performance evaluation, which covered the time period between July 1, 1997 and June 30, 1998, see Pl.'s 1997-1998 Performance Evaluation, and is therefore irrelevant to this analysis.

196 F.3d 255, 261 (D.C. Cir. 1999) ("A plaintiff must . . . demonstrate that all of the relevant aspects of [his] employment situation were nearly identical to . . . those" of his comparators.) (internal quotation marks and citation omitted). The sole alleged comparator who Nurriddin has identified as receiving a promotion to GS-14—Gary Gans—is not similarly situated. 2d Am. Compl. ¶ 78. Gans did not hold the title of Education Programs Specialist like Nurriddin, and he had different duties and a different background than Nurriddin. Gans was a GS-13 Management Information Specialist who "provide[d] overall agency[-]wide management for the development and application of a major Agency-wide system, the University Management Information System" and was required to have "[e]xpert knowledge of mainframe processes and expert knowledge of [computer software]." Def.'s Stmt. ¶ 5; Ex. 4 to Def.'s MSJ, Job Description for Management Information Specialist at 2-7. On the other hand, as an Education Program Specialist, Nurriddin was "responsible for the overall policy and program direction at headquarters level for agency[-]wide graduate fellowship programs." Def.'s Stmt. ¶ 6 (citing Ex. 4 to Def.'s MSJ, Job Description for Education Program Specialist at 9-12). In this capacity, he "develop[ed] policies, plans, and procedures for planning, implementing, and evaluating university[-]level fellowship programs." Id. For his position, Nurriddin was required to have "thorough knowledge of the nation's higher education system." Ex. 4 to Def.'s MSJ, Job Description for Education Program Specialist at 11. Although Nurriddin generally disputes NASA's characterization of the "major duties" of Nurriddin and Gans, he does not allege any facts showing that the employment situation of Gans was "nearly identical" to his. See Holbrook, 196 F.3d at 261. Accordingly, Nurriddin fails to establish any of the elements required for a prima facie case of discrimination for NASA's decision not to give him a grade increase: he provides no information to demonstrate that he sought a grade increase or was

qualified for one, and he does not identify any similarly situated comparators who received grade increases at the time.

Moreover, NASA has proffered a legitimate, nondiscriminatory reason for its decision not to increase Nurriddin's grade—he never applied for an increase and was not qualified for one—and Nurriddin fails to produce evidence from which a rational fact-finder could infer that NASA's explanation is a pretext for discrimination on the basis of race, sex, or religion.  See Lathram, 336 F.3d at 1088.  "At this stage, if [the plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [the defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [the plaintiff]."  Paquin v. Fed. Nat'l Mortg. Ass'n, 119 F.3d 23, 27-28 (D.C. Cir. 1997) (citing Celotex, 477 U.S. at 322); see also Brady, 520 F.3d at 495 (where "the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts," and summary judgment is appropriate).

Here, Nurriddin's only challenge to NASA's nondiscriminatory explanation is his claim that the performance evaluation, which NASA cites as evidence that he was not qualified for a grade increase, was based on "improper considerations."  Pl.'s Opp'n at 12-13.  In support, he cites his own deposition, in which he alleged that Owens, his second-level supervisor, "made a comment to me earlier on that I was getting a reputation for being a minority advocate and he said that was career-limiting."  Pl.'s Opp'n at 12 (citing Ex. 1 to Pl.'s MSJ, Deposition of Ahmad Nurriddin ("Nurriddin Dep.") 44:15-17).  Nurriddin claims that Owens made this alleged comment in 1991—seven years before Nurriddin's 1997-1998 performance evaluation—and he does not explain how it connects to his 1997-1998 performance evaluation, which was written by

a different person (Phelps). 2d Am. Compl. ¶ 26. "'Stray remarks,' even those made by a supervisor, are insufficient to create a triable issue of discrimination where . . . they are unrelated to an employment decision involving the plaintiff." Perry v. Shinseki, 783 F. Supp. 2d 125, 138 (D.D.C. 2011) (quoting Simms v. U.S. Gov't Prt'g Office, 87 F. Supp. 2d 7, 9 n. 2 (D.D.C. 2000)); see also Sewell v. Chao, 532 F. Supp. 2d 126, 138 n. 8 (D.D.C. 2008) ("Evidence of discrimination does not include stray remarks in the workplace, particularly . . . statements made by decisionmakers unrelated to the decisional process itself.") (internal quotation marks and citation omitted). Here, Nurriddin has not shown any connection between Owens' alleged comment in 1991 and Phelps' evaluation of Nurriddin's 1997-1998 work performance.

Furthermore, as explained by the D.C. Circuit in Forman v. Small, where a plaintiff complains of a refusal to promote and has cited remarks by a supervisor that could be construed to express "discriminatory feelings," the plaintiff still must show that he is qualified for the promotion in order to show that the employer's reason for denying the promotion was pretextual. 271 F.3d 285, 293-94 (D.C. Cir. 2001) ("Aka highlights precisely what is missing here[:] . . . evidence from which a reasonable jury could find that he was 'markedly more qualified' than the person selected for the position at issue. . . . [Plaintiff's] task is more difficult to the extent he is competing against himself. . . . Unless he could show that he had fulfilled the central purpose of his sabbatical and performance plans [thereby qualifying for the promotion] he cannot show that [his employer's] reason for denying his promotion was pretextual."). Here, Nurriddin has not shown that he was qualified for an increase in grade to GS-14. He asserts that he received an "Outstanding" rating in 1995-1996—two years before the time period in question—and a "glowing performance review" by a detail supervisor in 1999—after the time period in question—and argues that these evaluations "are evidence that [NASA's] assertion that his work

in 1997-1998 was substandard is questionable." Pl.'s Opp'n at 12-13. But NASA does not contend that Nurriddin's performance was "substandard." NASA argues only that Nurriddin did not seek a promotion and was not qualified for one, as shown by his performance evaluation, which noted that Nurriddin needed to address some problems for his work "to continue to be judged satisfactory." Pl.'s 1997-1998 Performance Evaluation. Nurriddin fails to put forward any evidence to rebut the performance issues identified in his performance evaluation, see Pl.'s 1997-1998 Performance Evaluation (identifying Nurriddin's problems with "timely completion of actions," "pattern of missed deadlines," and "unresponsiveness to management"), or to otherwise show that he was qualified for an increase in grade. See Fischbach v. D.C. Dept. of Corrs., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (where an employer's proffered explanation is that plaintiff's performance was not sufficient for a promotion, "[plaintiff] must show that the explanation given is a phony reason").

Ultimately, Nurriddin neither makes out a prima facie case nor offers evidence to challenge NASA's nondiscriminatory explanation for not promoting him to GS-14. He therefore fails to carry his burden of persuasion to show that NASA's proffered reason was not the true reason for the non-promotion. See Burdine, 450 U.S. at 256.

### B. Retaliation

Nurriddin also argues that NASA retaliated against him when it did not give him a noncompetitive grade increase to GS-14 in August 1998. To establish a prima facie case of retaliation for refusal to promote, "a plaintiff must show that (1) he engaged in protected activity, (2) he was qualified for the promotion, (3) the employer took an adverse personnel action, and (4) a causal connection existed between the protected activity and the adverse action." Forman, 271 F.3d at 299 (citing Paquin, 119 F.3d at 31; Mitchell v. Baldrige, 759 F.2d 80, 86 n. 5 (D.C.

Cir. 1985); McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984)).  Because Nurriddin

fails to show that he was qualified for a grade increase, he fails to present a prima facie case for

retaliation.  See, e.g., Mitchell, 759 F.2d at 86 n.5 ("In cases of alleged retaliatory . . . failure to

promote, the plaintiff must also show as part of the prima facie reprisal case that he was qualified

for the position.").

Nonetheless, similar to a discrimination claim, where a defendant proffers a legitimate

reason for an action that plaintiff claims was retaliatory, "'a court reviewing summary judgment

looks to whether a reasonable jury could infer . . . retaliation from all the evidence,' which

includes not only the prima facie case but also the evidence a plaintiff offers to 'attack the

employer's proffered explanation for its action' and other evidence of retaliation."  Jones, 557

F.3d at 677 (quoting Carter v. George Wash. Univ., 387 F.3d 872, 878 (D.C. Cir. 2004)).  "At

[this] stage, the only question is whether the employee's evidence creates a material dispute on

the issue of retaliation 'either directly by [showing] that a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence.'"  Id. at 678 (quoting Aikens, 460 U.S. at 716).  Here, the arguments and

evidence offered by Nurriddin fail to create any material dispute on the issue of retaliation.

Nurriddin first asserts that NASA's explanation must be pretextual because, "[a]fter [he]

began complaining about discriminatory and retaliatory treatment, he started to receive lower

performance reviews."  Pl.'s MSJ at 29; see also Pl.'s Opp'n at 12-13.  This assertion, however,

does not comport with the record.  Nurriddin had been complaining about unfair treatment since

1991, see Nurriddin I, 382 F. Supp. 2d 79, and the record shows that he continued to receive

positive reviews after bringing numerous complaints.  See, e.g., Pl.'s List   ¶ 7A (stating that

Nurriddin filed a formal complaint of discrimination and retaliation in February 1995); 2d Am.

Compl. ¶¶ 54-55 (stating that Nurriddin received an "Outstanding" performance evaluation rating in August 1996 for the 1995-1996 evaluation period).

He next argues that a comment Phelps allegedly made to him in a meeting is evidence that NASA's explanation is mere pretext for retaliation. Nurriddin cites his own deposition, in which he stated that he and Phelps "were in a meeting talking about my performance and [Phelps] just tossed out that the—my EEO complaints were a bunch of bull and a crock of s-h-i-t and [to] just go file another EEO complaint." Nurriddin Dep. 47:20-25. Yet neither in his deposition nor in his brief does Nurriddin provide a date when this alleged statement was made or otherwise show how it connects to NASA's refusal to increase his grade in 1998. Regardless, this alleged remark by Phelps is not sufficient for Nurriddin's claim of retaliation to survive summary judgment. As discussed already, where a plaintiff complains of a refusal to promote and has cited negative remarks by supervisors, the plaintiff still must show that he is qualified for the promotion for his claim to survive summary judgment. Forman, 271 F.3d at 293-94, 300. Here, Nurriddin provides no evidence to show that he was qualified for a grade increase in or around August 1998, and he fails to cite any evidence rebutting the negative comments in his performance evaluation, such as his "pattern of missed deadlines" and "unresponsiveness to management." Pl.'s 1997-1998 Performance Evaluation.

Ultimately, Nurriddin fails to present a prima facie case and fails to offer evidence rebutting NASA's nonretaliatory explanation that he did not receive a grade increase because he was not qualified for one. Hence, Nurriddin fails to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but a pretext." Woodruff v. Peters, 482 F.3d 521, 529 (D.C. Cir. 2007) (quoting Reeves, 530 U.S. at 143); see also Talavera v. Shah, 638 F.3d 303, 313 (D.C. Cir. 2011) (employee must "present evidence

from which a reasonable jury could find that [the alleged adverse action] was the result of unlawful retaliation").

### 2. Diminished Performance Award in 1998

Nurriddin initially argued that he was denied a performance award in 1998 because his "performance evaluation was lowered." 2d Am. Compl. ¶ 85. NASA responded that Nurriddin received an $800 performance award for 1998, and that his performance evaluation was not "lowered"—the performance appraisal system changed to a pass/fail system in 1997-1998, and Nurriddin passed. Def.'s MSJ at 19-20. Nurriddin now concedes both that he was awarded an $800 performance award in 1998 and that "each member of [his] department received the same 'pass' rating as [Nurriddin]." Pl.'s Opp'n at 11. Undeterred, he now argues that he suffered discrimination and retaliation when he was awarded "only an $800 performance award." Id.

For an action to be adverse, it must "affect [the employee's] position, grade level, salary, or promotion opportunities." Baloch, 550 F.3d at 1199. Here, the parties do not present arguments about whether a "diminished" performance award is an adverse action. Because Nurriddin's receipt of an $800 award, rather than a larger amount, would have affected his compensation, the Court will assume it represents an adverse action.[10] See, e.g., Russell v. Principi, 257 F.3d 815, 819 (D.C. Cir. 2001) (holding that, because a lower performance evaluation resulted in a lower bonus amount, which is analogous to one's salary or to a benefit of one's employment, it was adverse). Nevertheless, Nurriddin fails to provide any evidence to support an inference of discrimination behind his "diminished" award.

Nurriddin's basis for believing that he received a "diminished" performance award in 1998 is that others in the Office of Education at NASA received higher performance awards than

---

[10] As a general matter, however, Nurriddin received a performance award of $250 for his work in 1996-1997, so the $800 award he received for his work in 1997-1998 represents an increase, not a decrease, in award amount. See Ex. 8 to Def.'s MSJ, Declaration of Angela McDonald ("McDonald Decl.") at 3.

he did.  Pl.'s Opp'n at 11.  He argues that he "received the lowest award in his department," even though "each member of the department received the same 'pass' rating."  Id.  Although a plaintiff can make out a case for discrimination where employees of a different race, sex, or religion are treated differently, he must show that the other employees were similarly situated. See, e.g., Brady, 520 F.3d at 495; McGill v. Munoz, 203 F.3d 843, 848 (D.C. Cir. 2000).  NASA produced a list of the performance awards given to individuals in the Office of Education in 1998.  See Ex. A to Def.'s Reply to Pl.'s Opp'n ("Def.'s Reply") (Declaration of Fred A. Johnson and Chart of 1998 Performance Award Information).  The list provides each individual's name, performance award amount, race, sex, age, and rating.  The list contains no information, however, about the individuals' job titles, supervisors, responsibilities, or employment situations, and Nurriddin fails to provide such information.  Without it, he fails to show that these individuals were similarly situated.  See Holbrook, 196 F.3d at 261 (requiring that a plaintiff "demonstrate that all of the relevant aspects of [his] employment situation were nearly identical to those [he seeks to use as comparators]").  Moreover, the list does not suggest that NASA treated others differently based on race or sex: other employees of Nurriddin's race and sex received higher awards than he did.  The simple fact that other employees were awarded larger performance awards, without more, does not give rise to an inference of discrimination.  See Waterhouse v. District of Columbia, 298 F.3d 989, 995 (D.C. Cir. 2002) ("courts are without authority to second-guess an employer's personnel decision absent demonstrably discriminatory motive").

Nurriddin also fails to rebut NASA's legitimate, nondiscriminatory and nonretaliatory explanation for not awarding him a higher performance award: he was not qualified based on his performance.  Instead, he rehashes his argument about why he believes the performance

evaluation suffered from improper considerations. Pl.'s Opp'n at 11. But he fails to address NASA's evidence of his work performance problems and does not otherwise show that he was qualified for a greater performance award. Nurriddin also does not offer any other evidence to show that discrimination or retaliation played any role in the amount that NASA awarded him in 1998. Without more, he fails to present evidence sufficient for a reasonable jury to find that NASA's nondiscriminatory and nonretaliatory explanation for granting him an $800 performance award is pretextual.

### 3.    Denial of a Performance Award in 1998-1999

Nurriddin next claims that he suffered discrimination and retaliation when he was denied an award for the 1998-1999 performance evaluation period. NASA does not dispute that it did not grant Nurriddin a performance award, but denies that discrimination or retaliation played a role in its decision.

#### A.  Discrimination

The record does not contain a 1998-1999 performance evaluation of Nurriddin so it is unclear whether he was eligible for an award. Drawing every inference in his favor, because he was eligible for an award in prior years, the Court will assume that he was eligible for some sort of performance award in 1998-1999. Therefore, because NASA did not grant him any performance award at all, there is an adverse action here. See, e.g., Douglas, 559 F.3d at 552-53 (holding that "the denial of even a purely discretionary bonus can be actionable"). Nurriddin has not, however, offered any evidence, such as information about comparators' ratings and awards, that would support an "inference of discrimination."[11] See Wiley, 511 F.3d at 155. Nor has he

---

[11] Nurriddin submits a chart titled "Proposed FE Awards FY 99," which purportedly lists the "proposed" awards to several NASA employees, including Nurriddin, in 1999. See Ex. 18 to Pl.'s Opp'n, Proposed FE Award FY 99 Chart (sealed). He fails, however, to provide any description of how the chart was made or who made it, nor any affidavit confirming its reliability. The Court will not consider information of such an indeterminate origin. See

cited evidence to rebut NASA's nondiscriminatory explanation for not awarding him a performance award.

NASA explains that it did not award Nurriddin a performance award in 1998-1999 because he had been out of the office for the vast majority of that time period[12] and his performance did not warrant an award.  Def.'s MSJ at 21; Ex. 11 to Def.'s MSJ, Affidavit of Malcom Phelps ¶ 28; McGee Aff. ¶ 15.  McGee stated that Nurriddin had been on leave for "a significant part of the time from August 1998 through January 1999, then went on detail in February 1999 for a year. . . . So in management's estimation, there was no 'performance' that justifies an award."  McGee Aff. ¶ 15.  Moreover, NASA presented evidence documenting Nurriddin's performance problems during the time that he was not on detail and was working in NASA's office: in August 1998, he received an official reprimand for "failure to follow procedures concerning conference attendance and failure to follow directions"; in September 1998, he received an official reprimand concerning "his attendance, the need to provide medical documentation when citing illness as a reason for absence, and failure to communicate when at work" and he was separately warned about his failure to communicate with his supervisors and to complete work on time; and in October 1998, he received an official reprimand for "his attendance problems and failure to follow leave procedures."  Def.'s MSJ at 19-20 n. 7 (citing 8/26/98 Official Reprimand; 9/16/98 Official Reprimand; Ex. 14 to Def.'s MSJ, Sept. 15, 1998 Email from Phelps to Nurriddin; 10/30/98 Official Reprimand).  An employee's poor job performance is a well-established nondiscriminatory justification for an adverse employment action.  See, e.g., Waterhouse, 298 F.3d at 993; Nichols v. Billington, 402 F. Supp. 2d 48, 73 (D.D.C. 2005).  Furthermore, NASA asserts that "if a detail agency funds . . . an award for [a]

Brown, 674 F. Supp. 2d at 188 (a Title VII plaintiff is not relieved of his obligation to support his allegations with competent evidence).

[12] The period under review was July 1998 to June 1999.  Def.'s Stmt. ¶ 11.

NASA employee for work done on detail[,] the NASA employee will receive such an award," but here Nurriddin's detail agency, the National Science Foundation ("NSF"), did not make a cash award to Nurriddin and did not recommend to NASA that he receive an award. Def.'s MSJ at 21 (citing Ex. 47 to Def.'s MSJ, June 30, 1999 Letter from NSF to Phelps ("6/30/99 Letter from NSF to Phelps")).

Nurriddin responds that other employees on detail received performance awards, but he fails to cite any particular person—let alone a similarly situated comparator—who received an award. Pl.'s Resp. ¶ 11. He cites only NASA's response to interrogatories admitting that "[o]ther NASA managers received performance awards while on detail." Id. (citing Ex. 2 to Pl.'s Opp'n, Def.'s Response to Interrogatories ¶ 119). This point, however, is not in dispute. NASA has stated that if a detail agency provides funds for an award, that award will be provided to the employee. Here, although NSF reported positively on Nurriddin's performance during his detail, there is no evidence that NSF offered to fund an award for him. See 6/30/99 Letter from NSF to Phelps.

Nurriddin does not dispute that he was out of the office for a significant portion of the year, that he had performance issues while he was in the office, or that NSF failed to fund an award for him, and he provides no evidence that NASA's explanation for not awarding him a performance award was a pretext for discrimination. Hence, he fails to meet his burden of producing evidence from which a reasonable jury could conclude that NASA unlawfully discriminated against him. See Aka, 156 F.3d at 1290.

### B. Retaliation

Nurriddin also alleges that the lack of a performance award was retaliatory, but he does not attempt to connect the lack of a performance award to any protected activity. See Forman,

271 F.3d at 299 (requiring that, for a prima facie case of retaliation, plaintiff show a causal connection existed between a protected activity and the adverse action). Instead, Nurriddin cites a November 1998 email purportedly showing that NASA "attempted to withhold approval of Mr. Nurriddin's NSF detail unless Mr. Nurriddin dropped his EEO complaints against NASA." Pl.'s Opp'n at 16 (citing Ex. 19 to Pl.'s Opp'n, Nov. 3, 1998 Email Chain Between Paulette Quinn and Phelps ("11/3/98 Email Chain")).[13, 14] This email does not, on its face, have any relation to NASA's decision not to give him a performance award in 1998-1999—which happened approximately eight months later—and Nurriddin fails to offer any connection. See Jones, 557 F.3d at 677 (requiring plaintiff to show a causal link between a protected activity and alleged adverse action to make out a prima face case for retaliation); Wiley, 511 F.3d at 155 (same); Bolden, 2002 WL 1364275 at * 1 (same). Because he fails to show how NASA's decision not to give him a performance award is causally connected to any protected activity, Nurriddin fails to make out a prima facie case.

Nurriddin also fails to offer evidence to dispute NASA's explanation for not granting him a performance award: that he had performance problems during the limited period of time in 1998-1999 that he was at NASA, that his extended absences resulted in essentially no performance for NASA to reward, and that his detail agency failed to fund an award for him. Nor does he provide any evidence to support a retaliatory motive behind NASA's decision not to give him a performance award. Ultimately, he fails to produce "sufficient evidence that would discredit [NASA's nonretaliatory] reasons and show that the actions were retaliatory." See

_____

[13] Nurriddin's exhibit is an email chain between Paulette Quinn, whose role at NASA is not identified, and Phelps. In a discussion about Nurriddin's request for a detail, Quinn or Phelps, it is not clear from the email, states that "From our last meeting[,] I think Code G's response is that the detail is subject to some conditions[,] such as resolution of the EEO complaints." 11/3/98 Email Chain.

[14] Nurriddin was, however, granted a detail assignment, and there is no indication in his briefs that he dropped any of his EEO complaints.

Baloch, 550 F.3d at 1200 (upholding grant of summary judgment for employer where employee failed to produce sufficient evidence to show employer's reasons were "so ill-justified as to allow a jury to conclude that they were not the actual reasons and that he suffered retaliation for his discrimination complaints").

### 4.     Denial of Travel Requests to Minority Conferences in 1998

Nurriddin claims that NASA retaliated against him when it denied his request for travel to conferences on November 17, 1998, and on December 1, 1998, 2d Am. Compl. ¶ 84, but he does not identify which supervisors denied these travel requests.  The record shows that McGee denied a travel request on or around November 11, 1998, but the parties do not cite anything in the record explaining who allegedly denied Nurriddin's request for travel in December 1998.  See Ex. 50 to Def.'s MSJ, EEO Counselor's Report of McGee Interview ("EEO Report of McGee Interview").  The Court has already determined that the denial of requests to travel to conferences does not make out an adverse action for a prima facie case of discrimination.  See Dec. 4, 2009 Mem. Op. at 34-35; see also Nurriddin I, 382 F. Supp. 2d at 101-03.  The remaining issue is whether Nurriddin presents a viable claim for retaliation.

Again, a materially adverse action for a retaliation claim is one which would "'dissuade a reasonable worker from making or supporting a charge of discrimination.'"  Burlington Northern, 548 U.S. at 68 (quoting Rochen, 438 F.3d at 1219).  When this Court decided NASA's earlier, pre-discovery motion to dismiss, it held that NASA's denial of Nurriddin's travel requests was likely temporally connected to some aspect of Nurriddin's extensive EEO activity and that the denial could, when considered along with Nurriddin's other alleged events, have a "combined effect" of dissuading a reasonable worker from making or supporting a charge of discrimination.

See Dec. 4, 2009 Mem. Op. at 38-39. With a more complete record before it, the Court will now reexamine Nurriddin's retaliation claim.

NASA contends that the denial of travel requests would not dissuade a reasonable worker from making or supporting a charge of discrimination and that it did not dissuade Nurriddin from bringing charges of discrimination and retaliation. Def.'s MSJ at 26. The Court agrees. Previously, the Court used Nurriddin's other allegations—such as the alleged unlawful denial of a promotion and of performance awards—as context to support the proposition that a denial of travel requests could be an adverse action. See Dec. 4, 2009 Mem. Op. at 38-39. Now, based on the Court's assessment of those issues, that context no longer exists. And Nurriddin has not proffered any evidence to otherwise show that the denial was an "injury or harm" that could dissuade a reasonable worker from making or supporting charges of discrimination. Burlington Northern, 548 U.S. at 67. On these facts, then, the Court cannot conclude that the denial of travel requests represent an adverse action.

In any event, moreover, Nurriddin has not offered any evidence to rebut NASA's proffered legitimate, nonretaliatory explanation. NASA maintains that it denied Nurriddin's request for travel because of his "failure to complete assignments and [to] request permission from the appropriate supervisors." Def.'s MSJ at 28. NASA asserts specifically that McGee "denied [Nurriddin]'s November 17, 1998 travel request because [Nurriddin] had not yet prepared a performance plan 'despite repeated efforts by Dr. Phelps to schedule a meeting with him on it' and because it appeared that [Nurriddin] had deliberately avoided asking Dr. Phelps, his first line supervisor, for approval to travel." Def.'s MSJ at 27 (quoting EEO Report of McGee Interview). Nurriddin does not produce evidence showing that he properly requested travel or that he had completed the work necessary to engage in the travel requested. He

responds only by citing the alleged statements made to him by Owens and Phelps. Pl.'s Opp'n at 15. Nurriddin does not explain how these alleged statements are evidence that McGee's denial of his travel request in November 1998 was retaliatory. And because Nurriddin does not provide information about who allegedly denied his travel request in December, there is also no obvious connection between the alleged statements by Phelps and Owens and the December travel request denial.

Nurriddin has neither shown that the denial of travel requests was an adverse action nor provided evidence for a rational fact-finder to conclude that NASA's explanation for the denial of his travel requests is a pretext for retaliation. Hence, this claim, too, fails.

**5. Designation as AWOL for 59 Days in 2000**

Nurriddin alleges that he suffered from discrimination and retaliation when he was temporarily listed as AWOL from September 12, 2000, through December 1, 2000. 2d Am. Compl. ¶ 121. NASA does not dispute, though it might have, that being designated AWOL constitutes an adverse employment action. Compare Ware v. Billington, 344 F. Supp. 2d 63, 77 (D.D.C. 2004) (holding that designation as AWOL constituted an adverse action), with Brown v. Snow, 407 F. Supp. 2d 61, 65 (D.D.C. 2005) (holding that designation as AWOL did not constitute an adverse action). NASA instead provides a legitimate nondiscriminatory and nonretaliatory reason for placing Nurriddin on AWOL status.

At the outset, the Court notes that Nurriddin provides no evidence that raises an inference of discrimination. He also has not introduced any evidence that the AWOL designation was in retaliation for any protected activity. Nurriddin contends only—quite generally—that the decision to designate him AWOL was based on "discriminatory and retaliatory animus." Pl.'s Opp'n at 17. Without more, however, he does not make out a prima facie case for retaliation or

discrimination.  See Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999) (explaining that plaintiff bears the burden of establishing a prima facie case under McDonnell Douglas by a preponderance of the evidence).

NASA's nondiscriminatory and nonretaliatory reason for Nurriddin's designation as AWOL is that it was the appropriate determination based on his behavior.  Def.'s MSJ at 12-13. As recounted earlier, in April 2000 Nurriddin left NASA to take medical leave, and on April 12, 2000, Phelps sent Nurriddin a memorandum stating that he had failed to provide sufficient medical documentation for his leave requests.  Def.'s Stmt. ¶¶ 12, 15; 4/12/00 Memo from Phelps to Nurriddin (requesting that Nurriddin provide a letter from a "medical physician or practitioner" with specific information, such as Nurriddin's diagnosis, prognosis, and "an explanation of the impact of the medical condition on overall health and activities").  Phelps sent another memorandum to Nurriddin on June 15, 2000, stating that he had failed to provide sufficient medical documentation for his leave requests, and requesting the same medical documentation as requested by the April 2000 memorandum.  See 6/15/00 Memo from Phelps to Nurriddin.  On July 6, 2000, "NASA noted that [Nurriddin] hadn't 'made any attempt even to request leave in a month; he has apparently refused to provide any medical documentation in support of his most recent absences, much less acceptable documentation.'"  Def.'s Stmt. ¶ 15 (quoting 7/6/00 Email Chain).  From September 12, 2000, through December 1, 2000, Nurriddin was designated AWOL.  2d Am. Compl. ¶ 121.  At some point, he exhausted his leave and requested advance sick leave.  On September 26, 2000, Phelps sent Nurriddin a letter denying his request for several reasons: he had been out of the office for over 1,000 hours since his return from detail, he had failed to complete assignments, he had "fail[ed] to live up to [his] commitments concerning [his] return to work," and "we are not confident that you will return to

work for a long enough period to repay the advance leave." 9/26/00 Letter from Phelps to Nurriddin. Also on September 26, 2000, Nurriddin's doctor, John Echeverry, sent a letter to Phelps recommending that Nurriddin be permanently transferred away from Phelps' supervision to an environment where "confrontations or incidents are non-existent," but failing to provide the requested medical information. 9/26/00 Letter from Echeverry to Phelps (sealed).

NASA explains that designation as AWOL "is an appropriate status for employees who fail to provide proper medical documentation for extended sick leave from the office." Def.'s MSJ at 12 (citing 5 C.F.R. § 630.1208(I)). By September 2000, Nurriddin had been out of the office for several months on sick leave, had failed to provide the requested medical documentation, and had asked for advance sick leave because he had exhausted his earlier sick leave. Def.'s Reply [ECF No. 217-1] at 12. NASA asserts that Phelps' explanation for denying Nurriddin's leave request and placing him on AWOL was therefore appropriate. Id. Indeed, NASA's explanation for its actions is legitimate and nondiscriminatory. See, e.g., Ware, 344 F. Supp. 2d at 84 (explaining that Title VII plaintiff's failure to submit proper medical documentation was a legitimate, nondiscriminatory explanation for designating plaintiff AWOL).

NASA supports its explanation with evidence in the record. The then-operative NASA regulation stated that advance sick leave had to be approved by the employee's supervisor and the Director of Human Resources, with the maximum amount granted being 30 days (240 hours), and could be "used only for the specific illness or injury for the specific time period for which it is approved." Def.'s Reply at 12 (citing Ex. B. to Def.'s Reply, NASA Headquarters: Time, Attendance, and Leave Reporting Guide). There is no evidence that Nurriddin's supervisors failed to follow this regulation.

Moreover, the record demonstrates that Nurriddin was out of the office on sick leave for an extended period of time and that he had failed to provide the requested medical documentation to support his leave from September to December 2000. NASA acknowledges that it received a letter from Echeverry in September 2000 on behalf of Nurriddin, but states that the letter was insufficient medical documentation because "it did not state a prognosis, gave no useful information for minimizing or addressing [Nurriddin]'s ills, and did not set out a timeline for [Nurriddin]'s return." Def.'s Reply at 15 (citing 9/26/00 Letter from Echeverry to Phelps (sealed)). Phelps had consistently told Nurriddin what medical information was needed for sick leave approval, but this letter did not contain that information. See, e.g., 4/12/00 Memo from Phelps to Nurriddin; 6/15/00 Memo from Phelps to Nurriddin.

Several emails in the record establish that other individuals besides Nurriddin's supervisors recommended that he be placed on AWOL based on his failure to provide appropriate medical documentation. See 7/6/00 Email Chain (a NASA employee states that Nurriddin "hasn't made any attempt even to request leave in a month; he has apparently refused to provide any medical documentation in support of his most recent absences, much less acceptable documents; and the last two submissions we got from him, from two different doctors, both said that he's fit for work. . . . [W]e should . . . put him on AWOL."); Ex. 43 to Def.' s MSJ, July 18, 2000 Email Chain (Hillard Harrison, an Employee Relations Specialist, states that "it seems to me that since [Nurriddin] has not complied with directions to request leave and has not provided the required acceptable documentation, that it would be legitimate to place him on AWOL").

Nurriddin does not dispute that the NASA guidelines did not allow advance sick leave of more than 30 days and required the approval of both his supervisor and the director of Human

Resources. He also "does not dispute that NASA communicated concerns with his taking of leave and the need for medical documentation, but he disputes that his leave was not supported by proper medical documentation." Pl.'s Resp. ¶ 13. He states that he provided the agency with "detailed medical documentation throughout 2000, which the agency either discounted or ignored." Pl.'s Opp'n at 17; Pl.'s Resp. ¶¶ 12-15.

To support his argument, Nurriddin cites the medical documents he provided to NASA. Pl.'s Resp. ¶ 13. None of these documents, however, were provided during the September to December 2000 period in question or contain the requested medical documentation. Id. (citing Ex. 19 to Def.'s MSJ, April 11, 2001 Letter from OWCP to Human Resources ("4/11/01 Letter from OWCP to HR"); Ex. 20 to Pl.'s Opp'n, June 14, 2000 Letter from Echeverry to Hurey (sealed) ("6/14/00 Letter from Echeverry to Hurey"); Ex. 21 to Pl.'s Opp'n, April 27, 2000 Letter from Human Resources to NASA Headquarters Health Unit ("4/27/00 Letter from HR to NASA HQ Health Unit")). Nurriddin first cites an April 2001 letter to Human Resources from OWCP informing Human Resources that OWCP had accepted his claim for disability. Id. This letter was written several months after the period in question and thus cannot support Nurriddin's argument that he submitted proper medical document before or during the September to December 2000 period in question. See 4/11/01 Letter from OWCP to HR. He next cites a June 2000 letter from Echeverry to Denise Hurey, whose role at NASA is not identified. See 6/14/00 Letter from Echeverry to Hurey (sealed). The letter simply states that Nurriddin is under Echeverry's care, that it "is difficult for [Echeverry] to accurately assess at this point" how long Nurriddin "may have to be away from work," and that "[Nurriddin] would require some special accommodations once he returns to work." Id. This letter fails to provide the information requested by Phelps in his memoranda to Nurriddin. Nurriddin last cites an April 27, 2000 letter

from Human Resources to NASA Headquarters Health Unit, which discusses Nurriddin's request for medical accommodation, not medical leave. See 4/27/00 Letter from HR to NASA HQ Health Unit. None of these letters, then, show that Nurriddin provided the requested medical documentation to Phelps.

Nurriddin also claims that "the sufficiency of Mr. Nurriddin's documentation is a disputed issue that precludes summary judgment," because "deposition testimony establishes that the agency committed the question of 'sufficiency' wholly to Mr. Nurriddin's supervisors, without any governing policies dictating whether to approve or deny the request." Pl.'s Opp'n at 17; Pl.'s MSJ at 30. Certainly, "an employer's failure to follow its own internal employment procedures can constitute evidence of pretext," Rudin v. Lincoln Land Community College, 420 F.3d 712, 727 (7th Cir. 2005), but Nurriddin has not identified any NASA policy that would have required NASA to accept his deficient medical documentation. Moreover, NASA has established that it repeatedly requested Nurriddin to provide specific documentation, and Nurriddin has not shown that he provided such documentation.

Ultimately, Nurriddin fails to carry his burden. He does not rebut NASA's explanation for designating him AWOL from September to December 2000, and he fails to otherwise provide evidence of discrimination or retaliation. Failure to comply with an employer's attendance policy constitutes a nonretaliatory and nondiscriminatory ground for an adverse employment decision. See Lewis v. Holsum of Fort Wayne, Inc., 278 F.3d 706, 709, 711 (7th Cir. 2002); see also Adeyemi, 525 F.3d at 1227 (stating that the Court is not "a super-personnel department that reexamines an entity's business decisions"). Nurriddin does not offer evidence that would permit a reasonable juror to find that NASA's proffered justifications were pretext for retaliation for protected activity or for discrimination based on his race, sex, or religion.

6. **Denial of Donated Leave**

In June 2000, Nurriddin was accepted into the Voluntary Leave Transfer Program, through which he was eligible to receive donated annual leave from other federal officers and employees. He argues that he suffered discrimination and retaliation because NASA denied him access to donated leave. Pl.'s Opp'n at 17-18. A denial of leave can constitute an adverse action. See, e.g., Hyson v. Architect of Capitol, 902 F. Supp. 2d 84, 103 (D.D.C. 2011); Diggs v. Potter, 700 F. Supp. 2d 20, 43 (D.D.C. 2010). NASA's proffered nondiscriminatory and nonretaliatory explanation, however, is that it credited to Nurriddin all the donated leave to which he was entitled—so Nurriddin was never denied any leave. Def.'s MSJ at 17-18. A declaration by a Human Resources Specialist at NASA confirms that Nurriddin "received 737.5 hours of donated leave, which is all of what [the] leave donated from other Federal employees available for him amounted to." McDonald Decl. ¶ 6.

Nurriddin fails to rebut NASA's explanation or to cite any evidence of discriminatory or retaliatory animus. First, he argues that "the agency used its incorrect decision to brand Mr. Nurriddin as AWOL as a pretextual reason to deny him his rightful leave." Pl.'s Opp'n at 17. Nurriddin does not cite any evidence, however, showing that he was denied any donated leave. Moreover, as already stated, he has not shown that he was improperly designated AWOL, and he does not dispute that "[a]n individual who is in an unapproved leave status is not eligible for leave transfer." Def.'s MSJ at 18 (citing Ex. 44, Deposition of Hillard Harrison at 128:3-8).

Nurriddin also cites various statements made by NASA employees during different time periods about the amount of leave that had been donated to and used by Nurriddin in an apparent attempt to make NASA recordkeeping look suspicious. Pl.'s Resp. ¶ 17 ("NASA's records on this issue are all over the map"). The cited statements, however, do not appear inconsistent or

suspicious. They show that 737.5 hours were donated to Nurriddin overall, 680 hours of leave were donated between June 19, 2000, and January 12, 2001, and 453.5 hours of leave were used by Nurriddin between December 3, 2000, and March 10, 2001. Pl.'s Resp. ¶ 17. Nothing about these numbers is obviously suspect, as Nurriddin suggests. To the extent he sees a problem with these numbers, he fails to explain it.

Although there is no evidence in the record that NASA denied any transfers of donated leave to Nurriddin, the record does show a single instance where 40 hours donated by another employee took several months to be credited to him. See McDonald Decl. ¶¶ 3-4 and page 4 (record showing that donation form was signed in October 2000 and that the hours were credited in March 2001). The record also shows that Human Resources was responsible for crediting donated time, and thus was presumably responsible for any delay in that process. Id. (record showing donated leave form handled by Human Resources). Nothing indicates that Nurriddin's supervisors were, or could have been, involved in this process, and Nurriddin cites no evidence that would support an inference of discrimination or retaliation on the part of Human Resources. See Evans v. Sebelius, 716 F.3d 617, 623 (D.C. Cir. 2013) (stating that "[a]lthough [plaintiff] contends that [the alleged adverse action] was procedurally flawed . . . , []he must still provide sufficient evidence that the government's proffered explanation is pretext for racial[, sex, or religious] discrimination [or retaliation]").

Nurriddin fails to show that he was denied any donated leave and fails to offer any evidence from which a reasonable jury could infer pretext for discrimination or retaliation from NASA's processing of donated leave. Hence, this claim, too, fails.

## 7.    Denial of Timely "Within Grade Increase"

"Within-grade increases (WGIs) or step increases are periodic increases in a [General Schedule (GS)] employee's rate of basic pay from one step of the grade of his or her position to the next higher step of that grade."  Def.'s MSJ at 22 (alterations in original); see also 5 U.S.C. § 5335.  "Federal employees are required to complete certain amounts of calendar weeks in service in order to advance in steps up the pay grade."  Id. (citing 5 U.S.C. § 5335).  "An employee earns a WGI upon completion of calendar weeks in service as long as the employee performed 'at an acceptable level of competence.'"  Id. (citing 5 U.S.C. § 5335(a)(3)(B)).  The parties do not present arguments about whether a denial of a timely WGI is an adverse action.  The Court will assume it is, because a denial of a timely WGI would affect an employee's salary.  See Baloch, 550 F.3d at 1199 (an adverse action "affect[s] [the employee's] position, grade level, salary, or promotion opportunities").  Here, Nurriddin argues that he was a victim of discrimination and retaliation when NASA denied him a "within-grade pay increase [from GS-13 step 4 to GS-13 step 5] in 2000; [and] instead . . . deferred the increase to 2001."  Pl.'s Opp'n at 19.  NASA counters that Nurriddin was not due a within grade increase in 2000.  Def.'s MSJ at 22.  "NASA's records indicate that [Nurriddin] received his within grade increase effective upon the date which was compliant with federal policies."  Id.  The parties do not dispute that Nurriddin moved from a GS-13 step 4 to a GS-13 step 5 in 2001.

### A.  Discrimination

NASA explains that Nurriddin received a WGI in 2001, rather than in 2000, because he had not accumulated the necessary weeks of service until 2001.  Def.'s MSJ at 22.  As recounted above, federal employees are required to complete a certain number of calendar weeks in service in order to advance in steps up the pay grade.  Here, NASA contends, Human Resources

correctly determined Nurriddin's date to receive his WGI. NASA cites a declaration from a Human Resources Specialist at NASA, which states that NASA records show that Nurriddin received a WGI on December 1, 2001, with the annotation "effective date adjusted due to 540 LWOP (leave without pay) GS-13 step 5."[15] McDonald Decl. at 3. Another Human Resources employee confirmed that "individuals on [leave without pay] status have their eligibility for a [WGI] delayed. You have to be in grade and on duty for a certain period of time in order to receive [WGI]. [Leave without pay] over a certain period of time can delay one's [WGI]." Def.'s MSJ at 24-25; Ex. 55 to Def.'s MSJ, Affidavit of Hillard Mayer Harrison ¶ 14.

Nurriddin responds that because he had met the performance standard of "an acceptable level of competence," see 5 U.S.C. § 5335, "his increase should have been automatic." Pl.'s MSJ at 30 (citing Ex. 4 to Pl.'s MSJ, Determination for Within Grade Increase Form ("WGI Determination Form")). His purported support for this argument, however, actually undermines it. He cites deposition testimony in which a Human Resources employee reiterates that step increases are controlled by law, which requires not only that the employee meet the acceptable level of competence, but also that the employee serve the appropriate period of time in the office. See Ex. 3 to Pl.'s MSJ, Deposition of Inez Hunter 88:6-89:7. And Nurriddin does not dispute that he was out of the office for a significant period in 2000 or argue that NASA's calculations were incorrect. Instead, he argues that "his absences from work in 2000 were not due to independent or unrelated medical issues . . . [but] were a direct result of the treatment [Nurriddin] was experiencing at the hands of Dr. Phelps and others at NASA." Pl.'s Opp'n at 19. Whether Nurriddin's medical issues were caused by his employment, however, is not the

---

[15] There seems to be some confusion about when in 2001 the WGI was actually awarded. The Declaration of Angela McDonald states that NASA records show the WGI was awarded in December 2001, see McDonald Decl. at 3, but an affidavit by Fred Allen Johnson states that the WGI was awarded earlier, in February 2001, see Pl.'s Ex. 35 to Pl.'s Opp'n, Affidavit of Fred Allen Johnson ¶ 11. Because Nurriddin contends only that the WGI should have been awarded in 2000, the specific date in 2001 when it was awarded is not material.

question. The issue here is whether he has shown that NASA's reason for awarding him a WGI in 2001, rather than 2000, is a pretext for discrimination.

NASA's explanation is consistent with the record: Nurriddin simply had not served the required period of time for a WGI until 2001. In response, Nurriddin has not shown that he was entitled to receive a WGI at an earlier time and has failed to present any evidence to otherwise rebut NASA's legitimate, nondiscriminatory explanation for awarding him a WGI in 2001. This claim therefore fails.

### B.  Retaliation

As for Nurriddin's claim that the deferral of the WGI constitutes retaliation, he fails to make out a prima facie case because he does not cite a protected activity for which NASA allegedly retaliated against him. Nonetheless, he speculates that the timing of his WGI was an act of retaliation by his supervisors. Pl.'s Opp'n at 19. He cites to the "Determination for Within Grade Increase" form that Human Resources gave to Phelps, in his role as Nurriddin's supervisor, to fill out. Id. (citing WGI Determination Form). This form gives an employee's supervisor the option to check a box next to the statement "Grant the within grade increase. Employee's performance is at an acceptable level of competence," or to check a box next to the statement "Deny the within grade increase. Employee's performance is not at an acceptable level of competence and your Personnel Management Specialist has been contacted for guidance." WGI Determination Form. Phelps checked the box to deny the WGI, but crossed out the part about the employee's performance not being at an acceptable level of competence, and wrote in: "The employee has not worked in this office long enough in the past year to rate his performance as acceptable." Id. Nurriddin also points to another handwritten note written on the form. It is signed "asm" and states "Malcom, Another opportunity – please return." Id. Nurriddin argues

that the note is from McGee to Phelps, and characterizes it as "a comment which can be fairly interpreted as meaning 'another opportunity to take action against Mr. Nurriddin.'" Pl.'s Opp'n at 19. Nurriddin offers no additional information to support his speculative characterization of the note. His argument, then, is that McGee and Phelps purposely denied his WGI as a form of retaliation, as evidenced by the notes written on his "Determination for Within Grade Increase" form.

Whatever the meaning of the notes on the "Determination for Within Grade Increase" form, Human Resources has testified that Nurriddin's supervisors, McGee and Phelps, were not responsible for deciding when to award Nurriddin a WGI, and Nurriddin offers no basis to dispute that fact. A Human Resources employee testified that the "Determination for Within Grade Increase" form "is not the trigger that would or would not deny the within grade [increase]." Ex. 48 to Def.'s MSJ, Deposition of Inez Hunter at 98:18-21. Rather, as long as an employee's performance was rated as "acceptable," the employee would automatically receive their WGI when they had completed the requisite amount of time, as determined by Human Resources. Id. at 89:1-11 ("[The WGI] will happen automatically unless the Agency stops it, and the only way the Agency can stop it is if the employee has a rating of less than fully successful or they have not served that period, but the system itself – management wouldn't make the determination for the period. The system will make that determination . . . [Management only has an influence] [i]f an employee is less than fully successful."). Here, Phelps crossed out the option that rated Nurriddin's performance as "not at an acceptable level of performance," and wrote in his own note about Nurriddin's absence from the office. But the "Determination for Within Grade Increase" filled out by Phelps would have affected the timing of Nurriddin's WGI only if he had stated that Nurriddin was not at "an acceptable level of

competence." See id.; see also Ex. 54 to Def.'s MSJ, Deposition of Dorothy Egbert ("Malcolm Phelps['s] check[] on this form was null because the within grade was not due yet.").

Moreover, even if Phelps was responsible for delaying Nurriddin's WGI because of his annotation on the WGI form, the annotation was made for a legitimate reason: Nurriddin had in fact not been in the office "long enough in the past year to rate his performance as acceptable." WGI Determination Form. Nurriddin does not dispute his absences or NASA's calculations of them. Without more, the content of Phelps' annotation is not sufficient to support a claim of retaliation. Nurriddin's only remaining support for his retaliation claim is his speculation about the meaning of the note signed "asm," which is insufficient to avoid summary judgment. See Brown, 199 F.3d at 458-59 (holding speculation insufficient to avoid summary judgment); McGill, 203 F.3d at 846-47 (same).

Ultimately, Nurriddin was awarded a WGI when NASA determined that he had served the appropriate period of time. See McDonald Decl. at 3 (stating that NASA records show that Nurriddin received a WGI in 2001, with the annotation "effective date adjusted due to 540 LWOP (leave without pay) GS-13 step 5"). Nurriddin has not provided evidence to show otherwise, and he fails to present any evidence to show that the decision as to when to grant him a WGI was the result of retaliation for protected activity.

### 8. Wrongful Termination

After being on fairly consistent medical leave since April 2000, Nurriddin was terminated from his position in 2004. Def.'s Stmt. ¶ 28. The termination letter sent to him explained that he was terminated because he was "'medically unable to perform [his] duties' and because his termination was 'necessary in order to promote the efficiency of the service.'" Def.'s MSJ at 28 (citing Ex. 1 to Def.'s MSJ, Jan. 28, 2004 Letter from Diaz to Nurriddin).

*A. Discrimination*

Unsurprisingly, termination is typically considered "a significant change in employment status" that constitutes an adverse employment action. See, e.g., Douglas, 559 F.3d at 552; Nuskey v. Hochberg, 657 F. Supp. 2d 47, 57 (D.D.C. 2009) ("It goes without saying that being fired from one's job is an adverse employment action."). NASA argues that Nurriddin's termination was not an adverse action, however, because it "was not a change in his employment status or a change in his benefits because [he] was not working at the time and continues to receive, tax-free, workers' compensation in the amount of three-quarters of his NASA salary." Def.'s MSJ at 39. To illustrate its point, NASA explains that Nurriddin "was already out of the office receiving workers' compensation and in 2004 he was medically unable to return to a job at NASA in any capacity . . . Today, [Nurriddin] is still medically unable to return to NASA and he still is receiving workers' compensation." Id.

Nurriddin responds by asserting that "the gap between his workers' compensation payments and the compensation and benefits Mr. Nurriddin would have received had he been properly re-employed" shows a significant change in his employment status. Pl.'s Opp'n at 22. There is no reason, though, to compare Nurriddin's position post-termination to a hypothetical position "had [Nurriddin] been properly re-employed." Instead, the Court can (and should) simply compare Nurriddin's status before termination to his status after termination to determine if there was "a significant change in employment status." Douglas, 559 F.3d at 552. Although NASA is correct that the termination does not affect Nurriddin's current form of income (workers' compensation), the termination clearly affects "the terms, conditions, or privileges of [his] employment" because Nurriddin is no longer employed. See Forkkio, 306 F.3d at 1131. Hence, Nurriddin no longer has the option to voluntarily return to his former position (however

unlikely it would be that he would choose to do so or be medically able to do so). That option existed before termination, and that option no longer exists. Accordingly, the termination affected "the terms, conditions, or privileges of [Nurriddin's] employment," and constitutes an adverse action. Id.

NASA's nondiscriminatory and nonretaliatory reason for its termination of Nurriddin's employment comports with the explanation provided in Nurriddin's termination letter: "[Nurriddin]'s absence of indefinite duration and NASA's need for an employee to work [in his position] constitutes a legitimate, non-discriminatory basis for [Nurriddin]'s termination which occurred roughly four years after he had left NASA [on medical leave]." Def.'s MSJ at 28. NASA asserts that the agency had been reorganized and that "heightened work demands" required Nurriddin's position be filled by someone who could work. Id. at 29. NASA also contends that it performed another job search for Nurriddin in 2003, before his termination, but did not find a suitable position.[16] Id. at 30. Consequently, it became necessary to terminate him so that NASA could fill his "encumbered" position with someone who could do the work. Id. Simply stated, then, because NASA did not know when, if ever, Nurriddin would return, and because it needed to fill his position with "an employee who could work and assist in meeting the increased workload demands of the Education Office," NASA terminated him. Id. "A lengthy absence of indefinite duration, when an employer has a need for an employee who can fulfill the responsibilities of the position, constitutes a legitimate, nondiscriminatory basis for termination."

_____

[16] Nurriddin does not contest that the 2003 job search was performed or that it genuinely resulted in no positions for him; he merely notes that he thinks the search could have been broader. Pl.'s Resp. ¶ 27. Nurriddin does contest the legitimacy of a job search conducted in 2001, id.; Pl.'s Opp'n at 20, but he provides no argument or evidence connecting the 2001 job search to the 2003 job search or to his termination. There is no evidence in the record that the individuals involved in the 2001 job search were involved in the 2003 job search. And Nurriddin does not contest that Fred Johnson alone conducted his job search in 2003 and does not argue that Johnson was somehow influenced by the individuals involved in the 2001 job search. Pl.'s Resp. ¶ 27. Without more, any alleged bias that was involved in the 2001 job search does not automatically transfer to the 2003 job search. See Vickers v. Powell, 493 F.3d 186, 196 (D.C. Cir. 2007) (imputing alleged bias from one official to another is improper without "evidence of influence").

Laurent v. Bureau of Rehab., Inc., 544 F. Supp. 2d 17, 22 (D.D.C. 2008); see also Alexander v. Tomlinson, 507 F. Supp. 2d 2, 18 (D.D.C. 2007) (defendant's proffered explanation for plaintiff's termination—that plaintiff's absence had continued beyond a reasonable period of time and defendant had a need to fill plaintiff's position—was a legitimate nondiscriminatory reason).

In support of its position, NASA introduced a statement from a Human Resources official that

> [i]t is the accepted practice to terminate [an employee] when an employee is on long-term workers' comp and cannot come back to work as determined by OPM and Dept of Labor regulations. This has been done in every case of employees on long-term worker's comp at NASA Headquarters and [Nurriddin] was the only one left in their status who had not already been separated. NASA has a 100% practice of separating employee[]s on long[-]term works comp.

Ex. 31 to Def.'s MSJ, Affidavit of Dorothy Egbert ¶ 8. Nurriddin does not attempt to rebut this statement by pointing to similarly situated employees who were not terminated. Nor does he dispute his lengthy medical absence from work or that there was no indication of when, if ever, he would return to work at NASA. Instead, he maintains that he was medically fit to work. Pl.'s Opp'n at 20. But whether Nurriddin was actually medically fit to work is not material. What is material is whether NASA had a legitimate, nondiscriminatory basis for believing that Nurriddin was not medically fit to perform his work duties. See George, 407 F.3d at 415 ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."). Certainly NASA did. Nurriddin had been on medical leave for nearly four years. Such a lengthy term of medical leave with no indication of a return date is a legitimate basis for NASA to believe that he was medically unable to perform his duties.

Ultimately, Nurriddin puts forward no evidence to show that NASA's explanation for its decision to terminate him based on his medical inability to perform his work duties and the agency's need to have his position unencumbered was pretext for discrimination. Nurriddin may

believe his termination was unfair, but that is not enough to show the decision was based on race, sex, or religion.  See Waterhouse, 298 F.3d at 995 ("[C]ourts are without authority to second-guess an employer's personnel decision absent demonstrably discriminatory motive.").  No evidence demonstrates that Nurriddin was the victim of unlawful bias.

### B.  Retaliation

Likewise, Nurriddin fails to present any evidence of retaliation in the process of his termination or on the part of the individuals responsible for his termination.  Instead, he simply cites the proximity in time between his termination and a "critical filing" in his former action against NASA.  But that is not sufficient to show pretext.[17]  See Woodruff, 482 F.3d at 530 ("positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine"); Butler v. Dist. of Columbia Housing Fin. Agency, 593 F. Supp. 2d 61, 67 n. 13 (D.D.C. 2009) (employee "cannot rely on temporal proximity alone to establish pretext; he must point to additional evidence").  Nurriddin offers no reason why Houston, who proposed Nurriddin's termination, or Diaz, who made the decision to terminate Nurriddin, would want to retaliate against him.  None of Nurriddin's prior complaints of disparate treatment concerned Diaz or Houston.  See Pl.'s List.  Houston had never even met Nurriddin before his termination, Pl.'s Resp. ¶ 26 ("[Nurriddin] does not dispute . . . that Dr. Houston had never met Mr. Nurriddin at the time of Mr. Nurriddin's termination"), and there is no indication in the record that Diaz and Nurriddin had ever interacted before his termination.  Moreover, both Diaz and Houston stated that they were not influenced by anyone while making

---

[17] Although close proximity in time may establish a causal connection to make out a prima facie case of retaliation, more is required to establish pretext.  Compare Holcomb v. Powell, 433 F.3d 889, 903 (D.C. Cir. 2006) (a causal connection for a prima facie retaliation case can be established by showing that "the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity") with Woodruff, 482 F.3d at 530 ("If temporal proximity sufficed to rebut a legitimate proffer [of a nonretaliatory explanation], then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim.").

their decisions. Diaz Aff. at ¶ 2 ("I alone made the termination decision. I based my decision on the proposal for termination submitted to me by Dr. Houston and the record provided to me by Dorothy Egbert in NASA Headquarters Human Resources."); Ex. 29 to Def.'s MSJ, Affidavit of Clifford W. Houston at ¶ 8 ("I was not told or instructed by anyone to make the decision to propose [Nurriddin's] removal."). Nurriddin offers no evidence to counter these statements.

Nurriddin points out that Houston and Diaz were aware of his prior EEO activity. Pl.'s Resp. ¶¶ 26 ("Dr. Houston concedes that he was aware of Mr. Nurriddin's EEO activity"), 28 ("[Diaz] acknowledges that her decision [to terminate Nurriddin] was based on the record provided to her by NASA's human-resources department, including NASA's long-standing EEO and OWCP disputes with Mr. Nurriddin"). Nurriddin provides no reason, however, why access to his personnel file containing his EEO history—which seems reasonable in a situation where supervisors are considering whether to terminate an employee—would make Houston and Diaz want to retaliate against him. It is not enough that Houston and Diaz were simply aware of Nurriddin's EEO activity. In <u>Vickers</u>, the D.C. Circuit found no triable issue of fact where the plaintiff "failed to provide any evidence" as to why the person who ultimately made the decision to terminate her "might have wanted to see her removed." 493 F.3d at 195-96. There, the decisionmaker "was not involved in any of the events that preceded [the plaintiff's] termination, nor did he participate in any of the alleged incidents" that gave rise to the plaintiff's disparate treatment claims. <u>Id.</u> at 196. So, too, here. Both Diaz and Houston have clearly stated that they independently made their respective decisions about Nurriddin's termination, and Nurriddin does not rebut those statements with any evidence. Without more, the Court "cannot see how a reasonable jury might find a retaliatory motive at work in [the terminating officials'] decision. <u>Id.</u>

Again, Nurriddin may feel that it was unfair that he was terminated, but that is not enough to survive summary judgment here.  See Patterson v. Johnson, 505 F.3d 1296, 1300-01 (D.C. Cir. 2007) (noting that "[i]t is not enough for a plaintiff to show that [a] decision was not 'just or fair,'" the plaintiff "must show that it was retaliatory") (internal citation omitted). Nurriddin has failed to rebut NASA's legitimate, nonretaliatory justification for his firing or to present evidence otherwise showing that NASA's explanation was pretextual.

## CONCLUSION

Nurriddin's allegations amply demonstrate that he had a strained and often contentious working relationship with his supervisors at NASA.  What Nurriddin has not shown, however, is that any of the actions taken or decisions made by his employer were motivated by unlawful race-, sex-, or religion-based animus or by his protected conduct.  Hence, no reasonable juror could find that NASA violated Nurriddin's rights under Title VII.

For the foregoing reasons, Nurriddin's partial motion for summary judgment will be denied and NASA's motion for summary judgment will be granted.  A separate Order accompanies this Memorandum Opinion.

                                          /s/
                    _____
                              JOHN D. BATES
                         United States District Judge

Dated:  April 25, 2014